UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

ANDREW ROYER,

     Plaintiff,

     v.                                Case No. 3:22-CV-254 JD

ELKHART CITY OF, et al.,

     Defendants.

## OPINION AND ORDER

On June 21, 2022, Defendants Vicki Becker, the Elkhart County Prosecutor's Office, and the State of Indiana (collectively, the "Moving Defendants") filed a motion for partial dismissal. (DE 45.)[1] For the reasons explained below, the Court will partially grant and partially deny this motion.

### A.    Factual Background

At the motion to dismiss stage, a court construes the complaint in the light most favorable to the plaintiff and accepts the well-pleaded factual allegations as true. *Calderon-Ramirez v. McCament*, 877 F.3d 272, 275 (7th Cir. 2017). Accordingly, while the allegations in the Complaint may not prove to be true, the facts set forth below assume that the Complaint's factual allegations are true and view them in the light most favorable to the Plaintiff, Andrew Royer.

On the morning of November 29, 2002, Helen Sailor, a 94-year-old woman, was discovered dead in her apartment. (DE 1 ¶¶ 35–38.) In 2005, a jury found Andrew Royer guilty

---

[1] The Court notes that multiple defendants did not join this partial motion to dismiss. The City of Elkhart, Carlton Conway, Mark Daggy, Paul Converse, Peggy Snider, Todd Thayer, Michael Sigsbee, Joel Bourdon, Brett Coppins, Dennis Chapman, and Elkhart County were also named as defendants, but are not moving for partial dismissal.

of Sailor's murder. (*Id.* ¶ 233.) According to the Complaint, this verdict was the tragic culmination of police officers in the Elkhart Police Department and a deputy prosecutor fabricating multiple pieces of evidence, including an involuntary confession from Royer, a coerced statement from a corroborating witness, and fingerprint evidence from a witness who held himself out as a former fingerprint analysis with the FBI, but who had never trained with the FBI to conduct latent fingerprint comparisons. (*Id.* ¶¶ 5–12.) This improper evidence ultimately led to Royer spending nearly seventeen years of his life incarcerated for a crime he did not commit. (*Id.* ¶ 239.)

### *(1) Helen Sailor's Murder and the Initial Investigation*

At 5:30 p.m. on November 28, 2002, Larry Converse and his wife dropped Helen Sailor off at the door of the Waterfall Highrise Apartments ("Highrise"). (DE 1 ¶ 35.) That night, Carolyn Hoffer, a certified nursing assistant, called Sailor about ten times between 8:45 p.m. and 9:15 p.m. to remind Sailor she was coming the next morning. (*Id.* ¶ 36.) Sailor failed to answer any of these calls. (*Id.*) The next morning, Hoffer arrived at the Highrise and tried to "buzz" in. (*Id.* ¶ 37.) When Sailor again failed to respond, Hoffer called the Converse family, who arrived at the Highrise with a key. (*Id.* ¶ 38.) After Hoffer and the Converse family entered Sailor's apartment, they found Ms. Sailor's body. (*Id.*)

Defendant Todd Thayer and Detective Hammel of the Elkhart Police Department led the initial investigation into Ms. Sailor's death. (*Id.* ¶ 43.) This investigation produced two viable suspects: Larry Wood and Tony Thomas. (*Id.* ¶ 41.)

Larry Wood lived at the Highrise and initially denied going into Sailor's apartment on the day of the murder. (*Id.* ¶ 43.) Wood later admitted, however, that he may have ridden the elevator with Sailor, walked her to her apartment, and even assisted her inside. (*Id.*) When

Detective Hammel and Defendant Thayer searched Wood's residence, they discovered a reddish substance in his apartment, as well as an oily residue, which were both similar to substances found in Sailor's apartment. (*Id.* ¶¶ 45, 46.) Police also found a blood stain on the inside of Wood's shoe. (*Id.*) When Wood was taken to the Elkhart Police Department on December 12, 2002, for questioning, he "fell to his knees and began to cry" prior to entering the interrogation room. (*Id.* ¶ 49.) Later, Wood also failed a truth verification exam. (*Id.* ¶ 51.)

Tony Thomas was the second viable suspect in the initial investigation. Thomas had previously served more than a decade in prison for murder and had been seen in the Highrise on the day of Sailor's murder. (*Id.* ¶¶ 52, 55.) A number of witnesses placed him in the elevator at the same time as Sailor. (*Id.* ¶ 53.) Witnesses also described Thomas as acting bizarrely that day, saying that he was "suspicious," was poking his head out of the elevator and looking around the hallway, and that he seemed like a disoriented "crack-head." (*Id.* ¶¶ 63, 65.) While an interview with Thomas later took place, and a truth-verification exam was potentially given, no documentation regarding this interview or exam were ever disclosed to the defense. (*Id.* ¶ 67.)

### (2) Elkhart Police Department's First Homicide Unit and Nina Porter's Statement

In August of 2003, the Elkhart Police Department started a homicide unit, which consisted of: (1) Defendant Lt. Paul Converse; (2) Sgt. Bill Wargo; (3) Defendant Det. Peggy Snider; (4) Defendant Det. Mark Daggy; and (5) Defendant Det. Carly Conway. (*Id.* ¶ 69.) The first investigation assigned to them was Sailor's murder. (*Id.* ¶ 70.) Defendant Daggy convinced the head of the homicide unit, Detective Conway, to turn the investigation away from Larry Wood and Tony Thomas to a different individual: Lana Canen. (*Id.* ¶ 77.) Defendant Daggy had previously investigated Ms. Canen for a string of burglaries and suspected that she may have been involved. (*Id.* ¶ 74.)

3

Prior to this point, not a single piece of evidence implicated Royer in the Sailor homicide. (*Id.* ¶ 78.) However, this changed in September of 2003. On September 1, 2003, Nina Porter was pulled over for a traffic stop. (*Id.* ¶ 81.) Lana Canen was in her passenger seat. (*Id.*) Porter was on probation and believed that a violation of her terms of probation could get her sent back into custody. (*Id.* ¶ 81) After the stop, Porter was allowed to go home without even a traffic citation. (*Id.* ¶ 82.) Canen, on the other hand, was arrested and taken into custody. (*Id.*) Even though Porter was initially let go, on September 2, 2003, Detective Conway arrived at Porter's house, told Porter he had a warrant for her arrest, and took her into custody. (*Id.* ¶ 85.)

While in custody, Porter was not questioned about the warrant for her arrest, but was instead questioned extensively by Conway about the Sailor homicide. (*Id.* ¶ 87.) During the interrogation, Conway sat about eight inches away from her, spoke loudly, and fed her details about Sailor's death. (*Id.* ¶ 89.) When Porter said she knew nothing about the murder, Conway threatened to have her children taken away if she did not give a statement. (*Id.* ¶ 90.) Conway then showed Porter photographs of Sailor's deceased body — on the back of the photos, there were phrases written which were meant to serve as cues for Porter's statement. (*Id.* ¶ 91–92.) Porter recalls that one such phrase was "Thanksgiving," which was her cue to repeat "Thanksgiving. Thanks for giving death." (*Id* ¶ 92.) Then, with the recorder off, Conway fabricated a false statement for Porter which implicated Canen and Royer in the murder of Sailor. (*Id.* ¶ 93.) Conway also informed Porter that if she cooperated she would receive a monetary reward. (*Id.* ¶ 94.)

Porter's fabricated statement eventually helped secure Royer's conviction. The fabrication, the coercion, and promises of consideration were never disclosed to Royer or his defense prior to trial. (*Id.* ¶ 95.) True to Detective Conway's word, after the trial, Defendants

Daggy and Sigsbee later paid Porter $2,000 because, according to Defendant Daggy, "she testified consistently with the statement obtained during the underlying investigation." (*Id.* ¶ 97.)

### (3) Defendant's Interrogation of Royer and Subsequent Charging Decision

After securing the fabricated statement from Porter, Defendants then set out to question Royer. (*Id.* ¶ 99.) The Elkhart Police Department took Royer in for questioning on September 3, 2003. (*Id.* ¶ 101.) At the time of this interrogation, Royer had the mind of a child, had been diagnosed with schizoaffective disorder and depression, and had been prescribed multiple psychiatric medications. (*Id.* ¶ 100.) Defendant Conway conducted the interrogation, but Defendants Converse, Daggy, Snider, and Becker were all present. (*Id.* ¶¶ 104, 111.)

The interrogation began shortly after Royer arrived at the Elkhart Police Department on September 3, 2003. (*Id.* ¶ 112.) Defendants were already aware of Royer's psychological and emotional problems. (*Id.* ¶ 103–104.) Defendant Snider told Defendant Conway that the Elkhart Housing Authority had documentation showing that Royer was severely disabled and had the mind of a child. (*Id.* ¶ 103.) However, they took no steps to accommodate Royer's disability prior to nor during the interrogation: he had no lawyer, counselor, or family member present for his interrogations on September 3, 2003, and September 4, 2003. (*Id.* ¶ 105–107.) The *Miranda* warning provided Royer was given and documentation signed in less than one minute. (*Id.* ¶ 109.) Defendants also observed that Royer had great trouble understanding and comprehending what was taking place, but did nothing to limit or adapt their questioning to his known vulnerabilities. (*Id.* ¶ 115–116.) Instead, Defendant Conway used psychologically abusive interrogation techniques on Royer, repeatedly and strenuously accusing Royer of the Sailor murder, despite Royer's consistent denial, and feeding him intimate details of the crime. (*Id.* ¶ 116–120.)

After hours of interrogation, Defendants finally broke Royer. (*Id.* ¶ 121.) By this point, Royer was drifting, disabled, defeated, emotionally broken down, tired, and fatigued. Instead of terminating the interrogation, the other Defendants encouraged Conway to continue. (*Id.* ¶ 122.) Defendant Conway proceeded to take Royer's statement, and, at 5:30 p.m. on September 3, 2003, the police arrested Royer for the murder of Sailor. (*Id.* ¶¶ 123–125, 141.)

After reviewing Royer's statement, Defendants recognized that it was so factually inaccurate it could never be used to tie him to the Sailor murder. (*Id.* ¶ 143.) The Defendants therefore decided to manufacture another statement for Royer the following day. (*Id.* ¶ 145.) Even though Royer was under arrest and in police custody, Defendants initiated contact with Royer on September 4, 2003, and did not provide him access to counsel. (*Id.* ¶ 146.) After hours more of intensive interrogation by Defendant Conway, Royer provided another coerced and false confession. (*Id.* ¶ 147.) This confession was manufactured by the Defendants, inconsistent with Royer's earlier confession, and also inconsistent with the physical evidence developed during the underlying criminal investigation. (*Id.* ¶ 151.)

With both confessions in hand, in early September 2003, Defendant Snider initiated charges against Royer. (*Id.* ¶ 153.) When reviewing whether to authorize charges, the Elkhart County Prosecutor's Office discussed the coercive nature of Royer's interrogation and whether it was reliable. (*Id.* ¶ 154.) One prosecutor, Curtis Hill, had concerns about the investigation and refused to sign the charging documents against Royer. (*Id.*) Despite these concerns, Defendant Becker authorized charges against Royer for the murder of Ms. Sailor on September 8, 2003. (*Id.* ¶ 155.) Becker did this even though she had watched Conway's coercive interrogation through the closed-circuit monitoring system and knew probable cause did not exist. (*Id.* ¶¶ 156, 157.)

### (4) Fingerprint Evidence, Withheld Evidence, and Manufactured Evidence

Prior to trial, Defendants enlisted the assistance of Defendant Dennis Chapman. (*Id.* ¶ 159.) During the initial investigation, the Elkhart Police Department sent a latent partial print to the Indiana State Police Department. (*Id.* ¶ 160.) However, by October 2003, Defendant Bourden removed all the latent fingerprint evidence from the Indiana State Police laboratory and requested that it be sent to Defendant Chapman for comparison. (*Id.* ¶ 162.) In Chapman's initial comparison, both Royer and Canen were excluded from contributing the print. (*Id.* ¶ 164–165.) However, over the course of the next six months, Chapman was pressured by the other Defendants to make a print opinion to at least one of Defendants suspects. (*Id.* ¶ 166.)

One of the defendants employed by Elkhart then provided Chapman with their theory that Canen was the suspect and the "brains behind the murder." (*Id.* ¶ 167.) After being informed of this theory, Chapman created a false report which stated that "the latent print from the med tub is the left little finger of Lana Canen . . . The only identification was the left little finger of Lana Canen on the Med Tub." (*Id.* ¶ 169.) The report also stated that "the other fingerprint cards were then checked but none had a similar pattern," thereby excluding home healthcare aid Pamela Kruder's fingerprints as a contributor. (*Id.* ¶ 172.) Both of these statements were false: the Indiana State Police Laboratory later confirmed that the fingerprint on the med tub was not from Canen and also confirmed that the fingerprint on the med matched the left middle finger of a home healthcare aid, Pamela Kruder. (*Id.* ¶ 173.)

Not only was the substance of Chapman's report false, but the qualifications he provided were also fictitious. In his report, Chapman states that his opinion was "based on [his] experience as a Fingerprint Examiner with the Federal Bureau of Investigation from 1976-1978 and my continued examination of fingerprints with the Elkhart County Sheriff's Department." (*Id.* ¶ 174.) However, this was a lie: Chapman had never trained in fingerprint examination and had no

FBI experience in conducting latent print comparisons. (*Id.* ¶ 179.) Despite the above fabrications, Chapman was able to testify in line with his false report at trial. He first testified that he was formerly a fingerprint analyst for the FBI. (*Id.* ¶ 176.) He then informed the jury that he had compared a latent print from a medicine bottle at the crime-scene to Ms. Canen's prints and determined that it was a match. (*Id.*) Chapman and the Defendant Officers withheld from both the prosecution and defense that Chapman: (1) had never qualified nor trained to conduct latent print comparisons with the FBI nor the Elkhart County Sheriff's department; (2) lacked qualifications and training to conduct latent print comparisons; (3) was fed information about the defendant's theory of the investigations, and (4) was pressured by the Elkhart defendants into forming an opinion. (*Id.* ¶ 179.)

In addition to the fingerprint evidence, Defendants failed to disclose a variety of other potentially material evidence to the defense. Prior to Royer's 2005 trial, Defendant Conway was removed from the homicide division because his supervisors believed his prior misconduct would jeopardize the integrity of criminal investigations. (*Id.* ¶ 185.) Conway's misconduct and removal were never disclosed to the defense prior to trial. (*Id.* ¶ 191.)

The City of Elkhart routinely withheld disciplinary records in this manner. (*Id.* ¶ 192.) In 1993, the Board of Public Safety issued a report which found that the problem of police brutality in the Elkhart Police Department was worsened by a "system that is secured in privacy and protected by a code of silence . . . ." (*Id.* ¶ 195.) The Board recommended reforms to hiring and that "the Department . . . find a way to better conduct internal investigations." (*Id.* ¶ 196.) By Royer's trial in 2005, neither of these reforms were implemented. (*Id.* ¶ 200.) The code of silence continued to exist through 2021. (*Id.* ¶ 198.) The Board's report also addressed the withholding of officers' personnel files, writing "We need to put everything ever known about the officer in

his/her file. We need to understand we work for the people who elect managers for a four-year period." (*Id.* ¶ 199.) However, despite these warnings, defendants took no steps to address the problem of failing to disclose personnel files prior to Royer's wrongful conviction. This practice resulted in multiple other wrongful convictions, outside of Royer's. (*Id.* ¶ 202.)

In addition to withholding and fabricating evidence, certain defendants began to manufacture evidence in order to minimize other potential suspects. Defendant Coppins documented his November 2002 questioning of Wood more than a year later on December 31, 2003. (*Id.* ¶ 205.) This report attributed Wood's extreme stress to his emotional state and stated that the test results for Wood were inconclusive. (*Id.* ¶ 208.) However, this report was a fabrication and his test results showed that deception was indicated. (*Id.* ¶ 210.) Another document was created by Defendant Thayer on December 31, 2003, which claims that Thayer brought Wood's shoes to Defendant Joel Bourdon at the Elkhart Police Department for luminol testing. (*Id.* ¶ 217.) This document then states that "no areas of the shoes reacted in a positive test for possible blood" and that the tread pattern of the shoes did not match the latent shoes impressions at the crime scene. (*Id.* ¶ 218.) This report was a fabrication which was produced a full thirteen months after retrieving Wood's shoes. (*Id.* ¶¶ 218, 220.)

### *(5) Royer's Wrongful Conviction, Subsequent Exoneration, and the Instant Lawsuit.*

At trial, the jury received multiple pieces of fabricated evidence. First, the jury learned the contents of Porter's fabricated September 2, 2003 statement. (*Id.* ¶ 225.) The jury also received both of the false recorded confessions from Royer. (*Id.* ¶ 226.) Since much of the interrogation session was unrecorded, the jury was not provided with the portions of interrogation sessions where psychological coercion was used to manufacture and fabricate Royer's statements. (*Id.*) Finally, Chapman testified consistently with his fabricated report and

stated that the latent print on Sailor's medicine bottle matched Canen's fingerprints. (*Id.* ¶ 227.)

In their closing, the State argued that Porter's statement corroborated the fingerprint and

"virtually every piece of evidence" presented. (*Id.* ¶¶ 229, 231.) On the basis of this evidence, the

jury found Royer guilty of felony murder. (*Id.* ¶ 233.)

Royer was then sentenced to 55 years in prison. (*Id.* ¶ 233.) In 2019, however, after

Royer filed a successive post-conviction petition and an evidentiary hearing was held, Royer was

granted a new trial. (*Id.* ¶¶ 236–238.) Then, on April 2, 2020, after nearly 17 years of

incarceration, Royer was released from custody. (*Id.* ¶ 239.)

The State then challenged the decision of the trial court to grant him a new trial. (*Id.* ¶

241.) On April 8, 2021, the Indiana Court of Appeals unanimously affirmed that Royer's

constitutional rights were violated, writing "[s]imply put, Royer did not receive a fair criminal

trial." (*Id.* ¶ 21.) After this ruling, the charges against Royer were dismissed. (*Id.* ¶ 243.)

On March 30, 2022, Royer filed the instant lawsuit, asserting the following sixteen claims

(DE 1):

> **Count I** — 42 U.S.C § 1983 Due Process (against Elkhart Police Defendants and Defendant Chapman).
>
> **Count II** — Coercive Interrogation: Fifth and Fourteenth Amendments (against Defendants Conway, Daggy, Converse, Snider, and Becker).
>
> **Count III** — 42 U.S.C § 1983 Deprivation of Liberty Without Probable Cause (against Elkhart Police Defendants and Defendant Chapman).
>
> **Count IV** — 42 U.S.C. § 1983 Supervisory Liability (against Defendant Converse).
>
> **Count V** — 42 U.S.C. § 1983 Failure to Intervene (against all Defendants).
>
> **Count VI** — 42 U.S.C. § 1983 Conspiracy to Deprive Constitutional Rights (against all Defendants).
>
> **Count VII** — 42 U.S.C. § 1983 *Monell* Claim (against Defendant City of Elkhart).
>
> **Count VIII** — Americans with Disabilities Act (against the City of Elkhart, the Elkhart County Prosecutor's Office, Elkhart County, and the State of Indiana).
>
> **Count IX** — Rehabilitation Act of 1973 (against the City of Elkhart, the Elkhart County Prosecutor's Office, and the State of Indiana).

**Count X** — Negligent Supervision under Indiana state law (against Defendant Converse).

**Count XI** —Breach of Duty in Hiring Training, and Supervising under Indiana state law (against the City of Elkhart).

**Count XII** — Breach of Duty in Hiring Training, and Supervising under Indiana state law (against Elkhart County).

**Count XIII** — Breach of Duty in Hiring – Willful and Wanton Conduct (against the City of Elkhart).

**Count XIV** — Breach of Duty in Hiring  – Willful and Wanton Conduct (against Elkhart County).

**Count XV**  — Respondeat Superior (against the City of Elkhart and Elkhart County).

**Count XVI** — Intentional Infliction of Emotional Distress (against all Defendants).

(DE 1.) On June 21, 2022, Defendants Vicki Becker, the Elkhart County Prosecutor's Office, and the State of Indiana (collectively, the "Moving Defendants") filed a partial motion to dismiss (DE 45). Royer has filed a response to this motion and the Moving Defendants failed to file a reply, making this motion ripe for review. (DE 58.)

## B.    Standard of Review

In reviewing a motion to dismiss for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6), the Court construes the complaint in the light most favorable to the plaintiff, accepts the well-pleaded factual allegations as true, and draws all reasonable inferences in the plaintiff's favor. *Calderon-Ramirez v. McCament*, 877 F.3d 272, 275 (7th Cir. 2017). A complaint must contain only a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). That statement must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and raise a right to relief above the speculative level. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). However, a plaintiff's claim need only be plausible, not probable. *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930,

935 (7th Cir. 2012). Evaluating whether a plaintiff's claim is sufficiently plausible to survive a motion to dismiss is "'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678).

## C.    Discussion

The Moving Defendants seek to dismiss the following counts: Count V (failure to intervene) as to the Elkhart County Prosecutor's Office and the State of Indiana; Count VI (conspiracy) against Vicki Becker, the Elkhart County Prosecutors Office, and the State of Indiana; Count VIII (Americans with Disabilities Act) as to the Elkhart County Prosecutor's Office and the State of Indiana; Count IX (the Rehabilitation Act) against the Elkhart County Prosecutor's Office and the State of Indiana; and Count XVI (intentional infliction of emotion distress) against Vicki Becker, the Elkhart County Prosecutor's Office, and the State of Indiana.

As to claims against the Elkhart County Prosecutor's Office and the State of Indiana in Counts V, Count VI, and Count XVI, Plaintiff, in his response, voluntarily dismisses those claims. (DE 58 at 3 n.1 & n.2.) The discussion below considers the remaining claims Moving Defendants seek to dismiss.

### *(1) Conspiracy Claim against Vicki Becker*

The Moving Defendants first argue that Royer has failed to allege sufficient facts to state a claim of conspiracy to violate his constitutional rights against Defendant Becker. The Moving Defendants point to two deficiencies in the Complaint: (1) that the Complaint fails to sufficiently identify the other co-conspirators; and (2) that the Complaint fails to allege the precise date of the conspiracy. (DE 46 at 6–8.)

"A civil conspiracy is 'a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means.'" *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015) (quoting *Scherer v. Balkema*, 840 F.2d 437, 441 (7th Cir. 1988)). To establish conspiracy liability in a § 1983 claim, "the plaintiff must show that (1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." *Daugherty v. Page*, 906 F.3d 606, 612 (7th Cir. 2018) (citation and quotation marks omitted). At the motion to dismiss stage, to state a claim of conspiracy, a plaintiff must allege "the parties, the general purpose, and the approximate date of the conspiracy." *Loubser v. Thacker*, 440 F.3d 439, 443 (7th Cir. 2006).

Royer has sufficiently pled facts to support his conspiracy claim by alleging the parties, the general purpose, and the approximate date of the conspiracy. First, Royer alleges that the parties to the conspiracy included Defendants Conway, Daggy, Converse, Snider, Thayer, Sigsbee, Bourdon, Coppins, Chapman, and Becker, as well as other "unknown co-coconspirators[.]" (DE 1 ¶¶ 307, 308.) Despite the Moving Defendants arguing otherwise, the mere fact that Royer includes "unknown co-conspirators" in his allegations does not render his Complaint insufficient. Rather, at this stage, it is permissible and expected for a plaintiff to only be able to identify a portion of the co-conspirators instead of providing a complete list. *See Bohannon v. City of Milwaukee*, 998 F. Supp. 2d 736, 749 (E.D. Wis. 2014) (finding that a complaint was sufficiently pled where it alleged that the parties to the conspiracy were "Vagini, Gadzalinski, Dollhopf, Perleberg, and the unknown defendant officers . . ."); *Smith v. Burge*, 222 F. Supp. 3d 669, 687 (N.D. Ill. 2016) (finding that parties were adequately alleged where the complaint alleged a list of defendants "along with certain other co-conspirators . . .").

Royer's Complaint also alleges the general purpose of the conspiracy: "to frame Mr. Royer for the crime [of murdering Ms. Sailor] and to thereby deprive him of his constitutional rights and liberty[.]" (DE 1 ¶ 307.) Similar allegations have consistently been held to be sufficient. *See Hill v. Cook Cnty.*, 463 F. Supp. 3d 820, 840 (N.D. Ill. 2020) (finding complaint sufficient where it alleged that the general purpose of the conspiracy was "to implicate [the defendant] in the Frank's Liquor Store robbery"); *Boothe v. Sherman*, 66 F. Supp. 3d 1069, 1078 (N.D. Ill. 2014) (finding claim sufficiently alleged where the purpose of the conspiracy was "cover[ing] up the illegal arrest and excessive force, and to destroy [favorable] evidence"); *Sanchez v. Vill. of Wheeling*, 447 F. Supp. 3d 693, 705 (N.D. Ill. 2020) (holding that the alleged purpose of "coerc[ing plaintiff's] and witness's false statements with the goal of ensuring that he would be charged and convicted" was sufficient).

Finally, even though the Complaint does not provide the precise date range of the conspiracy, a precise date of the conspiracy is not required. Rather, only an *approximate* date is required. *Loubser*, 440 F.3d at 443 ("[C]ourts require the plaintiff [bringing a conspiracy claim] to allege the parties, the general purpose, and the *approximate* date of the conspiracy."); *Holzhauer v. Town of Normal*, 483 F. Supp. 3d 598, 603 (C.D. Ill. 2020) (explaining that approximate date was properly alleged where the complaint lays out a timeline of co-conspirators actions in furtherance of the conspiracy). The approximate date of the conspiracy is clear from the factual allegations: during the investigation and, at least, until Becker revealed the fact that she participated in Royer's interrogation in a 2021 media interview after the charges were dismissed. (DE 1 ¶ 137.) More specific information, such as when each individual defendant joined the conspiracy, need not be alleged at this stage, since a plaintiff could not reasonably be expected to have this information prior to discovery. *Loubser*, 440 F.3d at 443.

("The dates on which particular defendants joined the conspiracy are not alleged, but that is not the kind of information that a plaintiff can be expected to have when she files her complaint.").

As it relates to Becker, the Complaint also provides sufficient notice of the conspiracy claim against her to enable her to prepare her defense. *Walker v. Thompson*, 288 F.3d 1005, 1008 (7th Cir. 2002) (explaining that a conspiracy allegation must provide sufficient notice to "enable [a defendant] to prepare his defense . . ."); *Salaita v. Kennedy*, 118 F. Supp. 3d 1068, 1084 (N.D. Ill. 2015) (noting that, with a conspiracy claim, "the ultimate issue is whether the factual allegations in the complaint 'give the defendant fair notice of the claim for relief and how the claim has 'substantive plausibility'"). Royer's Complaint alleges that Defendant Conway used intimidation to obtain a false confession by Royer and details Conway's methods: subjecting Royer to on and off interrogation over the span of two days, leading Royer by providing details of the crime, and having Royer provide a statement even when he appeared "disabled, defeated, emotional, broken down, tired, and fatigued."  (DE 1 ¶ 122.) Royer also alleges that Becker and other defendants were present at the interrogation, were aware of his disability, but failed to accommodate him. Rather than stopping, the defendants encouraged, enabled, and authorized Conway to "psychologically coerce a mentally disabled Mr. Royer through two days of intensive interrogation[.]" (*Id.* ¶ 9.) Royer then specifically alleges that "Becker . . . repeatedly advised, urged, and ordered the Police Officer Defendants to continue the abusive and coercive interrogation of Royer even though it was plain to all involved that the interrogation was highly improper . . . ." (*Id.* ¶ 139.) The Complaint also alleges a slew of other improper conduct by her alleged co-conspirators, including fabricating a statement from Nina Porter, fabricating fingerprint evidence, a practice of withholding records, and instances of manufacturing false records. Such allegations are sufficient to put Becker on notice of the conspiracy claim against

15

her. *See United States v. Read*, 658 F.2d 1225, 1230 (7th Cir. 1981) ("Each conspirator is liable for overt acts of every other conspirator done in furtherance of the conspiracy, whether the acts occurred before or after he joined the conspiracy.").

Accordingly, because the conspiracy claim against Becker puts her on notice of the claim and adequately alleges the parties, general purpose, and approximate date of the conspiracy, the Court denies the motion to dismiss Count VI (conspiracy) as to Defendant Becker.

### *(2) Intentional Infliction of Emotional Distress Claim Against Vicki Becker*

Next, the Moving Defendants argue that Defendant Becker is entitled to immunity from Royer's claim for intentional infliction of emotional under Indiana state law. The Court agrees.

Under the Indiana Tort Claims Act ("ITCA"), "an employee acting within the scope of the employee's employment is not liable if a loss results from the . .  initiation of a judicial or an administrative proceeding." Ind. Code § 34-13-3-3(6). Indiana Courts have found that, under the ITCA and Indiana state common law, prosecutors have broad immunity, beyond that afforded under federal law. While federal law provides absolute immunity in regard to the evaluation of evidence by prosecutors, the charging decision, and presentation of evidence, "Indiana law is more generous to the prosecutor because it has rejected the Supreme Court's distinction between prosecutorial and administrative or *investigative* functions for purposes of immunity, as long as the prosecutor is acting within the scope of his or her authority." *Davis v. Zirkelbach*, 149 F.3d 614, 618 (7th Cir. 1998) (emphasis added).

Indiana courts have justified the broad immunity conferred by Ind. Code § 34-13-3-3(6) by relying on the "important public policy" of protecting public officers from harassment. For example, in *Livingston v. Consolidated City of Indianapolis*, the Indiana Court of Appeals

justified the broad nature of immunity for police officers in actions for malicious prosecutions, writing:

> When the duty to investigate crime and to institute criminal proceedings is lodged with any public officer, it is for the best interests of the community as a whole that he be protected from harassment in the performance of that duty. The efficient functioning of our system of law enforcement is dependent largely upon the investigation of crime and the accusation of offenders by properly trained officers . . . The public welfare requires that [the] choice (whether or not to institute proceedings) shall be free of all fear of personal liability. To assure this freedom of action it is deemed best to make that assurance positive and definite by securing him against even actions based upon a malicious abuse of his official power.

398 N.E. 2d 1302 (Ind. Ct. App. 1979). In *Foster v. Pearcy*, the Indiana Supreme Court relied on a similar rationale when it held that "where . . . the acts are reasonably within the general scope of authority granted to prosecuting attorneys, no liability will attach." 387 N.E.2d 446, 449 (Ind. 1979) ("This decision will insure that the prosecutor will be able to exercise the independent judgment necessary to effectuate his duties to investigate and prosecute criminals and to apprise the public of his activities [and] also allay the apprehensions about harassment of prosecuting attorneys from unfounded litigation which deters public officials from their public duties.").

In *Davis v. Zirkelbach*, the Seventh Circuit addressed the broad immunity afforded to prosecutors under Indiana law. 149 F.3d 614 (7th Cir. 1998). The defendant in that case was a prosecutor who, during the course of an investigation, had advised an officer that a tape from an unconstitutional wiretap could be used to flip a third-party. *Id.* at 618. After charges were dismissed, the plaintiff brought a claim for both malicious prosecution and intentional infliction of emotional distress. *Id.* According to the court, "[u]nder Indiana's more generous approach to prosecutorial immunity [the defendant prosecutor] cannot be held liable for giving erroneous legal advice about the ways in which the tape could or could not be used, as long as he was acting within the scope of his authority." *Id.* at 619. After detailing the law in Indiana regarding

prosecutorial immunity, the Seventh Circuit concluded that "[e]ven if Lenn's advice about the reach of the wiretap laws was wrong, the immunity he enjoys under Indiana law is broad enough to protect him[.]" *Id.* at 618.

Royer alleges in his Complaint that Defendant Becker was acting "within the scope of her employment during the investigation at issue." (DE 1 ¶ 32.) Such an allegation appears decisive. *Foster* holds that that "where . . . the acts are reasonably within the general scope of authority granted to prosecuting attorneys, no liability will attach," *Foster*, 387 N.E.2d at 449. Therefore, because the investigation, charging decision, and management of evidence were within the scope of authority granted to prosecutors, Becker is entitled to immunity.

In his response, Royer argues that the IIED claim does not hinge on Defendant Becker's "initiation of judicial proceedings," but rather depends on other acts, including her participation in the coercive interrogation, withholding of exculpatory evidence, and otherwise framing defendant for a crime he didn't commit. (DE 58 at 14.) However, *Foster* and *Davis* hold that prosecutorial immunity under Indiana law also encompasses investigations and conduct prior to the decision to charge. For example, in *Davis*, the Seventh Circuit found that a prosecutor was immune for his conduct providing improper legal advice concerning a wiretap, even though that conduct occurred during the investigation prior to the charging decision. *Davis*, 149 F.3d at 618.

Other cases in Indiana confirm that prosecutors are immune from actions outside of the mere "initiation of judicial proceeding," including actions taken in bad faith. In *Clifford v. Marion Cnty. Prosecuting Att'y*, 654 N.E.2d 805, 809 (Ind. Ct. App. 1995), the prosecutor improperly pursued collection of child support payments, creating withholding orders and failing to make arrangements for the plaintiff to be reimbursed — actions which often directly contradicted court orders. The court in that case noted that even those acts "motivated solely by

bad faith" fell under the "protection envisioned by the [Indiana Tort Claims Act]." *Id.* The court

explained that the "proper focus when considering whether a prosecutor was acting 'within its

authority' for purposes of tort claims immunity is not upon the propriety or impropriety of the act

in a particular context, but rather upon the nature of the activity itself." *Id.* at 810. "If it is an

activity in which the prosecutor may engage, i.e., within the prosecutor's general scope of

authority, the activity is 'authorized' within the meaning of the Tort Claims Act, regardless of

whether it was done negligently or done with improper motives." *Id.*

Therefore, because the nature of Defendant Becker's actions (investigation, interrogation,

managing evidence, and the charging decision) were within the nature of her job as prosecutor

(i.e., within her authority), she is immune from the IIED claim.

### (3) *Americans with Disabilities Act and Rehabilitation Act*

Finally, the Moving Defendants argue that Count VIII and Count IX must be dismissed

as to the State of Indiana and the Elkhart County Prosecutor's Office. In Count VIII and Count

IX, Royer alleges that he was not provided a reasonable accommodation for his disability during

his interrogation, in violation of Title II of the Americans with Disabilities Act ("ADA"), and

Section 504 of the Rehabilitation Act of 1973. (DE 1 ¶ 320, 337.) Title II of the ADA provides

that "no qualified individual with a disability shall, by reason of such disability, be excluded

from participation in or be denied the benefits of the services, programs, or activities of a public

entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Because Title II

of the ADA was based on § 504 the Rehabilitation Act, and because the "two provisions are

nearly identical," they are typically treated as "coextensive[.]" *Washington v. Indiana High Sch.

Athletic Ass'n, Inc.*, 181 F.3d 840, 845 n.6, 846 (7th Cir. 1999)."[T]he Rehabilitation Act is

distinguishable only because it is limited to programs receiving federal assistance." *Silk v. City of*

*Chicago*, 194 F.3d 788, 798 n.6 (7th Cir. 1999); *see also Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012) ("The analysis governing each statute is the same except that the Rehabilitation Act includes as an additional element the receipt of federal funds . . . ."). Here, the defendants do not dispute that they receive federal funding, making it proper to analyze the ADA and Rehabilitation Act claims together.

"To establish a violation of Title II of the ADA, the plaintiff must prove that he is a qualified individual with a disability, that he was denied the benefits of the services, programs, or activities of a public entity, or otherwise subjected to discrimination by such an entity, and that the denial or discrimination was by reason of his disability" *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015) (citations and quotation marks omitted). "The rehabilitation Act claim is functionally identical [to a claim brought under Title II of the ADA]: it requires the plaintiff to allege that '(1) he is a qualified person (2) with a disability and (3) the [state agency] denied him access to a program or activity because of his disability." *Id.* (quoting *Jaros*, 684 F.3d at 672).

The Moving Defendants do not raise an argument concerning whether Royer is a qualified individual with a disability. Nor is there a dispute about whether the Elkhart County Prosecutor's Office and the State of Indiana are "public entities". Rather, the Moving Defendants argue that the Elkhart County Prosecutor's Office and the State of Indiana cannot be held vicariously liable under either Title II of the ADA or § 504 of the Rehabilitation Act. (DE 46 at 12.) The Moving Defendants also assert that the Elkhart County Prosecutor's Office and the State of Indiana cannot be liable because they have "no control over custodial police interrogations" and do not "do" police interrogations. (*Id.* at 11.) While this latter argument is somewhat unclear, the Moving Defendants appear to be arguing that, based on the allegations in

the Complaint, the Elkhart County Prosecutor's Office and the State of Indiana cannot be held directly liable for violations of Title II of the ADA or § 504 of the Rehabilitation Act.[2]

Accordingly, the Court's analysis below proceeds in two steps: (1) the Court addresses whether the Elkhart County Prosecutor's Office and the State of Indiana may be vicariously liable for the activity of their employee, Prosecutor Vicki Becker;[3] (2) the Court examines whether Plaintiff has included sufficient allegations to state a plausible claim that the Elkhart County Prosecutor's Office and the State of Indiana are directly liable under the ADA and the Rehabilitation Act.

### a.   Vicarious Liability

The Moving Defendants first argue that the Elkhart County Prosecutor's Office and the State of Indiana cannot be held vicariously liable under Title II of the ADA or the Rehabilitation Act for an employee's action (in this case, Defendant Becker). (DE 46 at 12.) Whether Title II of the ADA and Section 504 of the Rehabilitation Act permit vicarious liability is a question left open by the Supreme Court. *See City & County of San Francisco*, *Calif. v. Sheehan*, 575 U.S. 600, 610 (2015) ("Our decision not to decide whether the ADA applies to arrests is reinforced by

---

[2] The Court notes that, to the extent the Moving Defendants are making a separate argument, it is waived. If the Moving Defendants are arguing that custodial interrogations are not a "service" which fall under Title II of the ADA, they included no case law or further argument to this effect. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived . . . ."). Additionally, the Supreme Court has found that, in certain situations, Title II of the ADA may apply to aspects of the criminal justice system. *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209 (1998) ("[T]he ADA plainly covers state institutions *without* any exception that could cast the coverage of prisons into doubt[.]"). Other district courts have recently found that police interrogations are within the ambit of Title II of the ADA. *Montgomery v. D.C.*, No. CV 18-1928 (JDB), 2022 WL 1618741, at *8 (D.D.C. May 23, 2022) ("A plaintiff may plausibly state a claim under Title II of the ADA against the [Metropolitan Police Department] for failure to accommodate [a plaintiff's] disabilities[.]").

[3] The Complaint alleges that, "[a]t the time of her involvement, Ms. Becker's employment would fall under the purview of the Elkhart County Prosecutor's Office, and/or Elkhart County, and/or the State of Indiana." (DE 1 ¶ 32.) At this stage, the Court accepts this allegation as true. Therefore, the question arises, whether the State of Indiana and the Elkhart County Prosecutor's Office can be held vicariously liable for the conduct of their employee, Vicki Becker.

the parties' failure to address a related question: whether a public entity can be liable for damages under Title II for an arrest made by its police officers. Only public entities are subject to Title II . . . and the parties agree that such an entity can be held vicariously liable for money damages for the purposeful or deliberately indifferent conduct of its employees . . . . But we have never decided whether that is correct, and we decline to do so here, in the absence of adversarial briefing."). The Seventh Circuit has also not addressed this issue. *See Ravenna v. Vill. of Skokie*, 388 F. Supp. 3d 999, 1005 (N.D. Ill. 2019) (noting that the Seventh Circuit "has not addressed the question" of whether an entity can be held vicariously liable for the conduct of its officers under Title II of the ADA); *King v. Hendricks Cnty. Commissioners*, 954 F.3d 981, 989 (7th Cir. 2020) (assuming without deciding that "Hendricks County could be held vicariously liable under Title II for [its officer's] actions").

Whether Title II of the ADA and § 504 of the Rehabilitation Act allow for claims under a theory of vicarious liability is determined by whether Title VI of the Civil Rights Act of 1964 allows for claims brought under a theory of vicarious liability. As mentioned above, the remedial scheme in Title II of the ADA incorporates by reference the remedial scheme of § 504 of the Rehabilitation Act. *See* 42 U.S.C. § 12133 ("The remedies, procedures, and rights set forth in [§505(a)(2) of the Rehabilitation Act] shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of Section 12132 of this title."). In turn, § 504 of the Rehabilitation Act incorporates by reference the remedial scheme in Title VI of the Civil Rights Act of 1964. *See* 29 U.S.C. § 794a(a)(2) ("The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 . . . shall be available" for any violations of § 504). Given the overlap of the statutes, the Supreme Court has stated that the "remedies for violations of [Title II] of the ADA and § 504 of the

22

Rehabilitation Act are coextensive with the remedies available in a private cause of action brought under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. . . .” *Barnes v. Gorman*, 536 U.S. 184, 185 (2002) (finding that “[b]ecause punitive damages may not be awarded in private suits brought under Title VI of the 1964 Civil Rights Act, it follows that they may not be awarded in suits brought under [Title II of the ADA] and § 504 of the Rehabilitation Act”). Because the rights, remedies, and procedures of the sections are coextensive, if vicarious liability is not permitted for claims brought under Title VI of the Civil Rights Act of 1964, then it stands to reason that vicarious liability is also not permitted for claims brought under Title II of the ADA. *See Ingram v. Kubik*, 30 F.4th 1241, 1258 (11th Cir. 2022) (quoting *Jones v. City of Detroit, Michigan*, 20 F.4th 1117, 1119) (“‘Title VI tells us whether vicarious liability is available under’ Title II; if vicarious liability is unavailable under Title VI, it is unavailable under Title II.”).

Neither the Supreme Court nor the Seventh Circuit have specifically addressed whether Title VI of the Civil Rights Act of 1964 allows for vicarious liability. However, the Supreme Court addressed a related question in *Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274 (1998). In *Gebser*, the Court considered whether vicarious liability was available under Title IX. Similar to Title II of the ADA, Title IX is modeled on the remedial scheme set forth in Title VI of the Civil Rights Act. *Id.* at 275, 286 (explaining that Title IX “was modeled after Title VI of the Civil Rights Act of 1964 . . . which is parallel to Title IX except that it prohibits race discrimination, not sex discrimination, and applies in all programs receiving federal funds, not only in education programs”). The Court held that because “Congress did not intend to allow recovery in damages [under Title IX] where liability rests solely on principles of vicarious

liability or constructive notice" that a defendant may not be held liable under Title IX "absent actual notice and deliberate indifference." *Id.* at 292–93.

The Court came to this holding for three principal reasons. First, the Court relied on the context surrounding the passage of Title IX. The Court noted that, in 1972, "the principal civil rights statutes containing an express right of action did not provide for recovery of monetary damages at all[.]" *Id.* at 285. Instead, under the civil rights statutes at the time, Congress opted to allow only injunctive and equitable relief. *Id.* Congress eventually made damages available under Title VII in 1991, but, even then, "Congress carefully limited the amount recoverable in any individual case[.]" *Id.* at 286. Given the lack of damages available under other civil rights statutes in 1972, and that Congress carefully limited damages in 1991, the Court concluded that the enacting Congress of Title IX likely did not contemplate "unlimited recovery in damages against a funding recipient where the recipient [was] unaware of discrimination in its programs[.]" *Id.* at 285.

The Court also focused on the contractual nature of Title IX as Spending Clause legislation, explaining how Title IX operated by "conditioning an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds." *Id.* at 286. Where a recipient receives conditional funding from the federal government, there is an implication that Congress only intended for relief if there was actual notice to officials of the funding recipient — without actual notice, the grantee of the funding may not be aware they are administering a program in violation of a condition. *Id.* at 287. Because Title IX was Spending Clause legislation, the Court found that it was "[s]ensible to assume that Congress did not envision a recipient's liability in damages" where the recipient did not have actual notice of the violation. *Id.* at 287–88.

24

Finally, the Court addressed Title IX's express means of enforcement through administrative agencies. *Id.* at 288. The statute allowed for agencies who disbursed funding to enforce rules implemented under the nondiscrimination mandate through administrative proceedings, but only if the agency first "advised the appropriate person or persons of the failure to comply with the requirement and has determined that the compliance cannot be secured by voluntary means." *Id.* The Court concluded that "[i]t would be unsound, we think, for a statute's *express* system of enforcement to require notice to the recipient and an opportunity to come into voluntary compliance while a judicially *implied* system of enforcement permits substantial liability without regard to the recipient's knowledge or its corrective actions upon receiving notice." *Id.* at 289. After examining those three aspects of Title IX, the Court held that "a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond." *Id.* at 290.

In *Jones v. City of Detroit, Michigan*, the Sixth Circuit explained that Title VI of the Civil Rights Act shares all of these traits with Title IX:

> [Title VI] was enacted at a time when existing civil rights statutes containing express rights of action authorized private claims for injunctive and equitable relief, not monetary relief. It invoked Congress's Spending Clause powers. And it contained the same administrative enforcement mechanism, which requires actual notice to a recipient's officials . . . .

20 F. 4th 1117, 1121 (6th Cir. 2021). Given these similarities, multiple circuits, including the Sixth Circuit, have extended *Gebser*'s "interpretation that there is no vicarious liability under Title IX" to Title VI. *See Foster v. Michigan*, 573 F. App'x 377, 389 (6th Cir. 2014); *Rodgers v. Smith*, 842 F. App'x 929, 929 (5th Cir. 2021) (per curiam) ("Title VI allows neither personal

liability claims against individuals nor vicarious liability claims against employers for the acts of their employees."); *United States v. County of Maricopa*, 889 F.3d 648, 652 & n..2 (9th Cir. 2018). Both the Sixth Circuit and the Eleventh Circuit have gone a step further and found that there is no vicarious liability under Title II of the ADA. *See Jones*, 20 F. 4th at 1121 ("Because Title II of the ADA and the Rehabilitation Act import Title VI's remedial regime, that ends the inquiry. If Title VI does not allow vicarious liability, neither do these provisions of the ADA or the Rehabilitation Act."); *Ingram*, F.4th at 1257. Other sister courts in the Seventh Circuit have also relied on *Gebser* in finding that Title II of the ADA and § 504 of the Rehabilitation Act do not permit recovery under a theory of vicarious liability. *See Ravenna*, 388 F. Supp. 3d at 1005 (holding that "in order to succeed on [a] Title II claim [a plaintiff] must prove, in accordance with *Gebser*, that a Skokie official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on [Skokie's] behalf ha[d] actual knowledge of discrimination . . . and fail[ed] to adequately respond").

Following the Sixth Circuit, the Eleventh Circuit, and our sister Court in the Northern District of Illinois, this Court also finds that *Gebser*'s holding regarding vicarious liability under Title IX is applicable to claims brought under Title II of the ADA and § 504 of the Rehabilitation Act. When enacting the ADA in 1990, Congress made the intentional choice to incorporate the "rights, remedies, and procedures" set forth in Title VI of the Civil Rights Act. In other words, Congress consciously decided to tie the remedies available for a claim brought under Title II to the remedies available for a claim brought under Title VI. *See Jones*, 20 F.4th at 1122 ("Title II of the ADA incorporates remedies from the Rehabilitation Act, which in turn incorporates Title VI . . . All we do here is honor these choices.").

The Court notes that Congress could have more explicitly indicated that it wished for the theory of liability in a Title VI case to be used in a Title II case. After all, Title II of the ADA only elects to incorporate the "rights, remedies, and procedures" set forth in Title VI of the Civil Rights Act. A theory of liability is distinct from the remedy itself and Congress could have opted to specify that it intended to also incorporate the theories of liability. The dissent in *Jones* largely relies on this distinction, between the type of remedy and a theory of liability that affects the scope of the remedy. *Jones*, 20 F.4th at 1125 (Moore, J., dissenting) (criticizing the majority for examining whether vicarious liability was available under Title VI of the Civil Rights Act in order to determine whether vicarious liability was available under Title II of the ADA, rather than independently looking at the context surrounding the passage of Title II of the ADA, because vicarious liability is a *theory* of liability, rather than the remedy itself). But the task for a Court is to determine whether Title II of the ADA, which is ambiguous, allows for vicarious liability. The Supreme Court has advised where text does not resolve an issue, a court should attempt to infer how the enacting Congress would have addressed the issue had there been an express provision. *See Central Bank v. First Interstate Bank*, 511 U.S. 176, 178 (1994). The Court believes that the best indication of Congress's preference as to the remedial theories available in a claim brought under Title II of the ADA is its explicit incorporation of the "remedies, procedures, and rights" from Title VI of the Civil Rights Act of 1964. *See Barnes v. Gorman*, 536 U.S. 187, 189 n.3 (2002) ("Justice Stevens believes that our analysis of Title VI does not carry over to the ADA because the latter is not Spending Clause legislation, and identifies 'tortious conduct . . . Perhaps he thinks that it *should not* carry over, but that is a question for Congress, and Congress has unequivocally said otherwise."). While Congress could have been clearer in laying out the exact theories of liability it wanted enforced, that the enacting

Congress incorporated the broad swath of "remedies, procedures, and rights" from Title VI of the Civil Rights Act of 1964 indicates that it likely would have also incorporated the theories of liability available under Title VI of the Civil Rights Act of 1964 to claims brought under Title II of the ADA.

Contrary to this analysis, some sister courts have interpreted the Seventh Circuit case, *Reed v. Columbia St. Mary's Hospital*, 782 F.3d 331 (7th Cir. 2015), as suggesting that vicarious liability would be allowed under Title II of the ADA. In *Reed v. Columbia St. Mary's Hospital*, the plaintiff brought claims against a defendant-hospital under Title III of the ADA and the Rehabilitation Act based on the conduct of the staff at that hospital, who reportedly "ignored her requests, treated her poorly, refused to consult with her regarding her care, and physically injured her when she was forcibly discharged." *Id.* at 334. The court found that the plaintiff had "stated viable claims under the ADA and Rehabilitation Act," even though the hospital was being sued based on the conduct of its employees. *Id.* at 337.  Multiple district courts have suggested that *Reed* might support a finding that vicarious liability is permitted under Title II. See *Reed v. State of Illinois*, No. 12-CV-7274, 2016 WL 2622312, at *4 (N.D. Ill. May 9, 2016) ("While [*Reed v. Columbia St. Mary's Hospital*] does not expressly address vicarious liability under Title II or the Rehabilitation Act, its outcome constraints this Court in finding . . . that the State Defendants cannot be held liable for damages under a vicarious liability theory."); *Field v. Hous. Auth. of Cook Cnty.*, No. 17-CV-02044, 2018 WL 3831513, at *8 (N.D. Ill. Aug. 13, 2018) ("[T]he facts in *Columbia St. Mary's Hospital*, which the Seventh Circuit ruled stated a viable claim for retaliation under the Rehabilitation Act, were based on vicarious liability of an employer for the retaliatory acts of its employees."); *Simmons v. Godinez*, No. 16 C 4501, 2018 WL 2391116, at

*2 n.3 (N.D. Ill. May 25, 2018) ("[L]ower courts have interpreted the ADA and the Rehabilitation Act to provide for *respondeat superior* liability.").

The Court finds that *Reed* provides little guidance to the instant case. In *Reed*, the Seventh Circuit considered claims brought under *Title III* of the Americans with Disabilities Act, not Title II. Title II of the ADA governs discrimination by "public entities," 42 U.S.C. § 12132. The statute explicitly defines public entity as "any state or local government [and] any department, agency, special purpose district, or other instrumentality of a State or States or local government. . . ." 42 U.S.C. § 12131. Title III of the ADA is broader, governing discrimination against individuals on the basis of disability in "any place of public accommodation by any person who owns, leases (or leases to), or *operates* a place of public accommodation." 42 U.S.C. § 12182 (emphasis added). Furthermore, Title III of the ADA incorporates aspects of Title VII and Title II of the 1964 Civil Rights Act, not Title VI of the 1964 Civil Rights Act, meaning its remedies differ in scope. *See Jones*, 20 F.4th at 1122 ("Title I and Title III of the ADA incorporate aspects of the enforcement regimes from Title VII and Title II of the 1964 Civil Rights Act.").

That *Reed* dealt with a different section of the ADA, providing for broader liability, counsels against giving too much weight to any suggestion that vicarious liability was allowed under Title III. Our sister court in the Northern District of Illinois came to a similar conclusion and also took a position different than this line of cases above. *Ravenna*, 388 F. Supp. 3d at 1007 (noting that the prohibition of discrimination under Title III "extends not simply to the 'public accommodation' itself or its owner, but to 'operators' of public accommodations" and that Title III's broader liability counsels against finding *Reed's* holding relevant to claims brought under Title II).

Furthermore, *Reed* never holds that vicarious liability is permissible in the context of Title III, let alone in the context of Title II. The plaintiff in *Reed* alleged:

> On one occasion, when Reed asked that staff bring the computer to her, they refused to do so because of her disabilities. When she repeated her request, she alleges, the staff retaliated against her by grabbing her and throwing her into a "seclusion room." Later, staff summoned Reed to a meeting with a doctor to discuss her discharge, where, still without her computer, she was unable to communicate. When the hospital discharged Reed, she asked to call her case manager, but hospital staff refused Reed's request, again because of her disabilities. To retaliate further they allegedly had Reed escorted out of the hospital by security guards, who injured her in the process.

*Reed*, 782 F.3d at 334–35. Even though the Seventh Circuit held that these allegations stated viable claims under Title III of the ADA, it is unclear what theory of liability the court was permitting the plaintiff to proceed under. The Seventh Circuit merely found that "Reed's allegations that the hospital, with knowledge of her disability, purposely denied her access to the computer that helps her communicate, permit an inference of intentional discrimination sufficient to support a claim for compensatory damages." *Reed*, 782 F.3d at 337. The allegations left open the possibility that the plaintiff was proceeding under a direct theory of liability: the plaintiff alleges that a "doctor," not merely staff were involved, and also that the staff mistreated her over a period of time. Rather than only supporting a theory of vicarious liability, as other courts have assumed, the allegations in *Reed* could support a claim under Title III of the ADA pursuant to a direct theory of liability. *See Gebser*, 524 U.S. at 284–85 (explaining that a direct claim may exist where an "official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond"). *Reed*'s holding therefore does not counsel in favor of finding that Title II supports claims using a theory of vicarious liability.

Because of the textual distinctions between Title II and Title III, and because *Reed* itself does not clearly address whether vicarious liability is permitted, the Court finds that *Reed* is not controlling. Rather, the Court adheres to the analogous analysis provided by the Supreme Court in *Gebser*. Accordingly, the Court finds that a claim under Title II cannot be brought using a theory of vicarious liability.

### (b) Direct Liability

Next, the Court considers whether Royer has stated a viable claim under Title II of the ADA & § 504 of the Rehabilitation Act against the State of Indiana and the Elkhart County Prosecutor's Office using a direct theory of liability. The Court concludes that he has not.

In order to succeed on his claim for monetary damages under Title II and § 504 of the Rehabilitation Act, Royer must show that the State of Indiana and Elkhart County Prosecutor's Office intentionally discriminated against him. *Strominger v. Brock*, 592 F. App'x 508, 511 (7th Cir. 2014). A plaintiff can establish "'intentional discrimination' in a Title II damage action by showing deliberate indifference." *See Lacy v. Cook County*, 897 F.3d 847, 862 (7th Cir. 2018) Deliberate indifference requires showing "both (1) knowledge that a harm to a federally protected right is substantially likely, and (2) a failure to act upon that likelihood." *Id.* at 863. The allegations here do not support a viable claim that the State of Indiana or the Elkhart County Prosecutor's Office was deliberately indifferent.

First, under the standard articulated in *Gebser*, the Court examines whether the Complaint sufficiently alleged that there was "an official who at a minimum ha[d] authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf" and also had "actual knowledge of discrimination in the recipient's programs [but] fail[ed] adequately to respond." *Gebser*, 524 U.S. at 290; *see also Ravenna*, 388 F. Supp. 3d at 1008

(applying the standard set forth in *Gebser* to determine if direct liability existed). This framework, according to the Court in *Gebser*, is "a rough parallel [to] the standard of deliberate indifference[.]" *Gebser*, 524 U.S. at 290. Other courts have described this framework for liability as the "appropriate officials theory" of liability. *See Montgomery v. D.C.*, No. CV 18-1928 (JDB), 2022 WL 1618741, at *22 (D.D.C. May 23, 2022) (examining whether two officers who conducted a custodial interrogation could be liable under Title II of the ADA).

The Complaint does not include sufficient allegations to support a viable claim under the "appropriate officials theory" of liability. First, Deputy Prosecutor Becker cannot serve as an appropriate official because actual notice to the State of Indiana or to the Elkhart County Prosecutor's Office must be based on someone other than the wrongdoer herself. *Gebser*, 524 U.S. at 291 ("Where a [public entity's] liability rests on actual notice principles . . . the knowledge of the wrongdoer himself is not pertinent to the analysis."). This finds its roots in the rule from agency law that the knowledge of the agent who committed the wrongful act does not affect the liability of the principal. *See* Restatement of Agency § 280; *see Gebser*, at 291 (citing the restatement in support). Other courts, in the context of trying to hold a governmental entity liable under Title II of the ADA for improper interrogations by their officers, have similarly found that an officers' "knowledge of their own alleged violations . . . is not sufficient to hold the district liable." *Montgomery v. D.C.*, No. CV 18-1928 (JDB), 2022 WL 1618741, at *22 (D.D.C. May 23, 2022); *see also M.S. ex rel. Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 126–28 (3d Cir. 2020) (reiterating the rule that a wrongdoer's knowledge of his own wrongdoing is not sufficient to create direct liability for a public entity); S*alazar v. S. San Antonio Indep. Sch. Dist.*, 953 F.3d 273, 277–78, 284–85 (5th Cir. 2017) (same); *Shah v. Univ. of Toledo*, Case No. 3:21

32

CV 581, 2021 WL 5140969, at *5 (N.D. Ohio Nov. 4, 2021) (same). Accordingly, in line with these cases, the Court finds that Defendant Becker cannot serve as an appropriate official.

The Complaint also fails to identify any other official of the State of Indiana or the Elkhart County Prosecutor's office who had actual knowledge of the failure to accommodate Royer during his interrogation and who could have intervened. The only other employee of the Elkhart County Prosecutor's Office or the State of Indiana identified is Elkhart County Prosecutor Curtis Hill. (DE 1 ¶ 154.) The Complaint alleges that Hill "had concerns about Mr. Royer's interrogation and declined to sign the charging documents against Mr. Royer." (*Id.*) However, this does not allege (1) that Hill knew that Royer had a disability, (2) that Hill knew that he had not been accommodated during the interview, or (3) that Hill had the ability to institute corrective measures for the failure to accommodate him during the interview. Accordingly, Hill also cannot serve as an appropriate official to hold the State of Indiana or the Elkhart County Prosecutor's office liable under Title II of the ADA or § 504 of the Rehabilitation Act. Therefore, because the Complaint does not allege any other potential appropriate officials of the State of Indiana or the Elkhart County Prosecutor's Office, the Court finds that the "appropriate official" theory of liability cannot provide for direct liability in this circumstance.

Furthermore, there are no allegations that the State of Indiana or the Elkhart County Prosecutor's Office were deliberately indifferent due to a pattern of failing to train its Deputy Prosecutors. A governmental entity may be deliberately indifferent when it provides a training program that the party knows or should know has failed to prevent tortious conduct by employees. *Flores v. City of S. Bend*, No. 20-1603, 2021 WL 1903225 (7th Cir. May 12, 2021) ("[F]ailure-to-train (or inadequate-training) liability arises when a municipality adheres to a

training program 'that they know or should know has failed to prevent tortious conduct by employees,' thereby demonstrating deliberate indifference to this known risk."). For example, in *Connick v. Thompson,* a claim was brought pursuant to Section 1983 which alleged that the Orleans Parish District Attorneys' Office was deliberately indifferent to the need to train prosecutors about their *Brady* disclosure obligation. *Connick v. Thompson*, 563 U.S. 51, 59 (2011). Plaintiff alleged that this resulted in *Brady* information not being disclosed and the plaintiff being improperly convicted. *Id.* The Supreme Court noted that, in order "to prove deliberate indifference, [the plaintiff] needed to show that the [district attorney] was on notice that, absent additional specified training, it was 'highly predictable' that the prosecutors in his office would be confounded by those gray areas and make incorrect *Brady* decisions as a result." *Id.* at 71. The Court ultimately held that a single incident of failure to disclose *Brady* material did not "prove a pattern of similar violations that would 'establish that the policy of inaction' [was] the functional equivalent of a decision by the city itself to violate the constitution." *Id.* at 72.

Similar to *Connick*, the Plaintiff here fails to allege a practice of violations of Title II of the ADA that would establish that a policy of inaction was the functional equivalent of a decision by the Elkhart County Prosecutor's Office or the State of Indiana to violate Title II of the ADA and § 504 of the Rehabilitation Act. The Complaint alleges that "within the *Elkhart Police Department*, there was a policy and practice of taking shortcuts to close criminal investigations, including by fabricating statements, coercing witnesses and/or suspects during interrogations" (DE 1 ¶ 253.) However, the Complaint also alleges that the "City of Elkhart is . . . responsible for the official policies of the Elkhart Police Department" and that the "City of Elkhart is or was the employer of each of the Defendant Officers." (*Id.* ¶ 30.) Unlike the City of Elkhart, which was responsible for the Elkhart Police Department according to the allegations, there is no allegation

that the Elkhart County Prosecutor's Office or the State of Indiana had a policy of inaction that was the functional equivalent of a decision to violate the statutory rights of suspects with mental disabilities during police interrogations and investigations. Without allegations to that effect, Royer fails to state a viable claim under Title II of the ADA using a failure-to-train theory. *See Montgomery v. D.C.*, No. CV 18-1928 (JDB), 2022 WL 1618741, at *17 (D.D.C. May 23, 2022) (finding that the defendant failed to make out a viable Title II claim under a failure to train theory where the defendant did not "allege that a pattern of similar violations put the District on notice of its need to train officers regarding the statutory rights of suspects with mental disabilities during police interrogations and investigations"). Nor is there an allegation that the State of Indiana or the Elkhart County Prosecutor's Office had an explicit policy that was deliberately indifferent to the care provided to mentally disabled individuals during police interrogations.

Accordingly, the Court finds that Royer has failed to allege a viable claim against the State of Indiana and the Elkhart County Prosecutor's Office under Title II of the ADA and § 504 of the Rehabilitation Act. Even accepting all of the well-pleaded factual allegations as true, and drawing all reasonable inferences in the Plaintiff's favor, Royer has not alleged facts supporting that the State of Indiana had (1) knowledge that a harm to a federally protected right is substantially likely (in this case, that mentally disabled individuals would be interviewed in violation of the ADA) or (2) a failure to act upon that likelihood. Therefore, the Court dismisses Count VIII and IX as to the Elkhart County Prosecutor's Office and the State of Indiana.

**D.    Conclusion**

Based on the foregoing, the Court GRANTS in part and DENIES in part Moving Defendants' partial motion to dismiss. (DE 45.) To summarize:

35

1. Count V (failure to intervene) and Count VI (conspiracy) proceed against all defendants except for the Elkhart County Prosecutor's Office and the State of Indiana.

2. Count VIII (Americans with Disabilities Act) and Count IX (Rehabilitation Act) proceed against the City of Elkhart and Elkhart County, but are dismissed as to the Elkhart County Prosecutor's Office and the State of Indiana.

3. Count XVI (IIED) proceeds against all defendants except for the Elkhart County Prosecutor's Office, the State of Indiana, and Vicki Becker.

4. No claims remain against the Elkhart County Prosecutor's Office or the State of Indiana, so they are DISMISSED from this action.

5. The remaining claims are unaffected by this order.

SO ORDERED.

ENTERED: December 13, 2022

_____/s/ JON E. DEGUILIO_____
Chief Judge
United States District Court