## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF INDIANA, SOUTH BEND DIVISION

| | | |
|---|---|---|
| ANDREW ROYER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.  3:22-cv-254-HAB-MGG |
| v. | ) | |
| | ) | |
| DENNIS CHAPMAN, VICKI E. BECKER, in their individual capacities, and ELKHART COUNTY SHERIFF'S DEPARTMENT. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) | |
| | ) | |

## AMENDED COMPLAINT

Plaintiff, ANDREW ROYER, by his undersigned attorneys, complain of Defendants, DENNIS CHAPMAN, VICKI BECKER, in their individual capacities, and ELKHART COUNTY SHERIFF'S DEPARTMENT, as follows:

### Introduction

1.      Plaintiff Andrew Royer spent more than sixteen years incarcerated for the murder of Helen Sailor – a crime he did not commit.

2.      Every wrongful conviction is tragic, but Mr. Royer's is particularly heartbreaking.

3.      At the time of his arrest, Mr. Royer was mentally disabled and living in the Waterfall Highrise, an apartment complex for the elderly and/or disabled in Elkhart, Indiana.

4.      The State's manufactured case against Mr. Royer hinged on three pieces of fabricated evidence.

5.      Included among that fabricated evidence was an involuntary false confession attributed to Mr. Royer, which was concocted, manufactured, and coerced through hours of illegal interrogation. During this interrogation, Dismissed Defendant Conway[1] – at the behest of other Defendants - used intimidation and manipulation to obtain a false and involuntary confession from Mr. Royer.

6.      Prior to the interrogation, Dismissed Defendant Conway was made aware that Mr. Royer was "mentally disabled" and "had the mind of a child."

7.      Dismissed Defendant Conway was not alone.  Other Dismissed Elkhart Defendants, including Mark Daggy, Peggy Snider, Paul Converse, and Vicki Becker were aware that Mr. Royer was mentally disabled prior to his interrogation.

8.      Still, no Defendant took any steps to accommodate Mr. Royer's disability.

9.      Instead, Defendants encouraged, enabled, and authorized Dismissed Defendant Conway to psychologically coerce a mentally disabled Mr. Royer through two days of intensive interrogation that resulted in a false confession.

---

[1] While the City Defendants have been dismissed pursuant to a settlement agreement between the City of Elkhart, the City Defendants, and Plaintiff, the factual allegations are still relevant to Plaintiff's remaining claims against Defendants Becker, Chapman, and Elkhart County Sheriff's Department.  As a result, former City Defendants are referred to as "Dismissed City Defendants" throughout the Complaint.  The claims involving Dismissed City Defendants have been adjusted to include just claims against remaining parties to the litigation.

10.   Mr. Royer's "confession" was demonstrably false.  Ample evidence demonstrates the falsity and unreliability of the manufactured statement.

11.   Second, Dismissed Defendant Conway manufactured a false and fabricated statement for third-party witness Nina Porter through coercion and undisclosed promises of consideration.  The State used Ms. Porter's fabricated statement to secure Mr. Royer's wrongful conviction at trial.

12.   Third, Defendants enlisted Elkhart County Sheriff's Deputy Dennis Chapman to provide a fabricated and false latent print opinion tying Mr. Royer's co-defendant to a piece of physical evidence from the crime-scene.  At trial, the State used the fabricated latent print "match" to secure Mr. Royer's wrongful conviction.

13.   Defendant Chapman's opinion regarding the latent print was false, fabricated, and the product of undisclosed pressure by the Dismissed Elkhart Police Defendants.

14.   Mr. Royer's wrongful conviction nearly cost him everything.  Before this case, Mr. Royer had never been convicted of a crime.  With the mind of a child, Mr. Royer was thrown into a maximum-security prison that was incapable of protecting him and providing him with the proper mental health and medical care that he needed to function and survive.

15.   Mr. Royer's wrongful conviction was caused by Defendants' egregious wrongdoing where they manufactured and fabricated all the evidence of his supposed guilt.

16.     Fortunately for Mr. Royer, Defendants' misconduct has since unraveled.  At a 2019 evidentiary hearing, Mr. Royer demonstrated that the case against him was nothing more than an illusion all along and that his wrongful conviction was obtained by police coercion, the withholding of critical exculpatory evidence, and the fabrication of false evidence.

17.     On March 31, 2020, Mr. Royer was granted a new trial.

18.     On April 2, 2020, Mr. Royer walked out of prison a free man having served nearly half his life behind bars for a crime he did not commit.

19.     Tragically, Mr. Royer's quest for justice did not end with his release.

20.     Instead, the State challenged the trial court's decision granting Mr. Royer a new trial to the Indiana Court of Appeals.

21.     On April 8, 2021, the Indiana Court of Appeals unanimously affirmed the grant of a new trial, affirmed that Mr. Royer's constitutional rights were violated—in part due to the withholding of exculpatory and impeachment evidence—and summarized, "[s]imply put, Royer did not receive a fair criminal trial."

22.     On June 30, 2021, the State filed a motion to dismiss the criminal charges against Mr. Royer.

23.     On July 12, 2021, the State's motion to dismiss was granted and Mr. Royer was finally exonerated from a crime he did not commit.

24.     This lawsuit seeks to bring the injustice that happened to Mr. Royer to light so that it will never occur again.

## Jurisdiction

25.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.  Mr. Royer also asserts claims under the Rehabilitation Act of 1973 and Title II of Americans with Disabilities Act.

26.     This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims pursuant to U.S.C. § 1367.

27.     Venue is proper under 28 U.S.C. § 1391(b).  The majority of Defendants reside in this district and the events and omissions giving rise to Plaintiff's claims occurred in this district.

## Parties

28.     Plaintiff Andrew Royer is a 46-year-old resident of Goshen, Indiana.

29.     At all times relevant hereto, Dismissed Defendants Carlton Conway, Mark Daggy, Paul Converse, Peggy Snider, Todd Thayer, Michael Sigsbee, Joel Bourdon, and Brett Coppins, (hereinafter "Dismissed Defendant Officers"), were police officers in the Elkhart Police Department.  All are sued in their individual capacities and acted under color of law and within the scope of their employment during the investigation at issue.

30.     Dismissed Defendant City of Elkhart is a municipal corporation under the laws of the State of Indiana.  The City of Elkhart is liable for all torts committed by the Dismissed Defendant Officers while employed by the City of Elkhart

pursuant to the doctrine of *respondeat superior*.  Dismissed Defendant City of Elkhart is additionally responsible for the official policies of the Elkhart Police Department.  The City of Elkhart is or was the employer of each of the Dismissed Defendant Officers.

31.     At all times relevant hereto, Defendant Dennis Chapman, (hereinafter "County Defendant Officer") was a deputy in the Elkhart County Sheriff's Department.  He is sued in his individual capacity and acted under color of law and within the scope of his employment during the investigation at issue.  The Elkhart County Sheriff's Department employed was the employer of Defendant Chapman.

32.     Vicki Becker served as a deputy prosecutor in Elkhart County from 1998 until 2016, when she was elected Elkhart County Prosecutor.  She is sued in her individual capacity and acted under color of law and within the scope of her employment during the investigation at issue. At the time of her involvement, Ms. Becker's employment would fall under the purview of the Elkhart County Prosecutor's Office, and/or Elkhart County, and/or the State of Indiana.

33.     Defendant Elkhart County Sheriff's Department is a governmental agency within the State of Indiana.  Elkhart County Sheriff's Department is liable for all torts committed by Defendant Chapman while employed by the Elkhart County Sheriff's Department pursuant to the doctrine of *respondeat superior*.

34.     At all times relevant to this action, each of the named individual Defendants acted individually and/or collectively, under the color of the laws,

regulations, and customs of the State of Indiana.  Each Defendant's actions constituted "state action" as defined under federal law.

## The Crime

35.     At approximately 5:30 p.m. on November 28, 2002, Larry Converse and his wife dropped off Helen Sailor at the door of the Waterfall Highrise Apartments.

36.     Carolyn Hoffer, a certified nursing assistant, called Ms. Sailor about ten times between 8:45 p.m. and 9:15 p.m. that same evening to remind Ms. Sailor that she would be coming the next morning.  Ms. Sailor was 94 years-old and Ms. Hoffer assisted in caring for her.  Ms. Sailor did not answer the calls.

37.     Around 7:00 a.m. the following morning, Ms. Hoffer arrived at the Highrise and tried to "buzz" into the building.  Again, Ms. Sailor did not respond.

38.     Ms. Hoffer eventually called the Converse family, who later arrived at the Highrise with a key in hand.  Upon entering the apartment, Ms. Hoffer and the Converses found Ms. Sailor's body.

39.     Mr. Royer had absolutely nothing to do with this heinous crime.

## Initial Investigation Produces Two Viable Suspects, Both of Whom Were Ignored By Dismissed Defendants in Their Quest to Frame Plaintiff

40.     Dismissed Defendant Todd Thayer and Detective De'Andre Christian of the Elkhart Police Department led the initial investigation into Ms. Sailor's death.

41.     The initial investigation into Ms. Sailor's death led to two viable suspects: Larry Wood and Tony Thomas.

42.   Larry Wood lived in the Highrise at the time of Ms. Sailor's death and was questioned almost immediately after her body was discovered.

43.   Mr. Wood conveyed to Detective Hammel and Dismissed Defendant Thayer that on the day of the murder he saw Ms. Sailor dropped off at her apartment in the late afternoon and opened the door to the Highrise for her. Although Mr. Wood initially denied going into Ms. Sailor's apartment, he later admitted that he may have ridden the elevator with her, walked her to her apartment, and even assisted her inside.

44.   Detective Hammel and Dismissed Defendant Thayer further learned during this interview that Mr. Wood was the delivery person for Seifert Drugs and was responsible for delivering prescription medication to Ms. Sailor and the other residents in the Highrise.

45.   Detective Hammel and Dismissed Defendant Thayer searched Mr. Wood's residence during their initial encounter with Wood.  There, the detectives discovered a bowl on his countertop that appeared to have some residue of red juice or punch.  A reddish substance – similar to that found in Mr. Wood's sink - was discovered on Ms. Sailor's body.

46.   The officers also found a pair of Mr. Wood's shoes that had an oily residue on them—similar to that found at the crime scene—and noticed that there was a blood stain on the inside of the shoe.

47.   Luminol testing confirmed the bloodstain on Mr. Wood's shoe.

48.     Mr. Wood appeared to be "very nervous" and asked Detective Christian and Defendant Thayer if he was in trouble.

49.     Mr. Wood was taken to the Elkhart Police Department on December 12, 2002 for questioning.  There, Mr. Wood "fell to his knees and began to cry" just prior to entering the interrogation room.

50.     At 9:45 a.m., Mr. Wood signed a waiver of *Miranda* rights form in the presence of Dismissed Defendant Coppins. That same day, Mr. Wood answered a series of questions posed to him.

51.     Mr. Wood then failed a truth verification examination.

### Initial Investigation Produces Significant Evidence Implicating Convicted Murderer Tony Thomas in Ms. Sailor's Death

52.     The initial investigation also produced evidence implicating Tony Thomas—a convicted murderer lurking in the Highrise on the day of the murder—in Ms. Sailor's death.

53.     Detective Christian spoke to a number of witnesses who directly implicated Mr. Thomas in the murder and placed him on a Highrise elevator at the same time that Ms. Sailor was last seen entering an elevator.

54.     At the time of Ms. Sailor's murder, Mr. Thomas' grandmother, Alberta Wolfe, lived in Apartment 300 of the Highrise complex.  Ms. Wolfe was out of state for Thanksgiving and had provided Mr. Thomas with a key.

55.     By the time of Ms. Sailor's death, Mr. Thomas had already served more than a decade in an Arkansas prison for murder.

56.     Detective Christian obtained affidavits from Eunice "Judy" Miller and James Cassity on December 9, 2002 during the initial investigation.

57.     At the time of Ms. Sailor's death, Eunice Miller was a resident on the Highrise.  On Thanksgiving Day 2002, Ms. Miller was at her apartment with Mr. Cassity.  Detective Christian learned that Mr. Thomas was in bad shape when he knocked on Ms. Miller's door around 2:00 p.m.  A distraught Mr. Thomas revealed that he had been living in his car for three months.

58.     Ms. Miller ultimately invited Mr. Thomas to Thanksgiving dinner. After Mr. Thomas left, Ms. Miller asked Mr. Cassity to hide her purse because of Mr. Thomas' bizarre behavior.  Ms. Miller revealed to Detective Christian that "something was not right with Tony" on the day that Ms. Sailor was killed.

59.     Mr. Cassity corroborated Ms. Miller's account to Detective Christian.

60.     Detective Christian was informed that when Thomas eventually returned, he was "belligerent," "sniffling," and apparently high.

61.     Mr. Thomas was wearing a green army jacket, jeans, and black slippers on November 28, 2002.  Ms. Miller was able to positively identify Mr. Thomas in a photo array.

62.     Mr. Cassity informed an Elkhart Detective in December of 2002 that he believed Tony Thomas was responsible for the murder of Ms. Sailor because he was so belligerent and irrational on the day of the murder.  This information was never documented nor disclosed in a police report.

63.     Another Highrise resident, Robert Hogan, signed an affidavit for police about a "suspicious" person on the Highrise elevator around 5:30 p.m. on Thanksgiving.

64.     At the time he arrived on the elevator, Mr. Hogan saw a black male wearing a green army coat and army hat.  Based on the descriptions provided by Ms. Miller and Mr. Cassity, police correctly believed that the description matched Tony Thomas.

65.     Mr. Hogan informed the police that Mr. Thomas stopped on each floor, where he poked his head out of the elevator and looked around the hallway. After each stop, Mr. Thomas claimed he had the wrong floor and remained on the elevator after Mr. Hogan exited.  Mr. Hogan believed Mr. Thomas was a disoriented "crack-head."

### August 2003 Report Refers to Undisclosed Interview and Polygraph of Thomas in 2002

66.     Though the State has never disclosed any report or recording regarding questioning of Tony Thomas, according to an August 8, 2003 report, an interview did take place.

67.     Detective Christian also disclosed in this report that she believes that Mr. Thomas was given a truth-verification exam, but no documentation has ever been disclosed regarding such a test.

### The Formation of the Elkhart Police Department's First Homicide Unit

68.     By the summer of 2003, the Sailor homicide investigation had turned cold.

69.     In August of 2003, the Elkhart Police Department started a homicide unit.  At the time, the unit consisted of: (1) Dismissed Defendant Lt. Paul Converse; (2) Sgt. Bill Wargo; (3) Dismissed Defendant Det. Peggy Snider; (4) Dismissed Defendant Det. Mark Daggy; and (5) Dismissed Defendant Det. Carl Conway.

70.     The Sailor investigation was the unit's first investigation.

71.     The Unit's supervisor – Lt. Paul Converse – was related to Ms. Sailor.  Instead of being walled off from the investigation, as should have been done in any legitimate law-enforcement agency, Dismissed Defendant Converse supervised the investigation into Sailor's death.

72.     Shortly thereafter, Defendant Conway was assigned to lead the homicide investigation.  Other Defendants assisted him along the way.

**Defendants' Obsession with Lana Canen Turns Focus of Investigation Away From Tony Thomas and Larry Wood**

73.     Even though the initial investigation developed significant leads implicating Larry Wood and Tony Thomas in the murder, Dismissed Defendant Daggy had his eyes set on a completely different individual: Lana Canen.

74.     Dismissed Defendant Daggy had been investigating Ms. Canen prior to Ms. Sailor's death for a string of burglaries in the Waterfall Highrise.

75.     While Dismissed Defendant Daggy suspected Ms. Canen as being involved in those burglaries, he never developed probable cause to charge her with any crime.

76.     Mr. Royer never committed any burglary with Ms. Canen, and nobody

has ever suggested or suspected that he had.

77.    By late August 2003, Dismissed Defendant Daggy convinced Dismissed Defendant Conway to turn the investigation towards Lana Canen.

### Not a Shred of Evidence Implicated Mr. Royer
### Prior to September 2, 2003

78.    Prior to September 2, 2003, not a single piece of evidence implicated Andrew Royer in the Sailor homicide.

79.    Prior to September 2, 2003, not a single witness implicated Andrew Royer in the Sailor homicide.

80.    Prior to September 2, 2003, Mr. Royer was not a witness, person of interest, or a suspect in the Sailor homicide.

### Dismissed Defendant Conway Fabricates Nina Porter's False Statement

81.    On September 1, 2003, Nina Porter was driving a car with Lana Canen when Elkhart Police Officer Ben Kruszynski pulled her over for a traffic stop.  At the time of this encounter, Ms. Porter was recently released from prison, on parole and probation, and under the belief that she faced eight years in custody if she violated her probation or parole.

82.    At this traffic stop, Lana Canen was arrested; Ms. Porter however, was given a traffic citation and allowed to go home.

83.    At no point during this interaction with the Elkhart Police did Ms. Porter volunteer information regarding Helen Sailor, Lana Canen, or Mr. Royer.

84.    After the stop, Defendant Conway learned from Officer Kruszynski that Canen had been with Ms. Porter.  Officer Kruzynski did not provide Dismissed

Defendant Conway with any information indicating that Nina Porter had knowledge regarding the Sailor homicide.

85.     The next day, September 2, 2003, Dismissed Detective Conway arrived at Ms. Porter's house and informed her that there was an outstanding warrant for her arrest and took her into custody.

86.     Dismissed Defendant Conway took Ms. Porter into custody as part of his effort to frame Mr. Royer (and Lana Canen) for a crime he did not commit.

87.     After being placed into an interrogation room, Ms. Porter was not questioned about the warrant for her arrest.  Instead, Ms. Porter was questioned for hours about the Sailor homicide.

88.     When Ms. Porter maintained that she knew nothing about the Sailor homicide and that Ms. Canen had never confessed to her, Dismissed Defendant Conway informed her that she would be in trouble if she didn't cooperate.

89.     According to Ms. Porter, Dismissed Defendant Conway spoke with her extensively before taking her statement.  Dismissed Defendant Conway was very loud and sat about eight inches from Ms. Porter as he fed her the details of the Sailor homicide, scaring and intimidating her.

90.     When Ms. Porter maintained that she knew nothing about the Sailor homicide, Detective Conway threatened to have her children taken away if she didn't provide a statement.

91.     After repeated attempts to fabricate a statement for Ms. Porter, Dismissed Defendant Conway showed her photographs of the deceased body of

14

Helen Sailor. Each photo had words written on the back that were meant to serve as cues for Ms. Porter to repeat when the recorder was turned on.

92.     Specifically, Ms. Porter recalls one of the photographs containing the phrase "Thanksgiving", which was her cue for repeating "Thanksgiving. Thanks for giving death."

93.     While the recorder was off, Dismissed Defendant Conway fabricated a false statement for Ms. Porter implicating Ms. Canen and Mr. Royer in the murder of Helen Sailor.

94.     Prior to giving a recorded statement, Dismissed Defendant Conway informed Ms. Porter that she would receive a monetary reward in exchange for her cooperation.

95.     None of this misconduct – the fabrication, coercion, and promises of consideration – were disclosed to Mr. Royer or his defense prior to trial.

96.     Ms. Porter's fabricated and coerced false statement manufactured by Defendant Conway was eventually used to secure Mr. Royer's wrongful conviction.

97.     Dismissed Defendants Daggy and Sigsbee later paid Ms. Porter the $2,000 reward.  Defendant Daggy admits that Ms. Porter was paid the reward because she testified consistently with the statement obtained during the underlying investigation.

98.     The payment to Ms. Porter was not disclosed to Mr. Royer prior to his conviction becoming final.

**Defendants Were Aware of Mr. Royer's Mental Disability Prior to His September 2, 2003 Interrogation and Took Zero Steps To Accommodate**

99. After fabricating a false statement for Nina Porter, Defendants set out to question Mr. Royer.

100. By 2003, Mr. Royer was a qualified individual with a disability under the Americans with Disability Act ("ADA"). By the time of his interrogation, Mr. Royer not only had the mind of a child, but was diagnosed with schizoaffective disorder, depression, and prescribed multiple psychiatric medications.

101. On September 3, 2003, Mr. Royer was taken to the Elkhart Police Department for custodial questioning.

102. Prior to the interrogation, Defendants did not have probable cause to charge Mr. Royer with any crime.

103. Prior to the interrogation, Dismissed Defendant Conway was informed by Defendant Snider that the Elkhart Housing Authority had documentation illustrating that Mr. Royer was severely disabled and had the mind of a child.

104. Dismissed Defendants Converse, Daggy, Snider, and Defendant Becker were likewise aware of Mr. Royer's disability during the interrogation.

105. Yet, Dismissed Defendants and Defendant Becker took no steps to accommodate Mr. Royer's disability prior to nor during the interrogation.

106. Mr. Royer was not permitted to have a lawyer, counselor, or family member present for his interrogations on September 3, 2003 and September 4, 2003.

107. Due to the lack of accommodations made, which could have included a lawyer, counselor, social worker, or family member, a disabled Mr. Royer was

unable to effectively participate in the specific police activity in an appropriate manner consistent with his disability.  Such an accommodation would have allowed for Mr. Royer to have the benefit of providing specific information responsive to Defendants' questioning.

108.   Due to the lack of accommodations made, Dismissed Defendants and Defendant Becker were able to psychologically coerce a disabled Mr. Royer into providing a false confession.

109.   Dismissed Defendants also failed to give Mr. Royer any effective *Miranda* warning.  No steps were taken to assure that Mr. Royer ever understood the *Miranda* warning that Defendant Conway provided to him.  As Dismissed Defendant Conway has since testified, the *Miranda* warning was given - and documentation signed - in less than one minute.  Mr. Royer never knowingly or voluntarily waive his right to remain silent or his right to have counsel present at the interrogation.

**Dismissed Defendant Conway Psychologically Coerced Mr. Royer Into a False Confession**

110.   Defendants' interrogation of Mr. Royer, which took place over the course of two days, was an extreme and alarming abuse of police power.  It was a wholly illegal effort to secure a false confession from Mr. Royer in violation of his constitutional rights by means of psychological coercion.

111.   Over the course of two days, Dismissed Defendant Conway, at Dismissed Defendants' and Defendant Becker's behest, coerced Mr. Royer into a false confession.  Dismissed Defendant Converse supervised this interrogation.

112.    The interrogation began shortly after Mr. Royer arrived at the Elkhart Police Department on September 3, 2003 and continued on an off over a period of two days.

113.    The Elkhart Police Defendants and Defendant Becker knew before the interrogation began that Mr. Royer had intellectual deficits and that he had a history of mental health problems that would render him especially vulnerable to coercive techniques.  Defendants were aware that Mr. Royer had a well-documented history of psychological and emotional problems and received psychiatric care and medication to manage those problems.

114.    Defendants had ample opportunity to observe the severe symptoms and consequences of these psychological problems throughout the course of the interrogation.

115.    During the interrogation, Defendants observed that Mr. Royer had great trouble understanding and comprehending what was taking place.

116.    Defendants took no steps to limit or adapt their questioning of Mr. Royer in response to his known vulnerabilities.  Instead, the opposite occurred: Defendants agreed among themselves and acted to exploit Mr. Royer's intellectual and emotional weaknesses to secure a confession regardless of whether it was true or false.

117.    Dismissed Defendant Conway accomplished Defendants' task by conducting physically and psychologically abusive interrogation techniques on Mr. Royer.

18

118. Dismissed Defendant Conway repeatedly and strenuously accused Mr. Royer of the Sailor murder over the course of the interrogation, despite Mr. Royer's consistent denials of any involvement in the crime.

119. During the unrecorded interrogations, Dismissed Defendant Conway repeatedly fed intimate details of the crime to Mr. Royer.

120. In the face of extreme psychological abuse and coercion, Mr. Royer steadfastly maintained his innocence. Mr. Royer told Dismissed Defendants over and over that he was innocent and had no connection to the Sailor murder. Dismissed Defendants brushed away evidence corroborating Mr. Royer's claims of innocence.

121. After hours of interrogation, Dismissed Defendants' misconduct finally broke Mr. Royer.

122. By the end, Dismissed Defendant Conway observed that Mr. Royer was "very mentally fatigued and having a hard time maintaining concentration." According to Detective Conway, Mr. Royer was drifting, disabled, defeated, emotional, broken down, tired, and fatigued.

123. Dismissed Defendant Conway observed that Mr. Royer had psychologically collapsed before ever taking a recorded statement on September 3, 2003.

124. Instead of terminating the interrogation, as he should have, Dismissed Defendant Conway took Mr. Royer's recorded statement.

19

125.   Prior to doing so, Dismissed Defendant Conway consulted with other Defendants, including Defendant Converse, who encouraged Defendant Conway to plow forward with Defendants' plan.

### Acting In Her Investigative Capacity, Defendant Becker Participates in the Interrogation of Mr. Royer Prior to Initiation of Charges

126.   Various Dismissed Defendants from the Elkhart Police Department watched Mr. Royer's coercive interrogation through a closed-circuit monitoring system in Dismissed Defendant Converse's office.   Those Dismissed Defendants include, but are not limited to, Defendant Converse, Defendant Snider, and Defendant Daggy.

127.   Dismissed Defendant Daggy now admits that the interrogation of Mr. Royer was "super leading" and among the worst he has ever seen.  Dismissed Defendant Daggy cannot name a single interrogation that he ever witnessed or conducted in his 21 years at the Elkhart Police Department that used more leading questioning than Mr. Royer's.  Dismissed Defendant Daggy never disclosed his observations and beliefs regarding Mr. Royer's interrogation to the defense prior to trial.

128.   Dismissed Defendant Daggy's concerns were not alone.

129.   Dismissed Defendant Snider also had concerns about the interrogation given Mr. Royer's mental capacity.  Mr. Royer was the only person in Dismissed Defendant Snider's entire career who she felt was an innocent person charged with a crime he did not commit.  Dismissed Defendant Snider never disclosed her observations and beliefs to Mr. Royer's defense prior to trial.

130.    Defendant Vicki E. Becker, then an Elkhart County deputy prosecutor, joined Defendants Daggy, Snider, and Converse in watching the interrogation through the closed-circuit monitoring system.

131.    Defendant Becker and the Dismissed Police Officer Defendants had been in frequent contact during the investigation that predated Mr. Royer's interrogation.  Defendant Becker did so in an investigative capacity.

132.    Defendant Becker was present for the interrogation with the other Police Officer Defendants in her investigative capacity before the initiation of charges.

133.    At the time Defendant Becker joined the interrogation, no probable cause existed to charge Mr. Royer with any crime.

134.    Defendant Becker participated in the interrogation while aware that Mr. Royer was mentally disabled.

135.    Defendant Becker took no steps to intervene nor ensure that Mr. Royer's disability was accommodated.

136.    Defendant Becker took no steps to stop Defendant Conway from using psychologically coercive interrogation tactics on Mr. Royer.

137.    Defendant Becker never disclosed to the defense that she was a participant and witness to Mr. Royer's interrogation prior to trial.  In fact, Defendant Becker withheld this information for 18 years until she divulged in a 2021 media interview that she saw "quite a bit of it" and "was in and out of the room" during Mr. Royer's interrogation.

138.    Defendant Becker withheld the fact that she was a witness, in part, to conceal the egregious misconduct that she not only witnessed but was actually a part of.

139.    With respect to Plaintiff's interrogation, Defendant Becker acted as an investigator of the Elkhart Police Department, and she repeatedly advised, urged, and ordered the Dismissed Police Officer Defendants to continue the abusive and coercive interrogation of Mr. Royer even though it was plain to all involved that the interrogation was highly improper, and that Mr. Royer was innocent.

140.    Due to the coercive interrogation techniques, Mr. Royer was mentally broken.  Yet, no Defendant took any steps to stop the coercive interrogation of Mr. Royer.  Instead, they advised one another on what steps should be taken in the interrogation and what techniques should be used to force Mr. Royer to confess, and they kept one another up to speed on their progress toward implicating Mr. Royer during the interrogation.

141.    A booking sheet documents that Mr. Royer was placed under arrest for the murder at 5:30 p.m. on September 3, 2003.  At that time, Defendant Conway requested that Mr. Royer not be moved to the Elkhart County Sheriff's department until further notice because he was "going to interview him the next day."

142.    Defendant Becker and the Dismissed Police Officer Defendants made arrangements to ensure that the interrogation could continue on September 3, 2003 through September 4, 2003.

143.    By that time, Defendants recognized that Mr. Royer's statement was unreliable and was so factually inaccurate that it could never be used to connect Plaintiff to the Sailor murder.  Defendants were aware that the facts of the statement diverged from and contradicted the evidence gathered during their investigation of the Sailor murder.  Defendants were also aware that any facts consistent with the murder were fed to Mr. Royer by Dismissed Defendant Conway through the interrogation.  In performing this analysis first statement, Defendants concluded that it could not legitimately support any charge of criminal conduct against Mr. Royer.

144.    Prior to the time that Mr. Royer repeated either of the false confessions, the Defendants knew that there was no legitimate evidence connecting him to the Sailor homicide.

145.    In addition, Defendants knew of strong evidence that put Mr. Royer at home on the night of the crime.  Knowing that they lacked probable cause to charge Mr. Royer with Ms. Sailor's murder, Defendants decided to manufacture another statement for Mr. Royer the following day.

146.    Although Mr. Royer was under arrest for the murder and in police custody, Defendants initiated contact with him on September 4, 2003 in violation of his constitutional rights.  Mr. Royer did not have access to counsel at the time Defendants sought to interrogate him a second time.

147.    Defendants used the same psychologically coercive techniques during the September 4, 2003 interrogation.  Again, Dismissed Defendant Conway took the lead while in consultation with the other Defendants.

148.    Defendants never had probable cause to suspect that Mr. Royer was involved in the Sailor homicide.  The manufactured and entirely false statements, which Defendants scripted was only (poorly) parroted by Mr. Royer after hours and hours of psychological abuse and uninterrupted interrogation.

149.    Outside of Ms. Porter's fabricated statement, Mr. Royer's coerced and false confession was the only evidence connecting Mr. Royer to the murder and was insufficient to establish probable cause.

150.    Without these false and coerced confessions there was nothing to support a criminal proceeding against Mr. Royer.  In the absence of the misconduct described above, Mr. Royer would not have stood trial and never would have been convicted of the murder of Helen Sailor.

151.    Defendants' investigation confirmed the falsity and unreliability of Mr. Royer's false confession.  Defendants learned that Mr. Royer's false confessions were not only inconsistent with one another, but they were likewise inconsistent with the physical evidence developed during the underlying criminal investigation.

152.    Defendants knew that Mr. Royer's false confessions did not amount to probable cause.

**Members of the Elkhart Police Department and Prosecutor's Office Believed That Mr. Royer's Confessions Were So Inconsistent and Unreliable That They Were Insufficient to Form Probable Cause**

153.    Based on the fabricated, coerced, and illegally obtained evidence described above, Dismissed Defendant Snider initiated charges against Mr. Royer in September 2003.

154.    Around that time, conversations took place in the Elkhart County Prosecutor's Office regarding the coercive nature of Mr. Royer's interrogations and the unreliability of the statements obtained.  Though it was never disclosed, Elkhart County Prosecutor Curtis Hill had concerns about Mr. Royer's interrogation and declined to sign the charging documents against Mr. Royer.

155.    In his place, Defendant Becker authorized charges against Mr. Royer for the murder of Ms. Sailor on September 8, 2003 – nearly five days after Defendants initially manufactured Mr. Royer's false confession.

156.    Defendant Becker did so knowing that probable cause did not exist for the initiation of charges.

157.    Defendant Becker did so having personal knowledge of the coercive circumstances of Mr. Royer's interrogation, as she watched the interrogation from a closed-circuit monitoring system.

158.    Defendant Becker did so knowing that Mr. Royer was mentally disabled and that no steps were taken to accommodate Mr. Royer's disability during the interrogations.

## Fabricated Latent Print Opinion

159.    To secure Mr. Royer's wrongful conviction, the State enlisted assistance from Defendant Dennis Chapman.

160.    During the underlying investigation, Dismissed Elkhart officers recovered a partial latent print lift from a pill container in Ms. Sailor's residence. Initially, the Elkhart Police Department sent the latent to the Indiana State Police Laboratory.

161.    By August 29, 2003, the Dismissed Elkhart Defendants provided physical evidence to Defendant Chapman, including fingerprint standards and lifts for comparison.

162.    By October 2003, Dismissed Defendant Bourden, removed all the latent print evidence from the Indiana State Police laboratory and requested that it be sent to Defendant Chapman for comparison.

163.    Defendant Chapman conducted a comparison of standards from Mr. Royer and Ms. Canen to the latent recovered from the crime scene.

164.    The comparison excluded Mr. Royer from contributing the print.

165.    The comparison excluded Ms. Canen from contributing the print.

166.    But over the course of six months, Defendant Chapman was pressured by the Elkhart Defendants to make a print opinion to at least one of Defendants' suspects.

167.    At least one Elkhart Defendant also provided Defendant Chapman with their theory of the murder to bias his fingerprint analysis and obtain the

26

fabricated false opinion.  Specifically, Defendant Chapman was informed that Ms.
Canen was the suspect and the brains behind the murder.  Defendant Chapman
was also informed that Mr. Royer was too simple to think up the plan that was
carried out.

168.    The Dismissed Elkhart Defendants plan to pressure Defendant
Chapman into fabricating a false opinion implicating their suspects was successful.

169.    In 2004, Defendant Chapman fabricated a report falsely stating that
"the latent print from the med tub is the left little finger of Lana Canen…The only
identification was the left little finger of Lana Canen on the Med Tub."

170.    The latent print recovered from the medicine tub never matched
Lana Canen.

171.    The Indiana State Police Laboratory has since confirmed that Ms.
Canen has been excluded as a contributor to the print on the medicine tub.

172.    Defendant Chapman's false and fabricated report also opined that
"the other fingerprint cards were then checked but none had a similar pattern."
Included in those exemplars was the standard of Pamela Kruder, a home
healthcare aide to Ms. Sailor.  Defendant Chapman's 2004 opinion excluding
Kruder was also false and fabricated.

173.    The Indiana State Police Laboratory has since analyzed the latent
print recovered from the medicine bottle and determined that it matches the left
middle finger of Ms. Kruder.  Importantly, this is the same latent print that
Defendant Chapman previously claimed was a match to Ms. Canen's left pinky

finger in 2004.  This is further evidence of Defendant Chapman's fabricated false opinion.

174.    Defendant Chapman's report also states that his opinion was "based on my experience as a Fingerprint Examiner with the Federal Bureau of Investigation from 1976-1978 and my continued examination of fingerprints with the Elkhart County Sheriff's Department."  This, too, was a fabrication as Defendant Chapman was never trained and had no FBI experience in conducting latent print comparisons.

175.    The fabricated forensic evidence was a cornerstone of the prosecution's case at trial.

176.    At Mr. Royer's 2005 trial, the State presented the testimony of Dennis Chapman, a deputy at the Elkhart County Sheriff's Department, as an expert on latent print comparisons. There, Mr. Chapman testified that he was formerly a fingerprint analyst for the FBI where he was responsible for examining and comparing prints.  Mr. Chapman further testified that he made approximately 100 latent print identifications and comparisons in the past several years.

177.    Ultimately, Mr. Chapman informed the jury that he compared a latent recovered from a medicine bottle at the crime-scene to Ms. Canen's standards and determined that it was a match.  Defendant Chapman's representations at trial were false and based upon the fabricated opinions contained in his report.

178.    Working in concert with the Dismissed Defendant Officers, Defendant Chapman fabricated this key "link" to the crime and withheld evidence

of this fabrication from the prosecution and defense at trial.

179.    Defendant Chapman and the Dismissed Elkhart Defendant Officer also withheld from the prosecution and defense at trial that Defendant Chapman: (1) was never qualified nor trained to conduct latent print comparisons with the Federal Bureau of Investigation nor the Elkhart County Sheriff's Department; (2) had a lack of qualifications and training to conduct latent print comparisons; (3) was fed information about the Defendants' theory of the investigation prior to forming a false and fabricated opinion; and (4) was pressured by the Elkhart Defendants into forming an opinion.

180.    Defendant Chapman's latent print opinions were a fabrication and he was never qualified to conduct latent print comparisons.

**Defendant Chapman Was Recruited by the Elkhart Police Department to Provide False Latent Print Opinions in Other Cases**

181.    But Defendant Chapman's fabricated latent print opinions in this case did not occur in isolation.

182.    Defendant Chapman was used to provide latent print opinions on behalf of the Elkhart Police Department dating back to the 1990s.

183.    Defendant Chapman was just a hired gun that the Elkhart Defendants used when the Indiana State Police Laboratory was not providing satisfactory results in criminal investigations.

184.    When that occurred, the Elkhart Defendants would withdraw the evidence from the Indiana State Police Laboratory and transfer it to Defendant Chapman, who they were confident would provide them with an opinion that was

29

consistent with their theory of the investigation.

### Conway Undisclosed Removal From Homicide

185.   Prior to Mr. Royer's 2005 criminal trial, Dismissed Defendant Conway was removed from the homicide unit due to sustained allegations of misconduct arising from an interrogation of a suspect in a separate homicide investigation.

186.   Dismissed Defendant Conway was removed from the homicide unit because his supervisors, Dismissed Defendant Converse and Sergeant Wargo, had concerns about the impact that his misconduct would have on future homicide investigations and his credibility at criminal trials.

187.   Dismissed Defendant Conway's supervisors further believed that his misconduct would jeopardize the integrity of criminal investigations.

188.   Dismissed Defendant Conway's removal from the homicide unit was not by choice.  In fact, Dismissed Defendant Conway appealed his removal to the Chief of Police.  But his efforts failed and Dismissed Defendant Conway never returned to the homicide unit.

189.   While Dismissed Defendant Conway was removed from homicide, no other discipline nor additional training was given to him.  As a result, Dismissed Defendant Conway continued to commit misconduct in criminal investigations that led to additional innocent men and women being charged and convicted of crimes they did not commit.

190.   No discipline against or demotion of Dismissed Detective Conway from the homicide unit was disclosed to Mr. Royer's defense prior to his 2005 trial.

191.   Dismissed Defendant City of Elkhart withheld Mr. Conway's removal – and additional sustained allegations of misconduct – from other criminal defendants in Elkhart for more than a decade.  Those withholdings, too, resulted in additional wrongful convictions.

**Dismissed Defendant City of Elkhart Has A Pattern and Practice of Withholding Discipline Records**

192.   Dismissed Defendant City of Elkhart's withholding of Defendant Conway's disciplinary records, allegations of misconduct, personnel files, and removal from the homicide unit was consistent with a longstanding pattern and practice that existed in Elkhart.

193.   Dating back to 1993, the Board of Public Safety issued a report "Regarding [the] Investigation of Police Officers Found Liable by a U.S. District Court of Using Excessive Force."  The Board of Public Safety's 1993 report found that some of the officers used "brutality," and more importantly, that the Department failed to implement proper discipline of officers who commit misconduct.

194.   The Board not only expressed frustration regarding efforts to hamper the City Administration's investigation attempts, but it likewise set forth the Report's goal: "to eradicate brutality as practiced by some of our police officers."  The Board linked this misconduct to the Elkhart Police Department failing to properly implement progressive discipline of officers.  The Board reasoned that, "[a]ctually if progressive, corrective discipline had been practiced in the cases of Hill and Ambrose[,] either they would be cops today who know how to follow proper

procedure or they would not be working here.  We tend to believe that failure to point out weakness early in the officers career does no one a favor…"

195.    The Board of Public Safety reiterated that "[t]he problem appears to be in a system that is secured in privacy and protected by a code of silence further protected by state law…"

196.    The Board likewise determined that the hiring of officers needed to be completely transformed and that "we the appointing authority pay more attention to the psychological profile." . In addition to revamped hiring practices, the Board recommended that "the Department must find a way to better conduct internal investigations."

197.    By 2005, these reforms were still not implemented, thus allowing Defendants to continue committing misconduct without fear of any meaningful discipline or consequences.

198.    Through Mr. Royer's exoneration in 2021, the code of silence continued to exist within the Elkhart Police Department.

199.    In 1993, the Board of Public Safety also addressed the withholding of officers' personnel files from defendants in criminal prosecutions. In doing so, the report found that:

> We need to put everything ever known about the officer in his/her file.  We need to understand we work for the people who elect managers for a four[-]year period.  We do not work for the prosecutor and leaning on the prosecutor[']s requirements need to stop.  To not put something on file that might make a police officer less than a credible witness if discovered is exactly as it should be.  To keep this from being discovered smacks at everything American.  To go to prison because of testimony from a less than credible witness is tragic.  It begs the questions should this cop be a cop.

200.    By Mr. Royer's 2005 trial, Dismissed Defendant City of Elkhart continued to withhold officers' personnel files – including sustained allegations of misconduct – from defendants in criminal prosecutions.

201.    Thus, while Dismissed Defendant City of Elkhart was on notice of a serious problem regarding the lack of discipline and the failure to disclose personnel files – including sustained allegations of misconduct – to criminal defendants by 1993, the City took no steps to address this problem prior to Mr. Royer's wrongful conviction in 2005.

202.    That pattern and practice of withholding personnel files led to scores of wrongful convictions, as officers like Stephen Rezutko, Edward Windbigler, Steven Ambrose, John Faigh, and Carl Conway were allowed to testify in criminal proceedings as defendants, like Mr. Royer, were without the ability to meaningfully attack the credibility of law-enforcement officers due to Dismissed Defendant City of Elkhart's withholding of exculpatory and impeachment evidence.

203.    This custom, pattern, and practice of withholding personnel files containing sustained allegations of misconduct contributed to the wrongful convictions of Keith Cooper, Christopher Parish, Mack Sims, Lana Canen, and Mr. Royer.  It likewise contributed to scores of other wrongfully convicted individuals who remain incarcerated to this day.

### After Mr. Royer is Charged, Defendant Coppins Creates Report
### Contradicting Mr. Wood's 2002 Questioning

204.    After Mr. Royer was wrongfully charged, other Dismissed Defendants manufactured reports to minimize leads implicating alternate suspects.

205.    On December 31, 2003, Dismissed Defendant Coppins documented his November 2002 questioning of Mr. Wood.

206.    Dismissed Defendant Coppins documented this information more than two months after the initiation of charges against Mr. Royer, and more than a year after conducting the December 2002 truth verification examination of Mr. Wood.

207.    Dismissed Detective Coppins' 2003 report demonstrates that the Elkhart Police Department went out of its way to rationalize Mr. Wood's behavior – and potential reasons for supposedly failing the examination - in an effort to minimize him as a suspect at Royer's criminal trial.

208.    For example, Dismissed Detective Coppins documented that the extreme stress by Mr. Wood throughout the examination was meaningless, attributing Mr. Wood's failure to his emotional state, and concluding that the test results were inconclusive.

209.    But Dismissed Defendant Coppins' report was a fabrication.

210.    Contrary to the "inconclusive" opinion, Larry Woods failed the examination because deception was indicated.  Because that was inconsistent with the investigation, Defendant Coppins attempting to bury it.

### Mr. Wood Refuses to Cooperate with Police

211.  Mr. Wood ultimately refused to cooperate with police.

212.  Although Mr. Wood was the last person seen with Ms. Sailor, had bloody shoes with an oily residue on them, and either failed a polygraph examination when he denied involvement or outright confessed – depending on which Coppins' report is credited – Dismissed Defendant Conway stopped trying to speak with Mr. Wood by October of 2003 because he did not "foresee Wood retaining an attorney."

213.  Notably, at the time Dismissed Detective Conway gave up on questioning Wood – an obvious suspect in the homicide – he had already manufactured a false confession for Mr. Royer and a fabricated statement from Ms. Porter.

214.  Put simply, since Dismissed Defendant Conway had already closed his case against Mr. Royer and Ms. Canen, it would have been detrimental to Defendant Conway's case to acknowledge the evidence implicating Mr. Wood.  So, Dismissed Defendant Conway and the other Dismissed Defendants did whatever they could to bury such evidence.

### After Charges Are Initiated Against Mr. Royer, Detective Thayer Manufactures Report Claiming that Testing Was Conducted on Mr. Wood's Shoes Prior to Their Return

215.  Dismissed Defendant Thayer also fabricated a report regarding the criminal investigation into Mr. Wood after charges were filed against Mr. Royer.

216.    On New Year's Eve, December 31, 2003, four months after charges were initiated, Dismissed Defendant Thayer created a document entitled "additional information," which is neither on Elkhart Police Department letterhead nor on the standard form typical of a legitimate police report.

217.    Dismissed Defendant Thayer claims in this document that he brought Mr. Wood's shoes to Dismissed Defendant Joel Bourdon at the Elkhart Police Department for luminol testing.

218.    According to Dismissed Defendant Thayer's report - written thirteen months after retrieving Mr. Wood's shoes - "no areas of the shoes reacted in a positive test for possible blood."  Additionally, "the tread pattern of the shoes were also visually examined and compar[ed] to latent shoe impressions left at the crime scene.  It was determined that the tread pattern did not match the latent impressions."

219.    Dismissed Detective Thayer further claimed that he didn't know what happened to the shoes after testing and had no idea where they were.

220.    Dismissed Detective Thayer's report is a fabrication.

221.    Dismissed Defendant Thayer's fabricated report is part of a transparent effort to close off leads to other suspects when Defendants had decided to obtain a conviction against Mr. Royer.

222.    Upon information and belief, Dismissed Defendant Thayer either returned the shoes to Mr. Wood knowing that no scientific testing or analysis

excluded them from being used in the murder or destroyed the shoes knowing that they would unravel the false and manufactured case against Mr. Royer.

## Mr. Royer's Tragic Wrongful Conviction

223.   At trial, the false, coerced, and fabricated case Defendants' manufactured resulted in Mr. Royer's wrongful conviction.

224.   Because the evidence against Mr. Royer was false, fabricated, and coerced, there was never probable cause to charge him with the murder of Ms. Sailor.  Without Defendants' misconduct, Mr. Royer would not have been prosecuted or convicted.

225.   At trial, the jury learned the contents of Ms. Porter's fabricated September 2, 2003 statement.

226.   The jury was also provided with the two false recorded confessions manufactured for Mr. Royer after two days of psychologically coercive interrogation sessions that exploited his disabilities.  The jury was not provided with the unrecorded interrogation sessions where psychological coercion was used to manufacture and fabricate the false confessions Mr. Royer later repeated during the recorded statements.

227.   Finally, Defendant Chapman testified consistently with his fabricated report that the latent print on Ms. Sailor's medicine bottle was a "match" to Ms. Canen.

228.  In closing arguments, the State argued that Ms. Porter's (fabricated) statement and corresponding testimony corroborated Mr. Royer's statements to Dismissed Defendant Conway and the fingerprint "match" to Ms. Canen.

229.  The prosecution in closing argument also highlighted Mr. Royer's statements to Dismissed Detective Conway.  The State implored the jury to ignore the defense argument that the interrogation "was so unreasonable, boy, they just pounded it into him.  They put all those words in his mouth, and then he just recited everything that the detectives wanted him to say."

230.  At the same time, the Defendants withheld the egregious misconduct that occurred during the psychologically coercive interrogation that resulted in Mr. Royer's false confession.  Defendants likewise withheld that Mr. Royer was fed the information throughout the interrogation sessions and did not volunteer it himself.

231.  According to the State's closing argument, this case came down to the testimony of Nina Porter.  In their view, Porter's testimony "corroborate[d] virtually every piece of evidence that came from that stand."

232.  The jury was informed:

> To find them guilty, all you have to do is look at [Porter's] statement and see [Canen's] fingerprint.  That's enough to find them guilty because the State of Indiana has to prove that they committed a robbery or attempted to commit a robbery.  You got that from her statements. Nobody was supposed to get hurt.  She just was supposed to give me money.  Money is gone from Helen's apartment.  There's the robbery, folks, and Helen is sure dead.  That's all you have to find beyond a reasonable doubt. You have the power now to say you are guilty, and we know you are guilty, and now you have to take responsibility for it cause you have to wonder then will Lana say once again Thanksgiving, thanks for giving death.

233.    With this, Mr. Royer was wrongfully convicted of felony murder and sentenced to 55 years in prison.

234.    The State made these arguments while withholding the very exculpatory and impeachment evidence that would have unraveled their falsity.

**Mr. Royer is Exonerated in 2021**

235.    Never giving up hope and remaining steadfast in his protestation of innocence, Mr. Royer challenged his wrongful conviction during his years of incarceration.

236.    In 2019, through counsel, Mr. Royer filed a Successive Post-Conviction Petition.   That litigation unraveled the truth as to how Mr. Royer was framed for a crime he did not commit.

237.    A four-day evidentiary hearing took place as part of that post-conviction litigation.

238.    At the conclusion of that proceeding, on March 31, 2020, Mr. Royer was granted a new trial.

239.    A few days later, on April 2, 2020, Mr. Royer was released from custody after nearly 17 years of wrongful incarceration.

240.    Mr. Royer's battle for justice did not end on April 2, 2020.

241.    The State of Indiana appealed Mr. Royer's grant of a new trial.

242.    On April 8, 2021, the Indiana Court of Appeals affirmed the grant of a new trial.

243.    On June 30, 2021, the State filed a motion to dismiss the criminal charges against Mr. Royer.

244.    On July 12, 2021, the State's motion to dismiss was granted and Mr. Royer was finally exonerated from a crime he did not commit.

**A Federal Jury Has Already Determined that Dismissed Defendant City of Elkhart Violated Christopher Parish's Constitutional Rights**

245.    On September 24, 2007, Christopher Parish filed a federal civil-rights action arising from his wrongful conviction against Elkhart Police Officer Defendants Rezutko, Ambrose, Cutler, and the City of Elkhart.  *See* Case No. 07-cv-452 at Dkt. No. 1.

246.    In that suit, Mr. Parish alleged that the Defendants violated his constitutional right to a fair trial and due process of law by fabricating evidence, coercing witnesses, conducting photo-arrays that were improper and unduly suggestive, and by withholding exculpatory evidence.

247.    Mr. Parish alleged that the Defendants engaged in such misconduct pursuant to the policies, practices and customs wrongfully maintained by the Defendant City of Elkhart.

248.    Mr. Parish was ultimately afforded a trial on his claims against Defendants City of Elkhart and Stephen Rezutko.

249.    Mr. Parish presented three *Monell* theories before a jury in his federal civil trial: 1) that the policy maker, Chief Bechtel, turned a blind eye to misconduct and did nothing about it, thus allowing Defendant Rezutko to violate Mr. Parish's constitutional rights; (2) that the City of Elkhart failed to train its employees, thus

allowing an untrained Defendant Rezutko to violate Mr. Parish's constitutional rights; and (3) that the City of Elkhart had a custom and practice of withholding exculpatory information, thus causing the violation of Mr. Parish's constitutional rights.

250.    On October 27, 2010, a jury found in favor of Mr. Parish and against Defendant Rezutko.  On Mr. Parish's policy and practice claim against Defendant City of Elkhart, the jury once again found in favor of Mr. Parish.

251.    The Seventh Circuit Court of Appeals affirmed the jury's liability determinations against Defendants Rezutko and the City of Elkhart on December 20, 2012. *See Parish v. City of Elkhart*, 702 F.3d 997 (7th Cir. 2012).

**The Dismissed City of Elkhart Failed to Provide Sufficient Training and Supervision to Avoid Brady Violations and Has Exhibited Deliberate Indifference as to Whether or Not Brady Violations Will Continue to Occur**

252.    Just like Mr. Parish, the constitutional injuries Mr. Royer suffered were caused by the policies and practices of the Elkhart Police Department.

253.    Indeed, within the Elkhart Police Department, there was a policy and practice of taking shortcuts to close criminal investigations, including by fabricating statements, coercing witnesses and/or suspects during interrogations, and withholding exculpatory and impeachment evidence.

254.    Policymakers and supervisory personnel were aware of and failed to curb the improper investigative practices that led to the numerous *Brady* violations in this case.

41

255.    The problems that Dismissed Defendant Conway had as an investigator, many of which were on full display during the Sailor investigation, were common knowledge at the Elkhart Police Department.  This includes the Department's most senior leadership.  Chief of Police Pamela Westlake herself knew about Dismissed Defendant Conway's misconduct.

256.    This policy and practice repeated itself in numerous criminal investigations conducted by Dismissed Defendant Conway at the Elkhart Police Department.

257.    Nonetheless, and despite notice to (and often involvement of) policymakers in the above-described unconstitutional policies and practices, there was no effort to rectify any such misconduct.  Dismissed Defendant Conway still remained as a law-enforcement officer within the Department, his misconduct remained undisclosed to criminal defendants like Mr. Royer, and he was permitted to act with impunity in criminal investigations.

258.    The Dismissed Defendant City of Elkhart and officials within the Department failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct.

259.    They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

260.   The policies and practices described in the foregoing paragraphs were consciously approved by City of Elkhart policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

261.   Those policies and practices were the proximate cause of the constitutional injuries that Plaintiff sustained, as described more fully above.

262.   Moreover, The Dismissed City's failure to train its officers effectively condones, ratifies, and sanctions the kind of misconduct that the Dismissed Defendant Officers committed against Plaintiff in this case.

263.   Constitutional violations such as occurred in this case are encouraged and facilitated as a result of the Dismissed City's practices and *de facto* policies, as alleged above.

**The Elkhart County Sheriff's Department Failed to Provide Sufficient Training and Supervision to Avoid Constitutional Violations and Has Exhibited Deliberate Indifference as to Whether or Not Violations Will Continue to Occur**

264.   Within the Elkhart County Sheriff's Department, there was a total lack of policies, procedures, training, and supervision over Defendant Chapman's latent print analyses.

265.   Policymakers and supervisory personnel were aware of and failed to implement any policies, procedures, training, or supervision that would have prevented Defendant Chapman from violating criminal defendants' constitutional rights.

266.   It was known within the Elkhart County Sheriff's Department that Defendant Chapman conducted fingerprint analyses for the Elkhart Police

Department, but no supervisor sought to implement any supervision, training, policies, or procedures governing Defendant Chapman's work for the EPD.

267.    This policy and practice repeated itself in numerous criminal investigations conducted by Defendant Chapman at the Elkhart Police Department.

268.    Nonetheless, and despite notice to (and often involvement of) policymakers in the above-described unconstitutional policies and practices, there was no effort to rectify any such misconduct.  Defendant Chapman still remained as a law-enforcement officer within the Department, his misconduct remained undisclosed to criminal defendants like Mr. Royer, and he was permitted to act with impunity in criminal investigations.

269.    The Elkhart County Sheriff's Department failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct.

270.    They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

271.    The policies and practices described in the foregoing paragraphs were consciously approved by Elkhart County Sheriff's Department policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

272.    Those policies and practices were the proximate cause of the constitutional injuries that Plaintiff sustained, as described more fully above.

273.    The Elkhart County Sheriff's Department's failure to train and supervise Defendant Chapman effectively condoned, ratified, and sanctioned the kind of misconduct that the Defendant Chapman committed against Plaintiff in this case.

274.    Constitutional violations such as occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* policies, as alleged above.

### Mr. Royer's Damages

275.   Mr. Royer was incarcerated for nearly 17 years for a crime that he did not commit.

276.   During his wrongful incarceration, Mr. Royer was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right.  He missed out on the ability to raise his child, share holidays, births, funerals and other life events with loved ones, and the fundamental freedom to live one's life as an autonomous human being.

277.   Mr. Royer also suffered physical injuries during his incarceration. Those injuries included the lack of adequate medical and mental-health care for Mr. Royer, a person with serious disabilities.  Those struggles caused Mr. Royer to suffer immensely, on a daily basis, and impacted his ability to function on a daily basis.

278.  As a result of his wrongful incarcerations, Mr. Royer must now attempt to rebuild his life all without the benefit of nearly two decades of life experience that ordinarily equip adults for that task.

279.  Mr. Royer has suffered tremendous damage, including physical sickness and injury and emotional damages, all proximately caused by Defendants' misconduct.

### Count I - 42 U.S.C. § 1983 Due Process
### Defendant Chapman

280.  Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

281.  As described more fully above, the Dismissed Elkhart Police Defendants and Defendant Chapman, while acting individually, jointly, and in conspiracy, as well as under color of law and within the scope of their employment, deprived Mr. Royer of his constitutional right to a fair trial.

282.  In the manner described more fully above, the Dismissed Elkhart Police Defendants and Defendant Chapman conducted a reckless investigation, withheld exculpatory evidence, withheld impeachment evidence, destroyed evidence, and fabricated false reports, false testimony, and other evidence.  Absent this misconduct, the prosecution of Mr. Royer could not and would not have been pursued.

283.  The Dismissed Elkhart Police Defendants and Defendant Chapman misconduct also directly resulted in the unjust criminal conviction of Mr. Royer,

thereby denying each of his constitutional right to a fair trial in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

284.    As a result of this violation of his constitutional right to a fair trial, Mr. Royer suffered injuries including but not limited to emotional distress and pain and suffering, as is more fully alleged above.

285.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Mr. Royer's constitutional rights.

286.    The misconduct described in this Count was undertaken pursuant to routine practice of the Elkhart Police Department to pursue wrongful convictions through reckless and profoundly flawed investigations, provision of false evidence and reports, coerced evidence, and failure to properly supervise employees knowing that those employees were providing false evidence.  In this way, the municipal defendants violated Mr. Royer's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

287.    These widespread practices, so well-settled as to constitute *de facto* policy in the Elkhart Police Department, were able to exist and thrive because municipal policymakers with authority over the Division of Police exhibited deliberate indifference to these problems, thereby effectively ratifying them.

288.    The widespread practices described in the preceding paragraphs were allowed to flourish because the municipal Defendants declined to implement sufficient training and/or enforce legitimate oversight and punishment.

**Count II**
**Coercive Interrogation: Fifth and Fourteenth Amendments**
**Defendant Becker**

289.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

290.    The actions of Dismissed Defendants Conway, Daggy, Converse, Snider, and Defendant Becker, individually, jointly, and in conspiracy, in coercively interrogating Plaintiff, and of using psychological interrogation techniques which "shock the conscience" during said interrogations, resulted in the false, coerced, and fabricated confession that was subsequently used against him at trial, and thereby violated Plaintiff's Fifth and Fourteenth Amendment rights to be free from compulsory self-incrimination and deprivation of liberty without due process of law as guaranteed by the United States Constitution.

291.    The actions of Dismissed Defendants Conway, Daggy, Converse, Snider, and Defendant Becker, in using coercive techniques to interrogate Plaintiff, and/or, in encouraging, condoning and permitting the use of said techniques, and/or failing to intervene to stop the coercive interrogation of Plaintiff, were the direct and proximate cause of Plaintiff's injuries and damages as more fully set forth above.

292.    Additionally, and alternatively, these actions were taken maliciously, willfully, wantonly and/or with reckless disregard for Plaintiff's constitutional rights.

48

293.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages set forth above.

294.    The misconduct described in this Count by the Dismissed EPD Defendants was undertaken pursuant to the policy and practice of the Elkhart Police Department, in the manner more fully described below in Count VII.

### Count III – 42 U.S.C. § 1983
### Deprivation of Liberty Without Probable Cause
### Fourth and Fourteenth Amendments
### Defendant Chapman

295.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

296.    As described more fully above, the Defendants, individually, jointly and in conspiracy with each other, as well as under color of law and within the scope of their employment, deprived Mr. Royer of his constitutional right to be free from unlawful prosecution and continued detention without probable cause.

297.    In the manner described more fully above, the Defendants made, influenced and/or participated in the decision to prosecute Mr. Royer for these crimes, for which prosecution there was no probable cause and which caused Mr. Royer to suffer a deprivation of liberty.  Their misconduct included falsifying evidence and withholding exculpatory evidence.

298.    The Defendants' misconduct directly resulted in the unlawful prosecution and incarceration of Mr. Royer, thereby denying each of his constitutional right to liberty in violation of his constitutional rights.

299.    As described more fully above, the prosecution was ultimately resolved in Mr. Royer's favor.

300.    Because of this violation of his constitutional rights, Mr. Royer suffered injuries, including but not limited to bodily harm and emotional distress, as is more fully alleged above.

301.    The Defendants' misconduct, as described in this Count, was objectively unreasonable and was undertaken intentionally with malice and willful indifference to Mr. Royer's constitutional rights.

302.    The misconduct described in this Count was undertaken pursuant to a routine practice of the Elkhart Police Department to pursue wrongful prosecutions and wrongful convictions through reckless and profoundly flawed investigations and coerced evidence.  In this way, the municipal defendants violated Mr. Royer's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

303.    These widespread practices, so well-settled so as to constitute *de facto* policy in the Elkhart Police Department, could exist and thrive because municipal policymakers with authority over the Division of Police exhibited deliberate indifference to the problem, thereby effectively ratifying it.

304.    The widespread practices described in the preceding paragraphs could flourish because the municipal defendants declined to implement sufficient training and/or enforce legitimate oversight and punishment.

### Count IV - 42 U.S.C. § 1983
### Failure to Intervene: Defendants Becker and Chapman

305.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

306.    In the manner described above, during the constitutional violations described above, one or more of the Defendants stood by without intervening to prevent the misconduct, despite having a reasonable opportunity to do so.

307.    Because of the Defendants failure to intervene to prevent the violation of Mr. Royer's constitutional rights, Mr. Royer suffered pain and injury, as well as emotional distress.

308.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Mr. Royer's rights.

309.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the Elkhart Police Department in the manner described more fully in the preceding paragraphs and was tacitly ratified by policymakers for the Municipal Defendants with final policymaking authority.

## Count V - 42 U.S.C. § 1983
## Conspiracy to Deprive Constitutional Rights:
## Defendants Becker and Chapman

310.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

311.    After Ms. Sailor was killed, the Defendants and Dismissed City Defendants reached an agreement amongst themselves to frame Mr. Royer for the crime and to thereby deprive him of his constitutional rights and liberty to be continuously taken away from him, all as described in the various Paragraphs of this Complaint.

312.    In this manner, the Defendants and Dismissed City Defendants, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

313.    In furtherance of the conspiracy, each of the co-conspirators committed overt acts as described in this Complaint and was an otherwise willful participant in joint activity.

314.    As a direct and proximate result of the illicit prior agreement referenced above, Mr. Royer's rights were violated, and he suffered financial damages, as well as severe emotional distress and anguish, as is more fully alleged above.

315.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

316.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the Elkhart Police Department in the manner described more fully in the preceding paragraphs, and was tacitly ratified by policymakers for the municipal defendants with final policymaking authority.

**Count VI - 42 U.S.C. § 1983**
***Monell* Claim Against the Elkhart County Sheriff's Department**

317.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

318.    The actions of Defendant Chapman in fabricating evidence and withholding exculpatory evidence were undertaken pursuant to the policies and practices of the Elkhart County Sheriff's Department, described above, which were created, maintained, or ratified by the policymakers for the Elkhart County Sheriff's Department with final policymaking authority.

319.    The policies and practices described in this Count were maintained and implemented by the Elkhart County Sheriff's Department with deliberate indifference to Mr. Royer's constitutional rights.

320.    As a direct and proximate result of Defendant Chapman and the Elkhart County Sheriff's Department's actions, Mr. Royer's constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.

321.    The Elkhart County Sheriff's Department is therefore liable for the misconduct committed by its officers.

## STATE LAW CLAIMS

### Count VII - State Law Claim
### Elkhart County Sheriff's Department Breach Of Duty in Hiring, Training and Supervising – Negligence

322.   Each of the foregoing Paragraphs is incorporated as if restated fully herein.

323.   Defendant Elkhart County Sheriff's Department at all times relevant had a duty to exercise due care in hiring police officers, and had a duty to properly train, supervise, and discipline Elkhart Sheriff's Department Officers in relation to their duties, including their actions in criminal investigations.

324.   Elkhart County Sheriff's Department breached those duties by failing to exercise due care in hiring and then failing to properly train, supervise, and discipline the officers involved as to the misconduct in criminal investigations.

325.   As a direct and proximate result of the Elkhart County Sheriff's Department failing to exercise due care in hiring and failing to train and supervise, Defendant Chapman was able to secure Mr. Royer's wrongful conviction.

### Count VIII - State Law Claim
### Elkhart County Sheriff's Department Breach Of Duty in Hiring – Willful and Wanton Conduct

326.   Each of the foregoing Paragraphs is incorporated as if restated fully herein.

327.   Elkhart County Sheriff's Department at all times relevant had a duty to refrain from willful and wanton conduct in hiring police officers.

328.   Elkhart County Sheriff's Department breached that duty by engaging in

willful and wanton conduct in hiring, including with Defendant Chapman.

329.    As a direct and proximate result of Elkhart County Sheriff's Department willful and wanton conduct in hiring Defendants, including Defendant Chapman, Defendant Chapman was able to secure Mr. Royer's wrongful conviction.

**Count IX**
**Respondeat Superior**

330.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

331.    In committing the acts alleged in the preceding paragraphs, Defendant Chapman was a member and agent of the Elkhart County Sheriff's Department, acting at all relevant times within the scope of his employment.  Defendant Elkhart County Sheriff's Department is liable as principals for all state law torts committed by their agents.

**COUNT X**
**Intentional Infliction of Emotional Distress: Defendants Elkhart County Sheriff's Department and Chapman**

332.    Mr. Royer hereby incorporate by reference the foregoing paragraphs and further allege as follows.

333.    Defendants intentionally and/or recklessly, directly and proximately caused Mr. Royer, innocent men, to be falsely arrested, maliciously prosecuted, and wrongly imprisoned, in breach of the duties they owed to Mr. Royer to refrain from a) destroying evidence, b) fabricating evidence, c) withholding material, exculpatory and impeachment evidence, d) failing to conduct a constitutionally adequate investigation, e) maliciously prosecuting, f) exploiting his disability, and g)

psychologically coercing his false confession, causing Mr. Royer's false arrest and imprisonment.

334.   The Defendants' actions caused Mr. Royer to suffer physical harm, including physical ailments and unauthorized physical contact resulting from the circumstances and duration of his wrongful incarceration, and to fear for his physical safety throughout the period of his pretrial and post-conviction incarceration.

335.   The Defendants' actions caused Mr. Royer to experience severe emotional distress, including, but not limited to humiliation, embarrassment, degradation, loss of trust, permanent loss of natural psychological development, ongoing depression and the continued effects of post-traumatic stress disorder.

**WHEREFORE**, Plaintiff ANDREW ROYER, respectfully requests that this Court enter judgment in his favor and against Defendants, DENNIS CHAPMAN, VICKI BECKER, in their individual capacities, ELKHART COUNTY SHERIFF'S DEPARTMENT, the ELKHART COUNTY PROSECUTOR'S OFFICE, and the STATE OF INDIANA awarding compensatory damages, attorneys' fees, and costs against each Defendant, and punitive damages against each of the individual Defendants, as well as any other relief this Court deems appropriate.

## <u>JURY DEMAND</u>

Plaintiff, ANDREW ROYER, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

/s/ Elliot Slosar
*One of Plaintiff's Attorneys*

Jon Loevy
Elliot Slosar
Margaret E. Campbell
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607
(312) 243-5900
Fax: (312) 243-5902