IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| ANDREW ROYER, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 3:22-cv-254 |
| | ) | |
| v. | ) | |
| | ) | HON. CRISTAL C. BRISCO |
| CITY OF ELKHART, et al., | ) | |
| | ) | |
| Defendants. | ) | MAG. MICHAEL G. GOTSCH, SR. |
| | ) | |
| | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT ELKHART COUNTY SHERIFF
DEPARTMENT'S MOTION TO DISMISS**

Now Comes Plaintiff, ANDREW ROYER, by and through his counsel, Loevy & Loevy, and submits this Response to the Elkhart County Sheriff Department's Motion to Dismiss. In response, Plaintiff states as follows:

**INTRODUCTION**

Plaintiff, Andrew Royer, spent sixteen years of his life wrongfully incarcerated for a crime he did not commit. Dckt. Nos. 1, 202. Plaintiff's wrongful conviction is attributable to egregious police and prosecutorial misconduct. One pillar of the misconduct is based upon Defendant Chapman's fabricated latent print opinion while he was employed by Defendant Elkhart County Sheriff's Department (hereinafter referred to as "Defendant Elkhart County"). As alleged in Plaintiff's Complaint – and proven in discovery – Defendant Chapman's misconduct is attributable to the County's failures to provide any supervision and training of him on critical police functions. Dckt. 202. Given the stakes, Defendant Elkhart County has sought to avoid liability for Defendant Chapman's misconduct for years. *See* Dckt. 89 (Motion for Judgment on Pleadings); Dckt. 107 (Opposition to PL's Motion for Leave to Amend). This

1

pending motion is another repackaged attempt by Defendant Elkhart County to reargue the allegations contained in Plaintiff's Complaint. As before, and for the reasons stated below, it must be denied.

## I.    FACTUAL BACKGROUND

In response to Defendant Elkhart County Sheriff's Department's Motion to Dismiss (Dckts. 227; 228), Plaintiff has laid out relevant facts below. The full extent of how Defendants achieved Plaintiff's wrongful conviction is set out in 279 paragraphs of factual allegations in Plaintiff's Complaint. Dckt. 202.

Plaintiff Andrew Royer spent more than sixteen years in prison for a tragic murder he did not commit. Dckt. 202, ¶¶ 223-33; 239. The victim was 94-year-old Helen Sailor, a resident of the same apartment complex where Plaintiff lived, which housed individuals who were mentally disabled and/or elderly. *Id.* at ¶¶ 1, 3, 35-36.

Plaintiff was not an average person framed by law enforcement. Dckt. 202, ¶ 100. Plaintiff was a vulnerable, mentally handicapped man with "the mind of a child" and no ability to withstand the coercion he experienced at the hands of the Defendants from the City of Elkhart.[1] *Id.* at ¶¶ 6; 14; 100; 103. Preying on Plaintiff's handicaps, Dismissed Defendants fabricated, coerced, and suppressed evidence to frame him for murder. *Id.* at ¶¶ 6-15; 103-05; 113-75.

Plaintiff's wrongful conviction was partially the result of egregious fabrications. Dckt. 202, ¶¶ 231-34. One such fabrication was a coerced statement from Nina Porter, a witness who succumbed to Dismissed Defendants' threats, intimidation, and eventual promise of a monetary

---

[1] While the City Defendants have been dismissed pursuant to a settlement agreement between the City of Elkhart, the City Defendants, and Plaintiff, factual allegations are still relevant to Plaintiff's remaining claims against Defendants Becker, Chapman, and Elkhart County Sheriff's Department. As a result, former City Defendants are referred to as "Dismissed Defendants" throughout this Response.

award, agreeing to falsely implicate Plaintiff and another person in Sailor's murder. *Id.* at ¶¶ 88-94. As the Complaint fully lays out, (Dckt. 202, ¶¶ 99-152), Defendants used the statement they fabricated from Ms. Porter to bring Plaintiff in for custodial interrogation and coerce a false confession out of him. *Id.* at ¶¶ 99-01. Defendants exploited Plaintiff's developmental, emotional, and psychological vulnerabilities to subject him to two days of unconstitutional interrogation, at which point he broke down and falsely confessed. *Id.* at ¶¶ 100-21.

After Defendants coerced Ms. Porter into making a fabricated statement and manufactured Plaintiff's false confession, they sought forensic "corroboration" as a final evidentiary link in their false case against Plaintiff. *Id.* at ¶¶ 13, 176-80. Dismissed Defendants enlisted Defendant Dennis Chapman, a deputy at the Elkhart County Sheriff's Department ("County"), to falsify this evidentiary link. *Id.*

Defendant Chapman was a known quantity in the Elkhart Police Department. Dckt. 202, ¶ 181-83. In the 1990s., Dismissed Defendants would receive latent print results from the Indiana State Police Lab that did not match their investigative theory, so they would turn to Defendant Chapman to fabricate an opinion that did align with their theory. *Id.* True to form, Defendant Chapman fabricated a false latent print opinion here that Dismissed Defendants relied on to pursue Plaintiff's wrongful conviction. *Id.* at ¶¶ 12, 159, 227. As the Complaint details, the opinion was a complete fabrication used to falsely connect Plaintiff's co-defendant, Lana Canen, to the crime scene. *Id.* at ¶¶ 223-28. Defendant Chapman was never qualified to provide latent comparisons and his opinion in this case, like others in the past, was entirely false. *Id.* at ¶¶ 159-64, 174-80.

Defendant Chapman bolstered his fabricated opinion by lying about his credentials and experience with latent print comparisons, claiming he had fingerprint examination training with

the FBI in the 1970s and "continued examination of fingerprints with the Elkhart County Sheriff's Department." Dckt. 202, ¶¶ 174, 176. During the initial deposition of Defendant Chapman, he testified that Defendant County never trained him to conduct latent prints, despite having done "continued latent print" analyses at the County. *Id.*; Dckt. 173, Ex. 2, Chapman dep. 31:5-23; 32:4-9. Chapman has also admitted that Elkhart Police Department officers told him their theory of the case and pressured him into making an identification of Canen. Dckt. 202, ¶ 167. At Plaintiff's trial, the State used Chapman's fabricated latent print "match" of Lana Canen and Chapman's bogus credentials to secure Plaintiff's conviction. *Id.* at ¶¶ 176-78.

Defendant County is the governmental agency that employed Defendant Deputy Sheriff Chapman and failed to sufficiently train and supervise him to avoid constitutional violations such as in this case. Dckt. 202, ¶ 264. Defendant County was aware that the duties of Defendant Chapman included regularly performing fingerprint analyses for the Elkhart Police Department, including latent print comparisons. *Id.* at ¶¶ 264-66. Defendant Chapman, as a Deputy at the County, regularly conducted latent print comparisons despite not being qualified to do so. *Id.* at ¶ 176. Defendant Chapman was able to carry out his County duties, which were known to County personnel, by acting as a "hired gun" who handed false fingerprint opinions to the Elkhart County police. *Id.* at ¶¶ 181-83; 265-66.

Although Defendant Chapman was never qualified to conduct latent print comparisons, he did so falsely throughout the 1990s and in this case, resulting in Plaintiff's wrongful conviction. Dckt. 202, ¶¶ 180-83, 267. Just like in prior cases, Dismissed Defendants fed Defendant Chapman false information about their investigative theory and pressured him to form a specific opinion regarding Lana Canen's print. *Id.* at ¶ 179. Aware of Defendant Chapman's lack of qualifications, the pressure exerted on him to fabricate opinions, and his misconduct, no

4

County supervisor sought to implement any supervision, training, policies, or procedures governing Defendant Chapman's ongoing work for the Elkhart Police Department. *Id.* at ¶¶ 166, 264-65. There was also no effort to rectify any such misconduct, as Defendant Chapman remained with the County and his misconduct went undisclosed to criminal defendants like Plaintiff, and he was permitted to act with impunity in criminal investigations. *Id.* at ¶ 268.

Based on Defendant Chapman's erroneous latent print match, Plaintiff's coerced false confession, and the other false and fabricated evidence, Plaintiff was granted a new trial on March 30, 2020. Dckt. 202, ¶ 238. The Indiana Court of Appeals affirmed the trial court's decision on April 8, 2021. *Id.* at ¶¶ 242-43. Finally, the State's motion to dismiss the criminal charges against Plaintiff was granted on July 12, 2021, and he was finally exonerated from a crime he did not commit. *Id.* at ¶ 244.

On March 14, 2024, the Court granted Plaintiff's motion to amend his Complaint in this case, which included adding the County as a Defendant:

> Plaintiff's motions to amend his complaint are GRANTED. . . . Plaintiff is ORDERED to separately file an amended complaint by March 20, 2024, that (1) adds the Elkhart County Sheriff's Department ("the Sheriff's Department") as a defendant; (2) adds a *Monell* claim against the Sheriff's Department; and (3) eliminates the confusion about active versus dismissed parties and claims evidence in the most recent amended complaint.

Dckt. 198, p. 2. (internal citations omitted).

Per the Court's March 14, 2024 Order, Plaintiff filed his Amended Complaint on March 20, 2024, properly naming the County as a Defendant and alleging sufficient facts to state a *Monell* claim against it based on the total lack of policies, procedures, training, and supervision over Defendant Chapman's latent print analyses. Dckt. 202, ¶¶ 159-84; 264-74; 317-21.

Plaintiff's Complaint lays out each of the federal and state law claims against Defendants through ten counts, five of which are against Defendant County (counts VI-X) and sufficiently

5

pleaded.  Dckt. 202, ¶¶ 317-35.  Each of these counts against Defendant County begins with a paragraph that explicitly incorporates the earlier paragraphs of the Complaint.  *Id.* at ¶¶ 317; 322; 326; 330; 332.  Therefore, despite Defendant County's attempt to whittle down the Complaint's allegations by citing paragraphs in the legal counts, every count Plaintiff alleged against any Defendant must be read in the context of the 279 paragraphs of factual allegations set forth within the Complaint.  *See*, *e.g.*, Dckt. 228 at 7-8 (recounting paragraphs of Plaintiff's counts against Defendant County, citing only ¶¶ 264-73 of the Complaint).  *But see* Dckt. 202, ¶¶ 174-80; 227-28; 232 (alleging additional facts not cited by Defendant that, taken together, paint the full picture of how Defendant Chapman was able to fabricate forensic evidence from within the County).

## ARGUMENT

## II.    LEGAL STANDARD

A motion to dismiss "test[s] the sufficiency of the complaint," it does "not . . . decide the merits."  *Triad Assocs., Inc. v. Chicago Hous. Auth.*, 892 F.2d 583, 586 (7th Cir. 1989).  To survive this stage, a complaint need only contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  This standard "does not require 'detailed factual allegations,'" only "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Rule 8(a)(2) "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court."  *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

When ruling on a motion to dismiss, a court must "construe the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all

possible inferences in her favor." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008)

(citing *Twombly*, 550 U.S. at 554. In the Seventh Circuit, plaintiffs need to pass only "two easy-

to-clear hurdles" to survive a motion to dismiss under *Twombly*: (1) "the complaint must describe

the claim in sufficient detail to give the defendant fair notice of what the claim is and the grounds

on which it rests"; and (2) "its allegations must plausibly suggest that the plaintiff has a right to

relief, raising that possibility above a 'speculative level.'" *Equal Employment Opportunity*

*Commission v. Concentra Health Services, Inc*., 496 F.3d 773, 776 (7th Cir. 2007) (as quoted in

*Tamayo*, 526 F.3d at 1084).

"Plausibility" does not mean the Court "should decide whose version to believe, or which

version is more likely than not." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010)

(citing *Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 677. Rather, the complaint must merely

"give enough details about the subject-matter of the case to present a story that holds together. In

other words, the court will ask itself *could* these things have happened, not *did* they happen."

*Swanson*, 614 F.3d at 404 (emphasis in original). At this stage, dismissal for failure to state a

claim under Rule 12(b)(6) is proper only where "the allegations in a complaint, however true,

could not raise a claim of entitlement to relief." *Virnich*, 664 F.3d at 212 (quoting *Twombly*, 550

U.S. at 558*).

### III.  Plaintiff Sufficiently Pled *Monell* Allegations in His Complaint

#### A.  The Parties Already Briefed the Legal Sufficiency of Plaintiff's *Monell* Claim Against the County and Defendant's Motion is Regurgitation of Resolved Arguments

Before Defendant Elkhart County Sheriff's Department was named in this lawsuit, the

parties extensively briefed the issue of which Elkhart County entity was the proper defendant:

Elkhart County or the Elkhart County Sheriff's Department. Dckts. 89; 99; 100; 105; 107. In its

7

Motion for Judgment on the Pleadings, the County argued it was not the proper entity defendant because it had no control over duties of the County, and by extension, Defendant Chapman. Dckt. 89 at 9.  The County further argued that Plaintiff failed to allege sufficient facts to state a *Monell* claim against it.  *Id.* at 9-11.

In response, Plaintiff argued that the County was the appropriate entity to answer for Defendant Chapman's misconduct.  Dckt. 99 at 5-11.  However, Plaintiff alternatively moved for leave to amend the Complaint to add the County, in response to the County's position that it was the incorrect entity Defendant.  Dckt. 100.  In its reply to the Motion for Judgment on the Pleadings, the County again argued it was not the appropriate entity to answer for Defendant Chapman's misconduct.  Dck. 105 at 5-9.  And in responding to Plaintiff's alternative motion to amend the Complaint with the County as the appropriate entity Defendant, the County asserted it was "not a proper defendant in this lawsuit," relying on the same argument.  Dckt. 107 at 1. This series of motions hashed out the municipal duties of the two entities, the County and the Elkhart County Sheriff's Department, regarding the somewhat ambiguous law on which entity defendant was appropriate.  *See* Dckt. 100 at 2-3.

The Court has since put these issues to rest in its Opinion and Order on April 21, 2023 and its Order on March 13, 2024.  Dckts. 127; 198.  On April 21, 2023, the Court found that it was the County Sheriff's Department, not the County itself, that was the appropriate entity defendant.  Dckt. 127 at 12 (in dismissing claims against Elkhart County, noting "Elkhart County is not a proper defendant under § 1983 because it is not responsible for setting policies or approving the decisions of the sheriff or the sheriff's deputies.")  Following the Court's dismissal of the *Monell* claim against Elkhart County, Plaintiff filed a Second Motion to Amend his Complaint (Dckt. 173) to add the County Sheriff's Department as the proper entity Defendant.

Dckt. 173.  The Court granted Plaintiff's Second Motion to Amend on March 14, 2024.  Dckt. 198 at 2.  Plaintiff filed his Amended Complaint on March 20, 2024.  Dckt. 202.  Today, the same firm that represented Elkhart County now represents the County Sheriff's Department and re-asserts the previously adjudicated sufficiency question as to Plaintiff's *Monell* claim.  *See* Dckts. 89; 228.  The named entity Defendant has simply been swapped.

In the County's original Motion for Judgment on the Pleadings, it argued that Plaintiff failed to state a *Monell* claim.  Dckt. 89 at 9 ("There's no factual content in the Complaint tracing Royer's alleged injuries to Elkhart County, except . . . Royer's assertion that Elkhart County employed Chapman, the Sheriff's deputy who allegedly fabricated a fingerprint analysis in the Sailor murder investigation[.]")  The County argued a similar position to the one before the Court now on behalf of the County: there is no entity liability without sufficiently alleging final policymaking authority over Defendant Chapman and that Plaintiff's Complaint "fails to explain how Elkhart County is responsible for this misconduct" when it "lacked policymaking authority" over Chapman, arguing liability will not exist when "a subordinate employee took some action that was not later reversed by the policymaking official."  Dckt. 89 at 11 & n.4.  "In such cases, the plaintiff maintains his § 1983 claim only if the final policymaker either delegated policymaking authority to the lower-level employee or else ratified the employee's action."  Dckt. 89 at 11 n.4.

Defendant County now takes the same position, arguing that Plaintiff has not made sufficient factual allegations to state a § 1983 *Monell* claim against the County for playing the role of final policymaker.  Dckt. 228 at 9-11.  In other words, Defendant County, represented by the same attorneys who represented the County previously, attempts to take another bite at the apple.  However, the issue of *Monell* sufficiency has already been litigated with a different

defendant (the County) which previously stood in the same shoes as the County. For that reason,
Defendant County's redundant argument should be precluded.

    **B.**    **Defendant's Motion Excludes Relevant Factual Allegations Supporting
Plaintiff's Sufficient *Monell* Claim against Defendant**

Despite the nine pages of procedural history recounted in its brief, Defendant County
leaves out critical facts alleged in the Amended Complaint that support Plaintiff's *Monell* claims,
including facts related to Defendant Chapman's *modus operandi* for falsifying latent print
identifications within the County. Dckt. 228 at 1-9; *cf.* Dckt. 202, ¶¶ 160-84.[2]

Defendant's recitation of Plaintiff's allegations "[a]s to Chapman" leaves out that,
pursuant to a pattern since the 1990s, Dismissed Defendants from the EPD *first* sent a recovered
latent print to the Illinois State Police (ISP) Laboratory (Dckt. 228 at 6; *cf.* Dckt. 202, ¶ 160) and
that "Dismissed Defendant Bourden[,] removed all the latent print evidence from the [ISP lab]
and requested that it be sent to Defendant Chapman for comparison." Dckt. 202, ¶ 162. These
facts left out by Defendant are critical support for Plaintiff's sufficiently pleaded claims based on
its total lack of policies, procedures, training, and supervision to prevent Defendant Chapman's
pattern of fabricating latent print analyses from within the County. *See* Dckts. 89, p.11 & n.4;
228, pp. 6-7. *But see* Dckt. 202, ¶¶ 264-74. For example, Defendant describes Plaintiff's *Monell*
claim based on Chapman's misconduct this way: "'in fabricating evidence and withholding
exculpatory evidence were undertaken pursuant to the policies and practices of the [County],

---

[2] While skipping critical factual allegations, Defendant's nine pages of "[p]rocedural posture
relevant to Sheriff's Department's Partial Motion to Dismiss" lists irrelevant procedural facts,
such as exactly which paragraphs in Plaintiff's Amended Complaint have been edited to include
the ECSD as the proper Defendant. *See*, *e.g.*, Dckt. 228 at 4.

*described above . . .'"* Dckt. 228 at 11 (quoting Dckt. 202, ¶ 318) (emphasis added). Without any

discussion of what is *described above* in Plaintiff's Complaint, Defendant simply argues it is:

> devoid of the factual specificity that could allow the Court to reasonably infer that the Sheriff's Department was ultimately responsible for Chapman's alleged fabrication of evidence, but it also fails to put the Sheriff's Department on notice of what role it allegedly played in relation to the referenced policies or practices by failing to identify the referenced final policymaker.

Dckt. 228 at 11.  In actuality, the facts "described above" contain extensive allegations

supporting the entirety of Plaintiff's claim that Defendant Chapman's misconduct was acting as a

hired gun for Elkhart County police by fabricating latent print opinions such as the one in

Plaintiff's case.  *See* Dckt. 202, ¶¶ 159-74.

Moreover, Defendant County's motion asserts that the Complaint contains "no factual

allegations that previous fingerprint analysis conducted by Chapman was flawed, let alone

fabricated."  Dckt. 228 at 14.  Not so. Under a fact heading titled, "Fabricated Latent Print

Opinion," the Complaint lays out 22 paragraphs alleging how and why Defendant Chapman

fabricated a latent print opinion, followed by factual allegations that this misconduct had

occurred with a similar pattern in the past.  Dckt. 202, ¶¶ 159-84.

### C.    Plaintiff Sufficiently Pled the Basis of His *Monell* Claims, Including the County's Failure to Train and/or Supervise[3]

There are two ways to prove a municipality's failure to train.[4] First, by showing a

---

[3] While Plaintiff has sufficiently alleged other *Monell* theories, including liability based on an express policy and/or a custom and/or a widespread practice of causing the violation of citizens' constitutional rights, he moves forward solely on the failure to train and failure to supervise theories of *Monell*.

[4] Although this section of Plaintiff's brief primarily addresses failure to train, failure to supervise is treated the same way and subject to the same analysis in the Seventh Circuit. *See Alexander v. City of S. Bend*, 433 F.3d 550, 557 (7th Cir. 2006) ( "[Plaintiff] could show that [Defendant's] failure to train or supervise its officers amounted to deliberate indifference to the rights of people with whom the police came in contact."); *Flores v. City of S. Bend*, 997 F.3d 725, 732-33 (7th Cir. 2021) (citing cases that treat failure to supervise/train as a single issue); *Barnes v. City of*

pattern of similar constitutional violations by untrained employees, and second, by showing "evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation …." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 409 (1997) (*citing City of Canton v. Harris*, 489 U.S. 378, 390 & n.10 (1989)). This second way of proving a failure to train claim is often referred to as "single-incident failure to train municipal liability." *Valdez v. Macdonald*, 68 F.4th 796, 815 (10th Cir. 2023). Liability under this theory depends on "[t]he likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights …." *Brown*, 520 U.S. at 409. "The high degree of predictability may also support an inference of causation—that the municipality's indifference led to the very consequence that was so predictable." Id. at 409-10. Plaintiff proceeds under both methods of proving failure to train.

The Seventh Circuit has determined that summary judgment was inappropriate in several single-incident failure to train cases. *Glisson v. Indiana Department of Corrections*, 849 F.3d 372, 382 (7th Cir. 2017) (holding that inaction came at a time when the institution "had notice of the problems posed by a total lack of coordination," but then "despite that knowledge

---

*Centralia*, *Illinois*, 943 F.3d 826, 832 (7th Cir. 2019) (treating failure to train or supervise as the same claim); *Waller v. City & Cty. of Denver*, 932 F.3d 1277, 1284 (10th Cir. 2019) (municipal liability may take the form of failure to train or supervise, as long as the failure results from deliberate indifference). Plaintiff adequately pled the County's failure to supervise resulted in Plaintiff's constitutional violations. *See* Dkt. 202 ¶¶ 159-84; 264-74; 317-21. The County's deliberate indifference is shown by the fact that the need for supervision on the identified topics was obvious and the high risk of constitutional violations without such supervision. *Id*. In its brief, the County does not address failure to supervise—only failure to train. Dckt. 228. Thus, any argument for dismissal of Plaintiff's failure to supervise theory of municipal liability has been waived.

did nothing for more than seven years to address that risk."; *Woodward v. Correctional Medical Services of Illinois, Inc.,* 368 F.3d 917, 929 (7th Cir. 2004) (upholding a jury's *Monell* verdict against a jail's healthcare provider for an inmate suicide where the training on suicide prevention was so inadequate and widely ignored that the contractor was on notice that a constitutional violation was a highly predictable consequence of its failure to act.); *J.K.J. v. Polk Cnty.,* 960 F.3d 367, 380–81 (7th Cir. 2020); *Virgil v. City of Newport*, 545 F. Supp. 3d 444, 490 (E.D. Ky. 2021), *aff'd sub nom. Colemon v. City of Cincinnati*, No. 21-5968, 2023 WL 5095804 (6th Cir. Aug. 9, 2023) (denying summary judgment in a wrongful conviction case when law-enforcement failed to train officers on critical police functions).

Failure to train claims may be based on inadequate training in a specific aspect of an officer's job or no training at all. Both occurred here. Dkt. 202 ¶ 265 (County had a "total lack of policies, procedures, training, and supervision over Defendant Chapman's latent print analyses"); ¶ 269 (County "failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct"…). In *Virgil*, the district court rejected the County's argument that the district court should have granted summary judgment on plaintiff's theory that Newport failed to train its officers on a critical police function like disclosing exculpatory evidence. *Virgil*, 545 F. Supp. 3d at 490 (denying summary judgment in a wrongful conviction case when law-enforcement failed to train officers on critical police functions).  In doing so, the court reaffirmed its precedents holding that a municipality can be liable for failure to train on critical police functions.  The same must be true here.

Plaintiff's allegations are more than sufficient to survive the motion to dismiss on a single incident failure to train theory. The allegations are detailed, specific, and factual. As recounted below, Plaintiff alleges that the County provided no training to its officers in critical areas of

detectives' duties: 1) documenting and disclosing exculpatory evidence; 2) conducting forensic examinations of physical evidence; (3) and not creating reports without fabrication. Dckt. 202 ¶¶ 159-184, 264-288, 317-321. Not only did the County's final policymakers know about the need to provide training on these topics, *id*. ¶¶ 182; 264-67, but the situations in which an officer must decide how to handle these critical functions are recurring. *Id*. It is obvious that training officers on these topics is necessary and the highly predictable consequence of not training officers on these topics is the violation of citizens' constitutional rights. When determining whether a municipality has adequately trained its employees, "the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." *City of Canton*, 489 U.S. at 390.  As the Sixth Circuit explains:

> In their investigative capacities, police officers regularly uncover exculpatory materials. The Supreme Court has laid down very specific obligations of police officers on the disclosure of exculpatory materials. *See Brady*, 373 U.S. at 87 [ ]. Widespread officer ignorance on the proper handling of exculpatory materials would have the "highly predictable consequence" of due process violations.

*Gregory v. City of Louisville*, 444 F.3d 725, 753 (6th Cir. 2006).

The County fails to make any argument regarding why these areas: 1) documenting and disclosing exculpatory evidence; 2) conducting forensic examinations of physical evidence; (3) and not (4) creating reports without fabrication are not recurring tasks of police officers. *See* Dkt. 228, pp. 16-21.  Nor could it make any such argument as a matter of law. As a matter of fact, Plaintiff specifically pled it, Dckt. 202 ¶¶159-184, 264-288, 317-321, and it is also true as a matter of basic common sense. *See Iqbal*, 556 U.S. at 679 (whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."). Officers (especially detectives, like Defendant Chapman) need to be trained in their *Brady* obligations, how to properly conduct examinations of physical

14

evidence, testifying truthfully in criminal proceedings, and how to create reports without fabricating opinions because they encounter these issues on a recurring basis, and the failure of the County to give any training on these topics constitutes deliberate indifference. *See Gregory*, 444 F.3d at 754. The County's "policymakers know to a moral certainty that their employees will confront" situations where they have to handle, preserve, and disclose exculpatory evidence, conduct examinations of physical evidence, create reports that are accurate without fabrication, and testify truthfully in criminal proceedings. *Lance*, 985 F.3d at 802.

Indeed, in *Connick*, the Supreme Court contemplated the situation presented here: the failure to train officers on *Brady* obligations presenting a highly predictable danger of constitutional violations. *Connick v. Thompson*, 563 U.S. 51, 63-64 (2011). In *Connick*, the Court found no single-incident liability for failure to train prosecutors about *Brady* because prosecutors are lawyers and familiar with. *Id*. The Court specifically distinguished attorneys from police officers: "legal training is what differentiates attorneys from average public employees." *Id*. at 64 (cleaned up). The Court expressly stated that police officers are not equipped with the tools to find, interpret, and apply legal principles such as *Brady*: "The reason why the Canton hypothetical is inapplicable is that attorneys, unlike police officers, are equipped with the tools to find, interpret, and apply legal principles." *Id*. at 69- 70 (emphasis added); *see also id*. at 64 ("in the absence of training, there is no way for novice officers to obtain the legal knowledge they require."). The same goes for examining physical evidence, testifying truthfully, and creating reports that are accurate and without fabrication, recurring tasks of police officers. The County's failure to train and supervise its officers in how to properly perform these tasks was the moving force behind the violations of Plaintiff's constitutional rights. Dkt. 202 ¶ 286; 302.

Instead of addressing the specific topics on which Plaintiff alleges the County failed to train its officers and why the allegations insufficiently plead single-incident failure to train, Defendant's first argument completely ignores the factual allegations of Plaintiff's Complaint. Dckt. 228 at 18. According to the County, "mere allegations that Chapman was unqualified to perform a fingerprint analysis do not directly support a claim that Chapman violated Royer's constitutional rights." Dckt. 228 at 18. By making such an argument, the County disregards Plaintiff's actual failure to train theory: that the Elkhart County Sheriff's Department was aware of the duties of its employee Defendant Chapman, including regularly performing fingerprint analyses for the Elkhart Police Department, and failed to provide any police, procedures, training, and/or supervision of him on critical police functions. Dckt. 202, ¶¶ 182; 264-67.

Specifically, although Defendant Chapman was never qualified to conduct latent print comparisons, he did so falsely throughout the 1990s and in this case, resulting in Plaintiff's wrongful conviction. Dckt. 202, ¶¶ 180-83, 267. Just like in prior cases, Dismissed Defendants fed Defendant Chapman false information about their investigative theory and pressured him to form a specific opinion regarding Lana Canen's print. Dckt. 202, ¶ 179. Aware of Defendant Chapman's lack of qualifications, the pressure exerted on him to fabricate opinions, and his misconduct, no County supervisor sought to implement any supervision, training, policies, or procedures governing Defendant Chapman's ongoing work for the Elkhart Police Department. Dckt. 202, ¶¶ 166, 264-65. There was also no effort to rectify any such misconduct, as Defendant Chapman remained with the County and his misconduct went undisclosed to criminal defendants like Plaintiff, and he was permitted to act with impunity in criminal investigations. Dckt. 202, ¶ 268. In sum, Plaintiff's Complaint sets forth in detail how the County did not train officers on critical police functions, and because of that, Defendant Chapman was able to commit

such misconduct for decades on end. See Dckt. 202, ¶¶ 180-83; 264-67.  Defendant's argument simply ignores the above.  And for good reason, as it clearly meets the standard for survival.

The County next maintains that "[b]eing qualified to perform a fingerprint analysis is not the issue as to whether evidence was fabricated.  A highly qualified witness or an underqualified witness could both engage in fabrication of evidence."  Dckt. 228 at 18. This argument also misses the mark.  In every civil rights action under § 1983, plaintiffs must allege that the officer or governmental employee committed unconstitutional acts with a requisite state of mind above negligence (e.g., recklessly, knowingly, intentionally). *See, e.g., Daniels v. Williams*, 474 U.S. 327 (1986) (negligence not enough to state a § 1983 Fourteenth Amendment due process claim). Accepting the County's argument would mean that there could never be municipal liability on the basis of failure to train when there is an unconstitutional act by an officer. That is not the law.

In a final attempt to avoid the allegations contained in Plaintiff's Complaint, Defendant spends several pages discussing litigation filed by a different party, Lana Canen.  Dckt. 228 at 24-27.  There, Defendant regurgitates an argument from *Canen* involving Defendant Chapman's lack of qualifications.  *Id*.  This argument is a complete red-herring. Plaintiff's Complaint alleges – and discovery in this lawsuit has definitively proven, including admissions by Defendant Chapman himself – that Defendant Chapman intentionally fabricated the latent print opinion at the behest of other Defendants to falsely implicate Plaintiff (and his co-defendant) (Dckt. 202, ¶¶ 167-68) in a crime they did not commit, and he was enabled and encouraged to do so through the County's failures to train, supervise, and discipline Defendant Chapman as to critical police functions.  Dckt. 202, ¶¶ 180-83; 264-67.  So, while Defendant Elkhart County spends an inordinate amount of time discussing Defendant Chapman's qualifications to render an opinion –

and findings related to that – none of that is meaningful in the context of Plaintiff's *Monell* claim.

Defendant County failed to train and supervise Defendant Chapman, among others, on critical police functions. They are on the hook for the misconduct that flowed from those failures. As discussed in *Connick*, police officers are not lawyers. They are not equipped with the tools to find, interpret, and apply legal principles concerning *Brady v. Maryland*, 373 U.S. 83 (1963). *See Connick*, 563 U.S. at 69-70. Nor would police officers know how to document exculpatory evidence or conduct proper lineups and identification procedures that are not unduly suggestive without training. *See, e.g., Stovall v. Denno*, 388 U.S. 293, 302 (1967) (unduly suggestive lineup violates due process); *Foster v. California*, 394 U.S. 440 (1969) (unduly suggestive lineup where suspect stood out by his clothing and height); *United States v. Wade*, 388 U.S. 218, 232-33 (1967) (discussing ways in which a lineup may be suggestive). Without proper training on how to write reports, officers would not know how much information to include and that they need to include all of the information, even if they prove the ultimate opinion to be inconsistent with the police theory of the case (as Chapman's reports were). These are the types of gray areas that training makes less difficult for officers, particularly when an officer making the wrong choice would result in deprivation of citizens' constitutional rights. *See Lance*, 985 F.3d at 802.

In a case directly on point, *Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019), the Sixth Circuit found that the plaintiffs had presented sufficient evidence for a trial against Cleveland on its failure to train its officers on their *Brady* obligations in 1975. *Id.* at 835-37. In that case, detectives threatened a juvenile witness to falsely implicate the plaintiffs in a murder and forced him to sign a false statement. *Id.* at 803-05. The detectives

withheld the witness's exculpatory statements that he did not see the shooters and their own

coercion of the witness. *Id*. at 804-05; 814-15; 834. Cleveland argued that officers received

training on the general policies in their police manual. But the Sixth Circuit found, "those

rules could be read as insufficient to inform officers of their disclosure obligations, as none

of the rules in the Manual explicitly mandated disclosure of exculpatory witness statements

to prosecutors." *Id*. at 835. The court also noted the conflicting evidence in the record as to

the training officers received on their disclosure obligations, *id*., and held, "[a] reasonable

jury could interpret this testimony as indicating that officers received no training … in their

Brady obligations generally or in their obligation to provide witness statements to prosecutors."

*Id*. at 836. The court also found that there was sufficient evidence of deliberate indifference

because:

> the likelihood that the situation [i.e., a situation requiring police to handle exculpatory evidence] will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights mean that failing to train officers in their disclosure obligations demonstrates deliberate indifference to the highly predictable consequence that untrained officers will violate *Brady*.

*Id*. at 836 (cleaned up). Thus, the court reversed the grant of summary judgment. The analysis in

*Jackson* applies equally in this case.

### IV.    Not Only Has Plaintiff Sufficiently Pleaded His *Monell* Claim, but Defendants also Fully Understand the Viability of Such a Claim Through Discovery

#### A.    To the extent allegations in the Complaint are insufficient, amendment is entirely appropriate

To the extent that the Court finds any allegations insufficiently pleaded, Plaintiff

alternatively seeks leave to file an amended complaint. Amendment is appropriate where, as is

the case here, the parties are in the middle of discovery, counsel is on notice of and participating

in the ongoing discovery, and no prejudice against the defendant would occur by granting leave

to amend.  *See* Fed. R. Civ. P. 15(a); *Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 687 (7th Cir. 2004) ("'In the absence of any . . . undue delay, bad faith or dilatory motive . . . repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . . futility of amendment, etc.—the leave sought should, as the rules require, be freely given.'"  (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  *See Dubicz v. Commonwealth Edison Co.*, 377 F.3d 787, 793, n.1; 795 (7th Cir. 2004) (in holding that the district court abused its discretion when it denied plaintiffs' motion to amend, it was "important to emphasize that this litigation has never progressed beyond the pleadings stage. This is not the case where a plaintiff seeks to amend its complaint after the close of discovery or on the eve of trial").  *Cf. Hukic v. Aurora Loan Servs.*, 588 F.3d 420, 432 (7th Cir. 2009) (affirming the district court's decision to deny amendment where the plaintiff sought leave to amend "three days before the close of fact discovery"); *Sports Ctr., Inc. v. Brunswick Marine*, 63 F.3d 649, 652 (7th Cir. 1995) (affirming the district court's decision to deny amendment where the plaintiff sought leave to amend one week before trial).

Here, the parties are in the middle of discovery, with at least six months remaining.  Dckt. 198, p. 5. Completion of fact discovery is not until Jan. 15, 2025, and completion of all discovery is on April 1, 2025.  *Id.*  On June 21, 2024, the parties discussed logistics for nine remaining depositions, including the rest of Defendant Dennis Chapman's deposition, whose testimony is central to the claims against Defendant County. Should the Court find that any of Plaintiff's *Monell* claims against the County is insufficient, because there has been no undue delay, bad faith, previous failures to cure deficiencies through allowed amendments, or undue prejudice, allowing leave to amend to cure the insufficiency would be entirely proper and should "be freely given." *Foman*, 371 U.S. at 182 (quoting Fed. R. Civ. P. 15(a)).

## B. Defendant Elkhart County Well Understands the Contours of Plaintiff's Monell Claim

Should this Court find that amendment is necessary, Plaintiff can swiftly do so based upon evidence already obtained in discovery. Discovery demonstrates that the Elkhart County Sheriff's Department failed to train and supervise Defendant Chapman, and that those failures contributed to the violation of Plaintiff's constitutional rights. For starters, Defendant Chapman readily admits that he knowingly fabricated the latent print opinion in this case. Ex. 1, Chapman Dep. Tr. Specifically, Defendant Chapman admits that he left a range of "possible ridge count of 7-17" in his report because realized that Ms. Canen had a different number of ridges than the latent print from the crime-scene:

```
17  Q   And because you knew that the latent did not have
18      the same number of ridges as Ms. Canen, you wrote
19      in this report that the latent had a ridge count
20      of between 7 and 17, correct?
21  A   Correct.
22  Q   That's why -- because you knew that the latent
23      did not have the same number of ridge count as
24      Ms. Canen, that's why you wrote in here that the
25      latent had a possible ridge count of 7 to 17,
                                                    Page 178
1       correct?
2   A   Correct.
```

*Id*. at 177:7-178:2.

Defendant Chapman knew that the report would be used in a criminal investigation and to initiate charges. *Id*. at 178:9-14. And he testified to the substance of this report at Plaintiff's 2005 trial. *Id*. at 178:15-17. At the time Defendant Chapman committed this misconduct, he knew that a dissimilarity would have caused Ms. Canen to be excluded. *Id*. at 179:22-180:5. Even still, Defendant Chapman intentionally fabricated his false latent print opinion and buried that information from the State and defense. *Id*. at 179:5-18.

Critically, Defendant Chapman reveals that this misconduct occurred because of the County's failures to provide any supervision and training of him. *Id*. at 32. Defendant Chapman's revelations do not stand alone. Indeed, current Elkhart County Sheriff, Jeff Seigel, was Defendant Chapman's supervisor during the time when the underlying misconduct occurred. As Sheriff Siegel reveals, the Elkhart County Sheriff's Department had no: (1) policies, procedures, nor training in place that gave guidance to officers on critical functions (conducting latent print analysis, Ex. 2, Siegel Dep. at 18:1-20:15); (2) supervision of Defendant Chapman regarding his latent print analysis, *Id*. at 21:1-22:17; and (3) oversight nor supervision of Defendant Chapman on his fingerprint analysis or other agencies, *Id*. at 91:21-93:16. While discovery is ongoing, Plaintiff has already amassed significant evidence linking Elkhart County's failure to supervise and train Defendant Chapman to the violation of Plaintiff's constitutional rights.

## V.    Conclusion

Plaintiff's Complaint sufficiently sets forth the basis of liability against Defendant Elkhart County for its role in depriving Plaintiff of his constitutional rights. As Plaintiff's Complaint makes clear – and discovery has proven – Defendant Elkhart County completely failed to supervise and train Defendant Chapman on critical police functions, and because of that, Plaintiff lost nearly two decades of his life. Dckt. 202. For the reasons stated above, Defendant Elkhart County's Motion to Dismiss should be denied.

Respectfully submitted,


/s/ Elliot Slosar
*One of Plaintiff's Attorneys*

Jon Loevy
Elliot Slosar
Margaret Campbell
Kathryn Montenegro
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607
(312) 243-5900

## <u>CERTIFICATE OF SERVICE</u>

I, Elliot Slosar, an attorney, certify that on July 19, 2024, I delivered by electronic means a copy of the foregoing motion to all counsel of record.


<u>/s/ Elliot Slosar           </u>