UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

ANDREW ROYER,

    Plaintiff,

    v.

VICKI E BECKER,

    Defendant.

Case No. 3:22-CV-254-CCB

**OPINION AND ORDER**

Plaintiff Andrew Royer sued Defendant Vicki Becker under 42 U.S.C. § 1983, alleging violations of his Fifth and Fourteenth Amendment rights. Ms. Becker has now moved for summary judgment on all claims.

**BACKGROUND**

The Court reviews the record by construing all facts in the light most favorable to the nonmoving party, Plaintiff Andrew Royer, and drawing all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003). The Court draws the following undisputed facts from the record and the parties' summary judgment briefing.[1] At all relevant times, Ms. Becker was the Chief Deputy Prosecutor for the Elkhart County Prosecutor's Office. (ECF 264 ¶ 1). On November 29, 2002, 94-year-old Ms. Sailor was found dead in her apartment in Elkhart, Indiana. (ECF 271 ¶ 9). The

---

[1] To dispute a fact, the party opposing summary judgment must identify the fact as disputed and cite to evidence which raises a genuine dispute. N.D. Ind. L. R. 56-1(b)(2)(C); Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Thus, a fact is undisputed if the party either noted it as such, or failed to cite any evidence which raised a genuine dispute.

Elkhart Police Department determined that she had been murdered, and began an investigation. (ECF 264 ¶ 5).

During the investigation, Elkhart Police took a statement from a Ms. Nina Porter in September 2003. (ECF 271 ¶ 201). During the interview, Elkhart Police detectives provided Ms. Porter with a false statement implicating Ms. Lana Canen and Plaintiff Mr. Royer in the murder. (ECF 271 ¶ 203). The detectives offered her a $2,000 award for cooperating in the statement and repeating it at trial. (*Id.* ¶¶ 204–05). Ms. Porter eventually complied, making false statements that implicated Ms. Canen and Mr. Royer in Ms. Sailor's death. (*Id.* ¶¶ 201–03).

The day after Ms. Porter's interview, Detective Conway questioned Mr. Royer at the Elkhart Police Department on September 3, 2003. (ECF 264 ¶ 13). At the time of this questioning, several members of the homicide unit were aware that Mr. Royer was mentally disabled. (ECF 271 ¶ 5). Prior to Mr. Royer's recorded statements, there was an unrecorded interview which lasted for nearly four hours. (ECF 271 ¶ 15). During that time, Detective Conway repeated details about the crime to Mr. Royer while accusing him of murdering Ms. Sailor. (ECF 271 ¶ 17). Mr. Royer initially maintained his innocence but eventually confessed after repeated questioning. (ECF 271 ¶ 15). He then made his confession in a recorded statement. (ECF 254 ¶ 21).

Detective Conway later testified that during the interrogation, Mr. Royer was "very mentally fatigued," "breaking down," and had a "clouded memory." (ECF 271 ¶ 18). Another detective observing the interrogation later referred to it as "super leading" and among the worst he had ever seen. (ECF 271 ¶¶ 31–32). Other officers also

questioned whether the statement was reliable in light of Mr. Royer's mental disability. ( ECF 271 ¶ 26). Detective Conway also recognized that some of Mr. Royer's statements were inconsistent with the physical evidence of the crime. (ECF 271 ¶ 25).

Defendant Ms. Becker was present at the police station during Mr. Royer's interrogation. (ECF 271 ¶ 57). However, she was never physically present in the interrogation room. (ECF 264 ¶ 22). While at the station, Ms. Becker was reviewing police reports in an office where she could not watch or listen to the interview. (*Id.* ¶ 29). However, she would travel back and forth from the office to a "video room" where a live feed of the interrogation was playing. (*Id.* ¶ 29). She would do this on her own— no one came to retrieve her when she was out of the video room. (*Id.* ¶ 30).

Ms. Becker does not recall which portions of the interrogation she was present for. (ECF 264 ¶ 25). Still, according to a detective present in the video room, she was present for at least some parts of the interrogation that the officer found concerning. (ECF 271 ¶ 27).

Earlier in the investigation, Ms. Becker was present at an August 2003 meeting in which she and several detectives decided to send the fingerprints found at the crime scene (also known as "latent" prints) to Detective Dennis Chapman for analysis. (ECF 271 ¶ 103). In the following months, the complete fingerprint records (also known as "standards") of Ms. Canen, Mr. Royer, and all of Ms. Sailor's caregivers were also sent to Detective Chapman. (ECF 271 ¶¶ 104–05). In total, Detective Chapman received 13 latent prints and 16 fingerprint standards for analysis. (ECF 271 ¶ 107).

The decision to send the fingerprints to Detective Chapman was a deviation from the standard procedure, which was to send the prints to the Indiana State Police ("ISP") for analysis. (ECF 262-8 at 47). However, another detective present at the meeting testified that they chose to send the prints to Detective Chapman because they had recently sent a large quantity of evidence to ISP, and there were concerns about backlog. (ECF 262-8 at 84–85). Furthermore, Detective Chapman had previously represented to the Department that he was both qualified and willing to perform fingerprint analysis comparing latent prints to standards. (ECF 262-6 at 33, 37, 97–100). Detective Chapman's analysis found a match between one of the latent prints at the crime scene and Ms. Canen's print standard on record. This also implicated Mr. Royer in the crime, because on the prosecution's theory of the case, he was connected to the crime through Ms. Canen. (ECF 271 ¶ 118).

Mr. Royer's state postconviction review proceedings revealed that Detective Chapman was not qualified to compare latent prints to standard prints. He had worked for several years at the FBI as a fingerprint examiner. (ECF 271 ¶ 80). But his role had only been to classify and compare print standards. He had done no work that qualified him to compare standard prints with the latent prints from a crime scene. (*Id.* ¶¶ 80–82). The postconviction review also confirmed that Detective Chapman's match analysis of Ms. Canen had been erroneous. (ECF 271 ¶ 39). There is no evidence that anyone at the meeting or Detective Chapman himself did not think that he was qualified to review and analyze the prints, or that Detective Chapman intentionally mis-analyzed the prints.

At Mr. Royer's trial, the defense was not made aware of any of these reliability issues with evidence implicating Ms. Canen and Mr. Royer in the crime. (ECF 271 ¶ 209). Following trial, Mr. Royer and Ms. Canen were convicted of Felony Murder in Indiana state court on August 10, 2005. (ECF 264 ¶ 55). The Indiana Court of Appeals granted review in 2021. (ECF 264 ¶¶ 56–57). During the postconviction proceedings, the evidentiary problems with Mr. Royer's trial were found to be sufficiently severe to call into question Mr. Royer's conviction. The postconviction court found that "the newly discovered evidence, when considered together and viewed in light of the entire trial record, is of such value that it 'will probably produce a different result upon retrial.'" (ECF 262-17 at 52) (quoting *Carter v. State*, 738 N.E.2d 665, 671 (Ind. 2000)). The postconviction court's decision was affirmed on appeal. (ECF 264 ¶ 62) (reported as *State v. Royer*, 166 N.E.3d 380, 386 (Ind. Ct. App. 2021)(exhibited as ECF 262-10)).

Following that vacatur, Mr. Royer filed a § 1983 suit against several of the detectives and Ms. Becker in their individual capacities, as well as the City and County of Elkhart, the Elkhart Sheriff's Department, and the Elkhart Prosecutor's Office. (ECF 1). However, his claims against all defendants except Ms. Becker were voluntarily dismissed. (ECF 87;127;181; 242). Thus, in Mr. Royer's most recent amended complaint, only Ms. Becker remains as a defendant. (ECF 244). Mr. Royer alleges that Ms. Becker violated his constitutional rights through coercive interrogation (Count I), failure to intervene in a coercive interrogation (Count II), and conspiracy to deprive him of his rights (Count III). Ms. Becker has moved for summary judgment on all of Mr. Royer's claims. (ECF 253).

STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

To determine whether a genuine dispute of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Moore*, 351 F.3d at 282. The court must not "sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). The court does not have to conduct research or develop arguments for parties either. *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011); *see also United States v. Beavers*, 756 F.3d 1044, 1059 (7th Cir. 2014) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived.").

"To defeat a motion for summary judgment, the non-moving party cannot rest on the mere allegations or denials contained in his pleadings, but must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000) (internal quotations omitted), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*,

834 F.3d 760 (7th Cir. 2016). "Summary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (quotations omitted); *see also Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010).

ANALYSIS

### A. Coercive Interrogation and Failure to Intervene (Counts I and II)

Mr. Royer alleges that Ms. Becker participated in or failed to intervene to prevent an unconstitutional coercive interrogation during Mr. Royer's September 3, 2003 interview at the Elkhart Police Station.

### 1. Statute of Limitations

First, Ms. Becker argues that any Fourteenth Amendment claims based on Mr. Royer's interrogation are untimely because they accrued at the interrogation in 2003, not at the vacatur of his original conviction. If this were true, then those claims would be barred by Indiana's two-year statute of limitations. *See Justice v. Justice*, 303 F. Supp. 3d 923, 938 (S.D. Ind. 2018). In support of her argument, she cites a 2014 Seventh Circuit case, *Moore v. Burge*, which explained that "claims based on out-of-court events . . . accrue as soon as the constitutional violation occurs." 771 F.3d 444, 446 (7th Cir. 2014). But this rule exists alongside the Supreme Court's decision in *Heck v. Humphrey*, which holds that when a state prisoner seeks damages under § 1983 suit, the district court must dismiss the complaint if the judgment would "necessarily imply the invalidity of [the prisoner's] conviction or sentence." 512 U.S. 477, 487 (1994). For those claims, the

cause of action "does not accrue until the conviction or sentence has been invalidated." *Id.* at 490. It is unlikely that *Burge* was declaring an exemption to *Heck* for any and all out-of-court activities—something that would appear to be inconsistent with the reasoning in *Heck* itself. *See Robb v. Norfolk & W. Ry. Co.*, 122 F.3d 354, 361 (7th Cir. 1997) ("[O]ur obligation is to follow Supreme Court precedent, not contract or expand it" quoting *United States v. Gillespie*, 974 F.2d 796, 804 (7th Cir.1992))). Instead, the court appears to have been explaining that, because out of court activities often "do[] not . . . imply the invalidity of any particular conviction," they are not categorically barred by *Heck*. *Burge*, 771 F.3d at 446. But this would still be limited by *Heck*'s core rule: claims based on activities that *do* implicate a conviction's validity are barred. *Burge* affirmed this principle. *See id.* at 447 (noting that when a conviction's validity is implicated by misconduct, then "*Heck* indeed bars relief until a conviction is set aside.").

In any case, reading *Burge* to draw an exemption to *Heck* would contradict both contemporaneous Seventh Circuit decisions, *see Matz v. Klotka*, 769 F.3d 517, 530 (7th Cir. 2014), and the Supreme Court's 2019 clarification on the scope of *Heck*, *McDonough v. Smith*, 588 U.S. 109, 117–18 (2019). This has been noted by district courts in the years since the Supreme Court's decision. *See Savory v. Cannon*, 532 F. Supp. 3d 628, 635 (N.D. Ill. 2021) (without addressing the issue, noting the possibility that *Burge* did not "survive[] *McDonough*, which holds that the *Heck* bar applies when a claim, as pleaded, would necessarily imply the invalidity of criminal proceedings or a conviction"). *See also Johnson v. Winstead*, 900 F.3d 428, 437 (7th Cir. 2018) (pre-*McDonough* case noting that "our cases . . . have sent mixed signals on the methodological question" of how to

apply *Heck*, and contrasting the approach in *Burge* with other approaches taken by Seventh Circuit panels). In the absence of other guidance, this Court interprets *Burge* in the way that is most consistent with circuit and Supreme Court precedent. *See Gates v. Montalbano*, 550 F. Supp. 81, 83 (N.D. Ill. 1982); *Robb*, 122 F.3d at 361.

Here, Mr. Royer's claims implicate the validity of his criminal proceedings. The same activities that form the basis for his current § 1983 claim were the basis for the state court's vacatur of his conviction. *See Royer*, 166 N.E.3d at 386. Presumably, Mr. Royer would not have been able to bring these claims in a § 1983 action before that date, precisely because they would have created "parallel criminal and civil litigation over the same subject matter and the related possibility of conflicting civil and criminal judgments." *McDonough*, 588 U.S. at 118. (citing *Heck*, 512 U.S. at 484–85). When Mr. Royer's conviction relief became final in 2021, he was no longer barred by *Heck*, and the statute of limitations began to run. His original complaint was filed in 2022. (ECF 1). Thus, Mr. Royer is not time-barred from bringing his claims. *See Royer*, 166 N.E.3d at 386.

### 2. Immunity

Ms. Becker has asserted both absolute and qualified immunity against Mr. Royer's claims. The Court will address each in turn.

### a. Absolute Immunity

A prosecutor is protected by absolute immunity when she is acting within the scope of her prosecutorial duties. *Imbler v. Pachtman*, 424 U.S. 409, 420–24 (1976). "Whether or not an action falls within the scope of his prosecutorial duties depends

upon its function." *Fields v. Wharrie,* 672 F.3d 505, 510 (7th Cir. 2012). Prosecutorial

immunity derives from the prosecutor's role as a public servant operating within the

judicial system and is "based upon the same considerations that underlie the common-

law immunities of judges and grand jurors acting within the scope of their duties."

*Imbler*, 424 U.S. at 422–23. Thus, absolute immunity applies when prosecutors are

engaging in their core advocacy activities. *Martin v. Goldsmith*, 2025 WL 3769723 (7th

Cir. Dec. 31, 2025) ("Absolute immunity extends to actions involving the initiation of a

prosecution, the presentation of the state's case in court, or actions preparatory for these

functions.") (citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 278 (1993)).

At the same time, "the actions of a prosecutor are not absolutely immune merely

because they are performed by a prosecutor." *Buckley*, 509 at 273. Prosecutors may

engage in actions that do not fall within their role as advocate, but within an

administrative or investigatory role. When a prosecutor "functions as an administrator

rather than an officer of the court" or "performs the investigative functions normally

performed by a detective or police officer, it is 'neither appropriate nor justifiable that,

for the same act, immunity should protect the [prosecutor] but not the [detective or

police officer].'"*Buckley*, 509 U.S. at 273 (quoting *Hampton v. Chicago*, 484 F.2d 602, 608

(7th Cir. 1973)). "There is a difference between the advocate's role in evaluating

evidence and interviewing witnesses as he prepares for trial, on the one hand, and the

detective's role in searching for the clues and corroboration that might give him

probable cause to recommend that a suspect be arrested, on the other hand." *Buckley*,

509 U.S. at 273.

Here, no facts suggest that Ms. Becker did anything to involve herself in Mr. Royer's interrogation. There is no evidence that she had any interactions with Mr. Royer or any of the officers involved in his interrogation. There is no evidence that she knew anything about the circumstances of the initial Porter interview which implicated Mr. Royer. (ECF 252-1 at 140). She was not in the same room as Mr. Royer at any point during the interrogation. (ECF 254 ¶22). Rather, she was present for some indeterminate period of time in a "video room" where there was a feed of Mr. Royer's interrogation. During other periods of time, she was doing work in an office where she had no access to the interview feed. (ECF 264 ¶ 29). And even for the interview segments in which she was in the video room, it is unclear whether she was paying attention to the livestream or which parts of the interview she observed. (ECF 271 ¶ 27; 254 ¶ 25).

The line between prosecutorial and investigatory capacity is defined by a prosecutor's actions. *See Buckley*, 509 U.S. at 260. Thus, in every case cited by Mr. Royer, the prosecutors engaged in some act that involved them in the investigation. *See Orange v. Burge*, No. 04 C 0168, 2008 WL 4443280, at *10 (N.D. Ill. Sept. 29, 2008) (no absolute immunity when prosecutor "coached [defendant] regarding the false confession [defendant] was to deliver in exchange for the cessation of the alleged torture sessions"); *Patrick v. City of Chicago*, 213 F. Supp. 3d 1033, 1045 (N.D. Ill. 2016) (no absolute immunity on summary judgment when there was evidence that prosecutors presented plaintiff with a prefabricated confession and "began negotiating with Plaintiff what role he would be portrayed as playing in the murders"); *Serrano v. Guevara*, No. 17

CV 2869, 2020 WL 3000284, at *23 (N.D. Ill. June 4, 2020) (no absolute immunity when a witness stated that he "heard and saw [attorneys] plotting to frame [plaintiff]").

In fact, absolute immunity can still apply even when the prosecutor *does* directly interact with the criminal defendant. In *Hunt v. Jaglowski*, 926 F.2d 689, 693 (7th Cir. 1991), the Seventh Circuit held that an attorney was protected by complete immunity when he entered a cell to take a confession because the independent evaluation of statements is within the scope of the prosecutorial role. This was true even when the plaintiff alleged that he was tortured before and after the confession and informed the attorney that he had been beaten at the time the attorney took his statement. As in *Hunt*, while there may be evidence of independent police misconduct, there is no evidence that Ms. Becker went beyond the prosecutorial role of "gathering and evaluating evidence in order to make a prosecutorial decision." *Hunt,* 693 (quoting *Boyd v. Vill. of Wheeling*, No. 83 C 4768, 1985 WL 2564, at *11 (N.D. Ill. Sept. 12, 1985)). It is likely that Ms. Becker is protected by absolute immunity.

### b. Qualified Immunity

Even if complete immunity does not apply, Ms. Becker is also protected by qualified immunity, which is "the norm for executive officers." *Buckley*, 509 U.S. at 273 (internal quotations omitted) (quoting *Malley v. Briggs*, 475 U.S. 335, 340 (1986)). To overcome qualified immunity, a plaintiff must show that (1) "a statutory or constitutional right was violated," and (2) the "right was clearly established at the time of the relevant conduct." *Doe v. Gray*, 75 F.4th 710, 716 (7th Cir. 2023).

Thus, under a qualified immunity analysis, the main question is whether or not Ms. Becker violated a right that was clearly established at the time of Mr. Royer's interrogation. To be "clearly established" for purposes of qualified immunity, a right "must have a sufficiently clear foundation in then-existing precedent." *Campbell v. Kallas*, 936 F.3d 536, 545 (7th Cir. 2019) (quoting *D.C. v. Wesby*, 583 U.S. 48, 63 (2018)).

As noted above, Mr. Royer does not allege or provide facts showing that Ms. Becker directly participated in the interrogation in any way. Thus, any rights violations by Ms. Becker would need to rest on the failure to intervene claim. But even if a jury could infer that Ms. Becker observed the problematic portions of Mr. Royer's interrogation, Mr. Royer must first show that her actions violated a clearly established right. *See Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005).

Mr. Royer does not make a fabrication claim, but only a coercion claim. (ECF 244 at 46). This distinction is important— the Seventh Circuit has warned precisely against reframing coercion claims as fabrication claims. *Anderson v. City of Rockford*, 932 F.3d 494, 510 (7th Cir. 2019) ("[C]oercion and fabrication are not synonyms."). A fabrication claim involves "testimony that is made up" in which "the police or prosecutor manufactures evidence that he knows to be false." *Petty v. City of Chicago*, 754 F.3d 416, 422 (7th Cir. 2014) (quoting *Fields v. Wharrie*, 740 F.3d 1107, 1110 (7th Cir. 2014)). Coercion, on the other hand, involves no judgment or knowledge about the truth of the testimony. Rather, "[c]oerced testimony is testimony that a witness is forced by improper means to give; the testimony may be true or false." *Petty*, 754 F.3d at 422 (quoting *Fields*, 740 F.3d at 1110).

13

There is some language in the complaint suggesting that the confession was "fabricated evidence." (ECF 244 at 1). But Mr. Royer does not provide any evidence which supports the key element of a fabrication claim—that Detective Conway *knew* that the confession was false. *See Petty*, 754 F.3d at 422. In fact, Mr. Royer alleges that Detective Conway attempted to elicit the confession "regardless of whether it was true or false." (ECF 244 at 18). Nor does Mr. Royer allege that Detective Conway fed any false facts about the crime to Mr. Royer. The only facts that Detective Conway is shown to have fed Mr. Royer were *true* facts about the crime. (ECF 255 at 16–17). Thus, there is no fabrication claim based on the interrogation.

Mr. Royer also argues that Detective Conway violated a clearly established right against "psychological coercion." (ECF 270 at 11–12). But this frames the issue at far too high a level of generality—something that the Supreme Court has explicitly warned against in the qualified immunity context. *See Campbell*, 936 F.3d at 545 ("clearly established law cannot be framed at a 'high level of generality'") (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). It is true that some specific interrogation tactics have been identified as psychologically coercive. *See e.g.*, *Hurt v. Wise*, 880 F.3d 831, 846 (7th Cir. 2018) (making threats against the suspect's family is unconstitutional psychological coercion). But to show that the right was clearly established, tactics similar to the ones used against Mr. Royer would need to be identified as unconstitutional.

Apart from conclusory allegations of "psychological coercion," the actual tactics that Detective Conway is alleged to have used seem to be (1) leading questioning, (2) accusing Mr. Royer of committing the crime during the interrogation, and (3) engaging

in an extended and strenuous interrogation session. (ECF 271 ¶¶ 14–19). Mr. Royer does not cite any caselaw that clearly establishes a constitutional norm against these tactics as used by Detective Conway.

A district court in this circuit held just two years ago that there is no clearly established norm against "suggesting possible scenarios or methods by which a crime was committed" in order to "pressure the suspect to adopt [those proposed scenarios] as his own." *Olson v. Cross*, 714 F. Supp. 3d 1034, 1050 (N.D. Ill. 2024). Thus, there is no clearly established norm against Detective Conway's leading questioning. And accusations can be equally permissible. *See United States v. Kontny*, 238 F.3d 815, 817 (7th Cir. 2001) ("Trickery, deceit, even impersonation do not render a confession inadmissible, certainly in noncustodial situations and usually in custodial ones as well, unless government agents make threats or promises."); *Palmer v. City of Decatur*, No. 17-CV-3268, 2021 WL 7707939, at *29 (C.D. Ill. Sept. 20, 2021) ("there is nothing unconstitutional about confronting a witness or suspect with direct questions or statements concerning the police's theory of the case") (citing *Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 346 (7th Cir. 2019))). Nor does Mr. Royer show that the length of the interrogation (4 hours, followed by a recorded statement, ECF 271 ¶ 15) rendered it impermissibly coercive. *See e,g.*, *Janusiak v. Cooper*, No. 17-C-514, 2019 WL 78953, at *5 (E.D. Wis. Jan. 2, 2019) ("[w]hile the interrogation was long, no Supreme Court precedent compels a ruling that a 7-hour interrogation must be deemed coercive due to its length alone"), *aff'd*, 937 F.3d 880 (7th Cir. 2019).

Mr. Royer cites observer statements that the interrogation was "super leading" and "the worst interrogation [they] had ever witnessed." (ECF 264 at 6). But these comments alone cannot create a genuine issue of material fact. First, it is not clear that these comments reflected the observer's evaluations of the *constitutionality* of the interview—an interrogation could be "bad" for several reasons besides crossing the threshold of constitutionality. *See Walters v. Nystuen*, No. 1:20-CV-319-RLM-SLC, 2023 WL 4541956, at *5 (N.D. Ind. June 14, 2023) ("Even if [the officer's] questioning had been unprofessional or unethical, unprofessional and unethical tactics used by police don't rise to the level of a constitutional violation."). And even then, those observer's subjective evaluations cannot replace this Court's own analysis. *See Adams v. Bruno*, No. 10 C 2068, 2011 WL 4729793, at *5 (N.D. Ill. Oct. 6, 2011) ("the subjective opinions of the officers do not control the Court's objective analysis").

Mr. Royer repeatedly emphasizes that he "had the mind of a child." (ECF 270 at 8, 10, 18). This is presumably meant to suggest that even if Detective Conway's techniques were not necessarily impermissible against a person of sound mind, they were rendered impermissible by Mr. Royer's mentally disabled status. But this distinction further suggests that this case's facts are outside the realm of clearly established law, and thus inside the scope of qualified immunity's protection. The Supreme Court has held that previously unaddressed "unique facts and circumstances" cannot be covered by clearly established law under a qualified immunity analysis. *White v. Pauly*, 580 U.S. 73, 80 (2017). Mr. Royer's argument is precisely that his mental disability was a "unique fact" which rendered the interrogation unconstitutional. But

that line of reasoning cannot extend the scope of clearly established law to encompass his situation. *Id.*

Thus, the argument that Detective Conway's interrogation was clearly established as unconstitutional in 2003 is shaky. Even if it was, that cannot by itself deny qualified immunity to Ms. Becker. Ms. Becker stands at a further degree of attenuation—she did not actually engage in the interrogation. (ECF 254 ¶¶ 22–25). Mr. Royer cites no law clearly establishing that Ms. Becker had a constitutional duty to intervene in this situation.

This is not to say that prosecutors *never* have a duty to intervene—Mr. Royer cites several cases in which prosecutors were denied qualified immunity for failing to intervene. (ECF 270 at 38–39). But in all of those cases, the problematic activity was far more obviously egregious, and the prosecutors were far more directly involved in the interrogation. *See Rivera v. Lake Cnty.*, 974 F. Supp. 2d 1179, 1186 (N.D. Ill. 2013) (prosecutors urged on a four-day interrogation with more than 24 hours of nearly constant questioning, in which investigators screamed at plaintiff, failed to provide *Miranda* warnings and ignored his request to remain silent and cease questioning, lied that the plaintiff had failed polygraph tests, and tied plaintiff's limbs together in a "hog tie."); *Wilkinson v. Ellis*, 484 F. Supp. 1072, 1077 (E.D. Pa. 1980) (prosecutors failed to intervene when police officers beat the defendant while in their presence); *Saunders v. City of Chicago*, No. 12-CV-09158, 2013 WL 6009933, at *2 (N.D. Ill. Nov. 13, 2013) (officers threatened physical violence with firearm and ripped earring from plaintiff's ear in a confession that was recorded solely by prosecutor). And if, as Plaintiff's

argument suggests, Mr. Royer's mental disability was the critical factor in rendering the interrogation unconstitutional, there is a further issue with the intervention claim—no evidence indicates that Ms. Becker was aware of Mr. Royer's mental disabilities at the time of the interrogation. (ECF 262-6 at 338–42; 262-2 at 17).

Moreover, with one out-of-circuit exception, Plaintiff's duty-to-intervene cases cite a Seventh Circuit case from 2012 as the rationale for their extension of a duty to intervene from officers to prosecutors. *Saunders*, 2013 WL at *10; *Rivera*, 974 F. Supp. 2d at 1191 (all citing *Whitlock v. Brueggemann*, 682 F.3d 567 (7th Cir. 2012)). But *Whitlock* was decided almost a decade after the events in this case. Thus, it cannot be relevant to the determination of whether Ms. Becker's duties were clearly established at the time of the interrogation in 2003. *See Lovett v. Herbert*, 907 F.3d 986, 993 (7th Cir. 2018).

Nor did *Whitlock* even address how it applied to failure-to-intervene claims specifically. Other district courts in this circuit before and after *Whitlock* have found that prosecutors have no duty to intervene at all; *Gordon v. Devine*, No. 08 C 377, 2008 WL 4594354, at *17 (N.D. Ill. Oct. 14, 2008); *Andrews v. Burge,* 660 F. Supp. 2d 868, 876 n.6 (N.D. Ill. 2009); *Hobbs v. Cappelluti*, 899 F. Supp. 2d 738, 773 (N.D. Ill. 2012).

Thus, Mr. Royer's efforts to show a clearly established duty to intervene by Ms. Becker fail in several regards. First, he does not show controlling authority or a "robust consensus of cases of persuasive authority." *Est. of Davis v. Ortiz*, 987 F.3d 635, 638 (7th Cir. 2021) (quoting *Wesby*, 583 U.S. at 63 (2018)). Second, even tangentially relevant cases rely on precedent that occurred after the events in this case, making them inapposite for the question of whether the right was clearly established here. *See Lovett*,

907 F.3d at 993. And finally, even those cases are factually inapposite to the situation here. *See Day v. Wooten*, 947 F.3d 453, 461 (7th Cir. 2020). Thus, while it is likely that Ms. Becker is protected by absolute immunity, she is certainly protected by qualified immunity. *See Doe*, 75 F.4th at 716.

If immunity applies, then all relevant charges against a defendant must be dismissed as a matter of law. *Hampton*, 484 F.2d at 607 ("In those situations in which immunity is properly claimed, the action is defeated at the outset."). Thus, this Court dismisses all of Mr. Royer's coercive interrogation and derivative failure to intervene claims against Ms. Becker (Counts I and II).

## B. Conspiracy (Count III)

Mr. Royer also alleges that Ms. Becker conspired to violate his constitutional rights in the interrogation and also by engaging Detective Chapman to fabricate false prints that implicated him in the crime.

In order to show conspiracy, a party must show "an express or implied agreement among defendants to deprive plaintiff of his or her constitutional rights." *Scherer v. Balkema*, 840 F.2d 437, 442 (7th Cir. 1988). Thus, a plaintiff must provide facts from which a jury could infer a "meeting of minds." *Goldschmidt v. Patchett*, 686 F.2d 582, 585 (7th Cir. 1982). These facts can be "direct allegations of an agreement, like an admission by a defendant that the parties conspired," but they are "more often, circumstantial allegations of an agreement, which are claimed facts that collectively give rise to a plausible inference that an agreement existed." *Alarm Detection Sys., Inc. v. Vill.*

*of Schaumburg*, 930 F.3d 812, 827 (7th Cir. 2019) (citing *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628–29 (7th Cir. 2010)).

### 1. Conspiracy: Coercive interrogation

Here, Mr. Royer's alleged facts do not even show that Ms. Becker was aware of the entirety of what occurred at the interview, let alone that she had any communications with the detectives before or during the interrogation. (ECF 264 ¶¶ 25, 29). Ms. Becker was not physically present in the room during any part of the interview, and there is no evidence that she somehow facilitated it. (ECF 264 ¶¶ 21–25; 262-6 at 146–50). Thus, there is insufficient evidence to show a genuine issue of material fact as to whether there was a "meeting of the minds" between Ms. Becker and any individuals who executed the interview. *See Goldschmidt*, 686 F.2d at 585.

### 2. Conspiracy: Fabrication of Evidence

As a threshold matter, Ms. Becker argues that Mr. Royer is procedurally barred from making a conspiracy claim based on fabrication of evidence because he previously settled with Detective Chapman, the alleged co-conspirator who violated his underlying right. Ms. Becker argues that this is because there is no "standalone claim" for conspiracy under § 1983. (ECF 272 at 13). By this, she means that Mr. Royer cannot make a conspiracy claim without also making a separate cause of action alleging a constitutional violation. (*Id.*). However, Ms. Becker is incorrect in this articulation of the requirements for conspiracy. It is true that Mr. Royer would not be able to make a conspiracy claim without also alleging which specific right was violated. But this only

means that the plaintiff must show the elements of the underlying rights violation. It does *not* mean that the plaintiff must maintain an active separate cause of action for it. See *Indiana Land Tr. #3082 v. Hammond Redevelopment Comm'n*, 107 F.4th 693, 700 (7th Cir. 2024). Mr. Royer's claim is not barred on this ground.

Mr. Royer alleges that Ms. Becker conspired with Detective Chapman to generate a false fingerprint analysis implicating Mr. Royer in the crime. (ECF 244 at 26). In order to make a Fourteenth Amendment fabrication claim under § 1983, a party must show that defendants intentionally falsified evidence, leading to a deprivation of the plaintiff's liberty. *See Heidelberg v. Manias*, 503 F. Supp. 3d 758, 786 (C.D. Ill. 2020).

It is uncontroverted that Detective Chapman was not qualified to perform the fingerprint analysis that implicated Mr. Royer, and that his analysis was flawed. (ECF 271 ¶ 80; 264 ¶ 59). But Mr. Royer does not create any genuine issues of material fact from which a jury could infer that Ms. Becker conspired with Detective Chapman to violate Mr. Royer's constitutional rights. Mr. Royer presents no evidence that even detective Chapman knew that his analysis was flawed at the time he testified, let alone that he intentionally forged false evidence. *See Chicago Hous. Auth. v. Fed. Sec., Inc.*, 161 F.3d 485, 488 (7th Cir. 1998) ("Section 1983 requires proof of intentional acts to deprive victim of her civil rights.").

Mr. Royer argues that because Detective Chapman admitted that his initial analysis was flawed and incorrect, "his opinion was fabricated." (ECF 270 at 14). But that is incorrect. Fabrication requires that the individual "knowingly falsified" the evidence. *Patrick v. City of Chicago*, 974 F.3d 824, 835 (7th Cir. 2020). Mr. Royer does not

point to any evidence suggesting that Detective Chapman's flawed analysis was knowing or intentional.

But that's just the underlying rights violation claim. Mr. Royer's claim—that Ms. Becker conspired with Detective Chapman to enact the alleged violation—is even shakier. Mr. Royer does not provide any evidence that Ms. Becker communicated with Detective Chapman before the decision meeting. He does not provide any evidence that Ms. Becker was aware of the insufficiency of Detective Chapman's credentials at the time he was selected during the meeting. The only thing Mr. Royer can show is that Ms. Becker was present at a meeting in which Detective Chapman was selected to analyze the prints. (ECF 271 ¶ 99). Another detective present at that meeting testified that the decision to send the prints to Chapman rather than the Indiana State Police was made because "we had already sent a large amount of evidence to the state police and I believed him to be a qualified examiner to my knowledge at that point in time." (*Id.* at 39). There is no evidence that Ms. Becker played a decisive role in that meeting or did anything beyond agree to Detective Chapman's selection.

Mr. Royer does not submit any facts suggesting that Detective Chapman or Ms. Becker intended to create a false fingerprint identification, that Ms. Becker was aware of Detective Chapman's qualification issues, or that they communicated in any way before the meeting where he was selected. Thus, it would be "only speculation or guessing" for a jury to infer that there was a coordinated effort between Detective Chapman and

Ms. Becker to falsify evidence in order to frame Mr. Royer. *Davis v. Carter,* 452 F.3d 686, 697 (7th Cir. 2006). Summary Judgment is appropriate on this claim. [2]

CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment on all counts. (ECF 253). Plaintiff's claims are **DISMISSED.** The clerk is **DIRECTED** to close this case.

SO ORDERED on March 3, 2026.

_/s/ Cristal C. Brisco_
CRISTAL C. BRISCO, JUDGE
UNITED STATES DISTRICT COURT

---

[2] The parties also debate whether or not Defendant Becker's participation in the fingerprint analysis selection meeting was protected by immunity. But it is unnecessary to analyze that question because Plaintiff has failed to create a genuine issue of material fact whether there was a conspiracy in the first place. *See Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, 735 F. Supp. 2d 856, 903–04 (N.D. Ill. 2010).